**F I L E D**
CLERK, U.S. DISTRICT COURT

6/25/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____AH_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2025 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:25-cr-00651(A)-JFW |
| Plaintiff, | F I R S T |
| | S U P E R S E D I N G |
| v. | I N D I C T M E N T |
| AMAYA ARMSTEAD, aka "Lady Duck," KENYONDRE YOUNG, aka "Yunkg Poke," CAMERON LOCKETT, aka "Jankie," aka "Hesopayed," NAZIZ HARRIS, aka "richoffdabitchh," aka "n4presidential," aka "N4," CALEED MOUTON, aka "Poo," aka "Pooski," NAKAHLI MILLER, aka "FY3," AVERY AMOAKO, aka "Handz," aka "Hands Secure Payments," JARED EVANS, aka "JMoney," MATHEW BROOKS, aka "Buddha," aka "Vermont Star," JORGE MELENDEZ, aka "Crim Style," DERRAIL ROBINSON, aka "P4K," aka "Popkorn," | [18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. §§ 1591(a)(1), (b)(1), (b)(2), (c), 1594(a): Sex Trafficking and Attempted Sex Trafficking of Children or By Force, Fraud, or Coercion; 18 U.S.C. § 2251(a), (e): Sexual Exploitation of Children; 18 U.S.C. § 2423(a): Transportation of a Minor for Sex Trafficking; 18 U.S.C. § 1591(a)(2), (b): Benefitting from Sex Trafficking; 18 U.S.C. § 1952(a)(3)(A): Use of an Interstate Facility in Aid of Racketeering; 21 U.S.C. § 846: Drug Trafficking Conspiracy; 18 U.S.C. § 932(b)(1), (b)(2): Conspiracy to Straw Purchase Firearms; 18 U.S.C. § 1951(a): Hobbs Act Robbery; 18 U.S.C. § 1956(a)(1)(A)(i): Promotional Money Laundering; 18 U.S.C. § 1956(a)(1)(B)(i): Concealment Money Laundering; 18 U.S.C. § 1956(a)(1)(B)(ii): Money Laundering to Avoid Transaction Reporting Requirements; 31 U.S.C. |

JALON PHILLIPS,
  aka "WayMo,"
  aka "PayMo,"
  aka "Chop Em,"
  aka "Waylon,"
MAURICIO ULLOA-FRANCO JR.,
  aka "Ese Face,"
  aka "Face,"
BRYAN ISREL,
  aka "4Loc,"
  aka "Figga Foe,"
  aka "Notorious FIG,"
  aka "Tiny Lok,"
LAGRANE LENOX,
  aka "King Blue,"
  aka "Blue,"
TEJOHN GRAY,
  aka "Tiny3,"
TOMMY CROCKHAM,
  aka "Tommy Gunz,"
MUKESHKUMAR RAMBHAI AHIR,
  aka "Ockie,"
  aka "Ocky,"

          Defendants.

§ 5324(a)(3): Structuring Transactions to Evade Reporting Requirements; 18 U.S.C. §§ 924, 934, 981(a)(1)(C), 982, 1594(d), 1963, 2253, and 2428, 21 U.S.C. § 853, 28 U.S.C. § 2461(c), and 31 U.S.C. § 5317: Criminal Forfeiture]

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1962(d)]

[DEFENDANTS ARMSTEAD, YOUNG, LOCKETT, HARRIS, MOUTON, MILLER, AMOAKO, EVANS, BROOKS, MELENDEZ, ROBINSON, PHILLIPS, ULLOA-FRANCO JR., ISREL, LENOX, GRAY, AND CROCKHAM]

A.   THE ENTERPRISE

At times relevant to this Indictment:

1.   Defendants AMAYA ARMSTEAD, also known as ("aka"), "Lady Duck," KENYONDRE YOUNG, aka "Yunkg Poke," CAMERON LOCKETT, aka "Jankie" and "Hesopayed," NAZIZ HARRIS, aka "richoffdabitchh," "n4presidential," and "N4," CALEED MOUTON, aka "Poo" and "Pooski," NAKAHLI MILLER, aka "FY3," AVERY AMOAKO, aka "Handz" and "Hands Secure Payments," JARED EVANS, aka "JMoney," MATHEW BROOKS, aka

"Buddha" and "Vermont Star," JORGE MELENDEZ, aka "Crim Style," DERRAIL ROBINSON, aka "P4K" and "Popkorn," JALON PHILLIPS, aka "WayMo," "PayMo," "Chop Em," and "Waylon," MAURICIO ULLOA-FRANCO JR., aka "Ese Face" and "Face," BRYAN ISREL, aka "4Loc," "Figga Foe," and "Notorious FIG," LAGRANE LENOX, aka "King Blue" and "Blue," TEJOHN GRAY, aka "Tiny3," and TOMMY CROCKHAM, aka "Tommy Gunz," and others known and unknown to the Grand Jury, were members and associates of an organization known as the "Hoovers."

2.    The Hoovers organization was a criminal street gang engaged in a variety of illegal activities, including, but not limited to, sex trafficking of minors; sex trafficking through force, fraud and coercion; narcotics trafficking; money laundering; assaults; robberies; kidnappings; and other violent crimes.  The Hoovers operated in the Central District of California and elsewhere.  The Hoovers organization, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the Hoovers Enterprise" or "the Enterprise"), that is, a group of individuals associated in fact. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objects of the Enterprise.  The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

3.    Cash App is a licensed money services business, which is a financial institution pursuant to 31 U.S.C. § 5312(a)(2)(R), which is engaged in, or the activities of which affected, interstate or foreign commerce.

B.    BACKGROUND OF THE RACKETEERING ENTERPRISE

4.    The Hoovers were a criminal street gang formed in the late 1970s and later became a part of the larger "Westside Crips" umbrella.  The Westside Crips eventually split into two factions -- the Gangster Crips and the Neighborhood Crips -- and the Hoovers aligned themselves with the Gangster Crips.  From the late 1970s to the early 1990s, the Hoovers were known as "Hoover Gangster Crips" or "HGC."  To differentiate themselves from other gangs in the area and to establish their own reputation, Hoovers factions or "sets" dropped the "Gangster Crip," from their identity and became the "Hoover Criminal Gangsters" or simply the "Hoover Criminals" or "HCG."

 

Several enemy gangs of the Hoovers also "claim Crip," and the Hoovers believed it no longer made sense for them to hold onto the "Crip" faction identity.  The more sovereign Hoovers gang identity gave rise to the especially dangerous Hoovers mentality of being an "Everybody Killer," or "EBK," meaning that members will kill anyone, or commit violence against anyone, who stands in their way of making money or promoting the Enterprise.  This created an atmosphere of intimidation that allowed the Hoovers to operate with virtual impunity.  Moreover, the pride and power of being associated with the Hoovers enabled and empowered its members and associates to commit criminal offenses that

enriched the individuals and furthered the reputation and objectives of the Enterprise.

5. The Hoovers had many rivals, including but not limited to, the Rollin 30s, Rollin 40s, Rollin 60s, Rollin 90s, Rollin 100s, 5-7 Neighborhood Crips, Menlo Gangster Crips, 102 Budlong Gangster Crips, Hard Time Hustler Crips, 105 Underground Crips, East Coast Crips, 6-2 Brims, and Van Ness Gangster Brims. Rivalries stemmed from a history of feuds over territory for sex trafficking, territory for narcotics sales, rap music, violence on the streets, and feuds between gang members while they were incarcerated.

6. The Hoovers had approximately 1,800 members. The Hoovers claimed territory in the City of Los Angeles bounded by Vernon Avenue to the North, Imperial Highway to the South, the 110 Freeway to the East, and Vermont Avenue to the West. South of Manchester Avenue, Hoovers territory extended further west to Normandie Avenue. There were other pockets of Hoovers territory disjointed from this main area, including a portion of Hoovers territory east of the 110 Freeway, often referred to by Hoovers as the "Midwest." The Hoovers' territory largely encompassed the "Figueroa Corridor," a 3.5 mile stretch of Figueroa Street between approximately Slauson Avenue and Century Boulevard, notorious for sex trafficking, prostitution, and other related crimes. The Hoovers had strongholds over specific hotels and motels in their territory, including the Stadium Inn & Spas, located at 10411 South Vermont Avenue, Los Angeles (the "Stadium Inn"), and the One Ten Motel located at 700 West Florence Avenue, Los Angeles (the "One Ten Motel").

7. The Hoovers comprised numerous subsets, or "sets," which corresponded to streets within Hoovers territory, including, 43rd,

52nd, 59th, 74th, 83rd, 92nd, 94th, 107th, and 112th Street Hoovers. Each of these sets had some distinct nuances for their identities, but they all ultimately represented the "H," or the Hoovers, first and foremost.  For example, a Hoover from 112th Street was considered an "Eleven-Deuce Hoover."  Hoovers paid homage to the Enterprise as a whole and to their specific set.  While some Hoovers sets were friendly with other gangs, such as Grape Street Crips, Black P. Stones, 5-1 Troubles, Shotgun Crips, Swan Bloods, Kitchen Crips, and "Eight Trey" Gangster Crips, they were ultimately most loyal to the Hoovers Enterprise.

 

8.    The Hoovers adopted the Houston Astros Major League Baseball team logo as their primary symbol, a white "H" in front of an orange star.  The designated color of the Hoovers was orange. Hoovers wore Houston Astros attire and the color orange to show their membership, and to make their presence in their territory known, to maintain a stranglehold on criminal activities therein.

6



9.    Hoovers also signified their membership in the Enterprise with tattoos reading "H," a star, or other variations of the gang's name, streets, sets, or their monikers.

10.    Additionally, each set of the Hoovers also had their own emblems.  For example, 7-4 Hoovers would use the San Francisco Giants Major League Baseball team's orange "SF" logo to signify "Seven Four."  5-2, 9-2, and 11-2 Hoovers would wear the Detroit Tigers Major League Baseball team's "D" logo to signify "Deuce."

11.    As another means of intimidation and to show membership in the Hoovers Enterprise, Hoovers members flashed hand signs, including using their pointer and middle finger to point down, and their thumb in middle, effectively making an "H."  Some Hoovers also flashed a

number associated with their set, for example a 4 or a 5.  Gang hand signs showed a member's allegiance, membership, and loyalty to the Enterprise.

   

12.  The Hoovers utilized graffiti or tagging to mark their territory.  Tagging included images of the Hoovers hand signs, the Houston Astros star, and the words "Hoover," "Hoovers," and "Vers," which is a shortened version of "Hoovers."  Tagging often included the number associated with their Hoovers set, for example, a tag

might include "512" which showed the 5-1 Troubles and the 5-2 Hoovers were in good standing with one another.  Another common number shown in tagging was "716," which represented the sum of all Hoovers set numbers.  Hoovers tagging avoided using specific letters, including "S," because "S" was a letter associated with an enemy of the Hoovers, the Sixties.  Conversely, Hoovers would often add letters, such as "K," to indicate they are "Killers," or include "NK" which is shorthand for "Neighborhood Killer" or "Nap Killer" ("Nap" is a disrespectful reference to Neighborhood Crip gangs, referencing the word "nappy").

 

13.  To further demonstrate their membership in and allegiance to the Hoovers Enterprise, members would often refer to each other as "Groove," or "Groov," as homage to the gang's origins as "Hoover Groovers."  Members often referred to each other by their gang monikers and might not know each other's legal names.

14.  The Hoovers did not have a formal procedure for joining the gang.  Some members were admitted by virtue of familial connections or geographic location.  Other members were "jumped in," which

required the new member to be physically beaten by more established members of the gang to demonstrate toughness and resilience.

15. Each Hoovers set had senior members who could give orders to other members. The status of a senior member stemmed from "work" the Hoover "put in" for the gang. Widely reputed members such as defendant ARMSTEAD were considered "trophies" in the Hoovers gang, that is, some of the most active Hoovers members, and were permitted to give orders to other members in their set. Despite this, Hoovers members also worked individually to accomplish the Hoovers' control of criminal activities in their territory.

16. Associates of Hoovers from other gangs could obtain blessing from the Hoovers to commit crimes in Hoovers territory. Sometimes this involved paying "taxes" to operate in the territory; it might involve being "jumped into" the gang; and other times it involved developing a reputation or "rep" for being a prolific, particularly violent, or skilled criminal, or assisting well-regarded Hoovers in their criminal activities.

17. At times, various Hoovers sets would have disputes or "beef" with one another. But when it was time to "put in work" on behalf of the gang -- including committing crimes such as shooting at rivals, carrying out robberies, or extorting local businesses -- the Hoovers came together under the concept that "no one is bigger than the program," referring to the overall Enterprise.

18. Older members of the gang would serve as mentors, referred to as "big homies," within the Enterprise. If a gang member was under the wing of a "big homie," that member took the moniker of the big homie, but as "little homie." The next generation often took the designation "tiny homie," and the generation after that took

"infant."  The "little," "tiny," and "infant" homies all respected the "big homie."

19.  The younger generation of Hoovers were indiscriminately violent against anyone they considered to be an "opp," short for "opponent," that is, someone who disrespected the Hoovers' name or interfered with the Enterprise's moneymaking criminal activities. Some in the old generation of Hoovers lamented that the young generation lacked a code of conduct.  Many of the older generation Hoovers believed that the younger generation resorted to "gun play," or shootings, far too quickly when a simple assault would have sufficed.  But the concept of acting "For the Greater Good" of the Hoovers controlled.

20.  Hoovers largely controlled sex trafficking and prostitution in the Figueroa Corridor.  Members and associates of the Enterprise acted as "pimps" (a person who befriends, recruits, trains, and/or panders a person for prostitution) to promote and manage sex trafficking.  Hoovers pimps exploited commercial sex acts of victim sex workers, including minors, for the pimp's own personal gain and on behalf of the Enterprise.  Many Hoovers pimps portrayed a lavish lifestyle on social media to entice and recruit their sex workers with displays of money, flashy jewelry, fancy cars, designer clothing, and parties, among other things.  Hoovers pimps often recruited sex trafficking victims through displays of affection and intense attention to gain control and create rapid emotional dependency (a psychological manipulation referred to as "love bombing"), only to exploit them for financial gain through commercial sex.  To maintain control, some Hoovers pimps alternated between love bombing, withholding of affection, beratement and embarrassment,

violence, and threats of violence, all to instill fear and dependency in their victims.  Some Hoovers pimps posted photos and videos of guns, their Hoovers affiliation, or harassment or abuse of their victims to gain their victims' compliance.  Hoovers pimps also enticed and controlled victims with offers of drugs and by fostering their dependency on drugs.  Withholding drugs once a victim was addicted was also a powerful means of control.







21. To start working for a pimp, a sex trafficking victim was required to pay a "choosing fee," that is, a payment for the privilege to work for that pimp. Victims were taught that once they "chose" a pimp, they were not permitted to speak to or even look at other pimps, and they would face grave consequences for violating this rule. Similarly, if a victim attempted to leave her pimp, she was required to pay an exit fee or face grave consequences.

22. The Enterprise adhered to the rules of "The Game," which a pimp would teach any sex trafficking victim the pimp "turned out," that is, introduced to sex work. Hoovers pimps taught their victims to maintain absolute loyalty, often branding their victims with tattoos of their monikers to claim them as chattel. Pimps dictated how a victim interacted with clients ("Johns" or "tricks"), the other sex workers who worked for the pimp (referred to as "wifeys"), and with the pimp. A victim was required to remit all proceeds from commercial sex dates to the pimp. A victim who did not, or who violated other rules of "The Game" (referred to as being "out of pocket"), faced discipline, including assaults; berating and public humiliation; withholding of affection, drugs, or food; draconian "overtime" hours; or firing. In exchange, a pimp was expected to provide protection from other pimps and Johns, clothing, housing, food, and beauty services. Sex workers were required to have their hair and nails done at all times because their grooming was a status symbol that reflected on their pimp.

23. Members of the Enterprise facilitated each other's pimping, often referred to as "The Game," by managing and monitoring each other's sex trafficking victims; pooling resources to rent motel rooms for commercial sex dates; disciplining each other's victims to

intimidate the victim and show that the pimp's power extends beyond their own "arm's reach"; driving each other's victims to and from "blades," streets where victims solicited commercial sex dates; sourcing third parties to create online profiles for sex advertisements; and sending each other money via financial applications, including Cash App, or rideshare rides to transport each other's sex workers for commercial sex.  Enterprise members worked collectively to maintain a steady presence at Hoovers strongholds, especially at hotels, like the Stadium Inn, where they engaged in sex trafficking, to keep competitors out of their territory, and to further their monopoly on lucrative criminal activities in their territory.  To further each other's sex trafficking, Enterprise members apprised each other of the conditions on various blades, notifying each other of when there were minimal customers (sometimes referring to a blade as "dry"), when there were recruiting opportunities (sometimes referring to "new feet"), and when law enforcement presence was high (sometimes referring to a blade as "hot").

24.  Generally, if a person who was not a Hoovers gang member wanted to pimp or sex traffic in Hoovers territory, including on the Figueroa Corridor, they were required to be in good standing with the Hoovers or have Hoovers' permission to do so.  If a non-Hoover pimp sex trafficked in Hoovers territory without the Hoovers' authority to do so, that pimp risked being robbed and assaulted by Hoovers pimps, having his sex worker robbed and assaulted by Hoovers pimps, or having his sex worker "knocked," meaning recruited away from him to work for a Hoover or Hoover-associated pimp.

25.    Hoovers Enterprise members also worked together to recruit new victims.  Recruitment occurred on social media or in person, and focused on vulnerable minor girls and young women, particularly those who had financial and/or emotional struggles or had run away from home.  To recruit sex workers, Enterprise members utilized various methods of manipulation, including false promises of a luxurious lifestyle, intimidation, and actual or threatened violence.  Pimps supplied their victims with various drugs that served different purposes.  For example, oxycodone tended to make victims more compliant, lowered their inhibitions, and kept them warm when soliciting dates on cold nights.  Stimulants such as amphetamines could make a victim more productive and curb her appetite, allowing the pimp to increase profit margins by increasing revenue from more dates while spending less on food to sustain her.

26.    Hoovers also continually engaged in distributing controlled substances, including, but not limited to, oxycodone, promethazine with codeine, benzodiazepine, alprazolam, and fentanyl.  Hoovers often referred to promethazine with codeine as "tris," shorthand for "Tris Pharma, Inc.," the pharmaceutical company that manufactured promethazine with codeine.  They often sold entire bottles of promethazine with codeine, or "lines," a unit referring to the line on the dosage cup.  They often referred to oxycodone pills as "Percs," "Perks," or "Yercs," which are all shorthand for Percocet, a brand name for oxycodone pills.  Hoovers illegally diverted pharmaceutical drugs by recruiting fake patients to obtain and fill prescriptions for highly-sought-after controlled pharmaceuticals, purchased the drugs from the fake patients, then sold the drugs at a

profit.  Enterprise members regularly distributed large quantities of drugs to each other and to others.

27.  The Enterprise maintained a stronghold over certain local businesses that promoted the pattern of crimes committed by the Enterprise, including the House of Hotties, at 8501 South Figueroa Street, Suite 103 in Los Angeles ("House of Hotties"), which was owned and operated by Hoovers and Hoovers associates.  House of Hotties was a clothing store that primarily sold sex work outfits, and Hoovers enterprise members frequently dressed their trafficking victims for work with its offerings.  If a Hoovers member wanted to purchase clothing outside of business hours, they could contact the store owners or managers to open the store specifically for them.  Additionally, Hoovers also used the store for drug transactions and stashing contraband.  Hoovers members guarded the store wearing Hoovers colors to deter theft.  Shoplifters were assaulted, and the assaults were recorded and posted to social media to deter theft, aggrandize the Hoovers name and reputation for toughness and violence, and reinforce the Hoovers territory.



28.    Hoovers were known to utilize Cash App and Apple Pay as means of receiving and transferring criminal proceeds.  The vanity names on these financial accounts often referenced a Hoovers member's moniker.  Hoovers often directed their sex trafficking victims to deposit the proceeds of their sex work into the Hoovers member's Cash App account.  The Hoovers member would then use those proceeds to further promote their criminal activities, such as arranging Uber rides for sex trafficking victims, procuring hotel rooms for dates, and paying for food or condoms.  Sometimes Hoovers directed sex workers to send Cash App payments to a different Hoovers member, who then funneled the money to the intended recipient, to layer illegal proceeds transactions and frustrate efforts to trace victims' proceeds to their pimp.  Hoovers also accepted Cash App payments when they sold drugs.

29.    To support their human trafficking and drug trafficking activities, and to maintain control over their claimed "territory," the Enterprise maintained a ready supply of firearms.  Hoovers members shared these firearms and stashed them for one another. Members proudly displayed these firearms in social media posts to maintain and promote the Enterprise's reputation for violence, to intimidate the general community and the women and girls they sought to sex traffic, and to deter rival gang members who threatened to encroach on their territory or knock their sex workers.  The prolific and publicized possession of firearms allowed Hoovers to maintain exclusive control of its territory for illicit purposes.

17





30.  Hoovers members also engaged in acts of violence against members of the community; sex workers who acted "out of pocket," that is, disobeyed their pimp; and rival gang members in the Enterprise's territory.  Participation in violent acts increased one's reputation in the Enterprise and thus expanded a member's opportunity to profit from illegal activities in the territory.  Additionally, by committing violent acts, Hoovers enhanced the gang's overall reputation for violence, which intimidated citizens and chilled crime

reporting, thus allowing Enterprise members to continue their criminal activity.

31.  Many Enterprise members identified as rappers and produced rap music and rap videos.  These songs and videos often glorified the Hoovers, the pimping lifestyle, narcotics sales, and firearm possession, thereby further elevating the reputation of the Enterprise and catalyzing recruitment of sex trafficking victims.



X P4K (Baby Stone Gorillas) X ILLAH - "Real Life" (Official Music Video)



Tr3yway6k x Ese Face x Poke and the Hoovers present "THE HOOVAS" (Official Video)

19

32.   Some Enterprise members did not claim the Hoovers name, but participated in and contributed to the Enterprise, including by "putting in work," which involved criminal activities including shooting or assaulting enemies of the Hoovers; committing robberies; obtaining firearms; distributing drugs; disciplining, recruiting, or trafficking minors or adults through force, fraud, and coercion; or providing enforcement or look outs at Hoovers strongholds.

C.    THE PURPOSES OF THE ENTERPRISE

33.   The purposes of the Enterprise included, but were not limited to, the following:

a.    Enriching Enterprise members through, among other things, recruiting and maintaining juvenile and adult females through force, fraud, or coercion to engage in commercial sex work; transporting sex workers across state lines to engage in prostitution; distributing illegal narcotics; kidnapping; money laundering; robberies; and conducting other profit-driven illegal activities in Los Angeles and elsewhere;

b.    Maintaining control over illegal activities occurring in Hoovers "territory" within Los Angeles, including keeping the public-at-large in fear of the Enterprise, and in fear of its members and associates through threats of violence and actual violence;

c.    Controlling commercial sex work in Hoovers territory, including in the Figueroa Corridor, through intimidation, violence against sex workers operating in the Figueroa Corridor without a trafficker in the Enterprise, violence against rivals who attempted to sex traffic in the Figueroa Corridor or recruit away sex workers belonging to Enterprise members, and congregation in the Figueroa Corridor to show a strong and consistent Hoovers presence; and

20

d.    Preserving, protecting, and expanding the power of the Enterprise by broadcasting acts and threats of violence on social media platforms to reach the broader public and elevate the Hoovers reputation for violence.

D.    THE MEANS AND METHODS OF THE ENTERPRISE

34.    The means and methods by which defendants and other Enterprise members and associates conducted and participated in the affairs of the Hoovers Enterprise included the following:

a.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking of minors by targeting and recruiting children in the foster care system, runaways, and children who grew up in and around the Figueroa Corridor, where commercial sex was normalized and highly visible, among others;

b.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking of minors by providing them with false identification cards to facilitate interstate travel and to present to law enforcement if they were caught performing commercial sex;

c.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking of minors and young adults by projecting a lavish lifestyle, real or illusory, in person and on social media to recruit vulnerable persons and dupe them to believe they too would enjoy that lifestyle if they worked for an Enterprise pimp;

d.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, and coercion by utilizing terror and intimidation tactics, such as forming "pimp circles" where several Enterprise members closely

21

encircled a victim, aggressively attempted to make eye contact, and prevented the sex trafficking victim from leaving until she "chose" one of the pimps by looking them in the eye;

e.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, and coercion by kidnapping sex workers who were not controlled by a Hoovers pimp, bringing them back to Hoovers territory, and forcing them to work for a Hoovers pimp.

f.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, and coercion by threatening physical violence or perpetrating physical violence on the victim as a means of discipline or enlisting another Enterprise member to assault the victim;

g.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, and coercion by posting to social media videos and photographs of their assaults on others to intimidate their victims and ensure their compliance in performing commercial sex for their pimps' and the Enterprise's enrichment;

h.    Enterprise members conspired to commit, attempted to commit, and committed sex trafficking through force, fraud, and coercion by pimping their victims at certain Hoovers strongholds, such as the Stadium Inn, where they maintained control over their victims with the steady presence of other Hoovers members, often wearing Hoovers gang colors and attire, creating an atmosphere of intimidation and an invisible perimeter to prevent victims from leaving;

i.    Enterprise members transported minors and adults across the country to sex traffic them, including throughout California, Arizona, Colorado, Nevada, Illinois, Nebraska, Pennsylvania, Florida, and New York, among other states;

j.    Enterprise members conspired to commit, attempted to commit, and committed drug trafficking of controlled substances, including oxycodone, promethazine with codeine, benzodiazepine, alprazolam, and fentanyl, providing each other with drugs to sell to third parties and to distribute to sex trafficking victims to gain their compliance and breed addiction, making them more compliant and reliant on their traffickers;

k.    Enterprise members conspired to commit, attempted to commit, and committed drug sales to Johns via their sex trafficking victims to extract greater profits from commercial sex dates;

l.    Enterprise members directed their sex trafficking victims to remit all commercial sex proceeds to their trafficker via cash or other financial banking applications, such as Cash App and Apple Pay.  Some Enterprise members put their Cash App or Apple Pay accounts on their victims' phones and disguised their profile in their victim's name and photograph to make the Johns believe that they were paying the sex worker when in reality the funds were going directly to the pimp;

m.    Enterprise members knowingly conducted financial transactions, including over Cash App, which involved the proceeds of sex trafficking and drug trafficking, with the intent to promote and conceal their criminal activities;

n.    Enterprise members conspired to commit, attempted to commit, and committed commercial robberies by storming retail stores

23

in groups during business hours and taking by force or threat of force luxury products that they then sold for profit; and

o.    Enterprise members committed, attempted to commit, and threatened to commit acts of violence to protect and expand the Enterprise's territory and criminal operation, and to intimidate the general public.  They often posted videos and photographs of these threats and violence to social media to magnify their effect.



ARMSTEAD        YOUNG        LOCKETT        HARRIS

MOUTON        MILLER        AMOAKO        EVANS

24



BROOKS        MELENDEZ        ROBINSON        PHILLIPS

ULLOA-FRANCO JR.        ISREL        LENOX        GRAY

CROCKHAM

E.    THE RACKETEERING CONSPIRACY

35.    Beginning no later than in or around February 2021 and continuing through June 25, 2026, in Los Angeles County, within the

Central District of California, and elsewhere, defendants ARMSTEAD, YOUNG, LOCKETT, HARRIS, MOUTON, MILLER, AMOAKO, EVANS, BROOKS, MELENDEZ, ROBINSON, PHILLIPS, ULLOA-FRANCO JR., ISREL, LENOX, GRAY, and CROCKHAM, and others known and unknown to the Grand Jury, each being employed by and associated with the Hoovers Enterprise, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Hoovers Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), which pattern of racketeering consisted of:

  a. Multiple acts involving:

   i. Dealing in controlled substances, chargeable under California Penal Code, Sections 11370, 11351, 11350, 11352, 11377, 11378, 182, 664, 21a, and 31;

   ii. Robbery, chargeable under California Penal Code, Sections 182, 211, 664, 21a, and 31; and

   iii. Kidnapping, chargeable under California Penal Code, Sections 207(a), 664, 182, 21a, and 31.

  b. Multiple acts indictable under:

   i. Title 18, United States Code, Section 1591 (relating to sex trafficking of children or by force, fraud, or coercion);

   ii. Title 18, United States Code, Section 2423 (relating to the transportation of minors for criminal sexual activity);

iii. Title 18, United States Code, Section 2421 (relating to the transportation of adults in interstate commerce for prostitution or sexual activity);

iv.  Title 18, United States Code, Section 2422 (relating to coercion and enticement);

v.  Title 18, United States Code, Section 1952 (relating to racketeering);

vi.  Title 18, United States Code, Section 1951 (relating to interference with commerce by threats or violence);

vii. Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments);

viii.   Title 18, United States Code, Section 932 (relating to straw purchasing of firearms); and

ix.  Title 18, United States Code, Section 1028 (relating to fraud and related activity in connection with identification documents).

c.  Multiple offenses involving the distribution of controlled substances in violation of Title 21, United States Code, Sections 841, 846, and 859.

36.  It was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

F.  OVERT ACTS

37.  On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants ARMSTEAD, YOUNG, LOCKETT, HARRIS, MOUTON, MILLER, AMOAKO, EVANS, BROOKS, MELENDEZ, ROBINSON, PHILLIPS, ULLOA-FRANCO JR., ISREL, LENOX, GRAY, and

CROCKHAM, and others known and unknown to the Grand Jury, committed the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:    On an unknown date, at least four women were branded with tattoos of defendant ARMSTEAD's moniker, "Lady Duck."






Overt Act No. 2:    On an unknown date, at least two people were branded with tattoos of defendant AMOAKO's moniker, "Handz."



Overt Act No. 3:    On an unknown date, at least three people were branded with tattoos of a symbol or wording that defendant ISREL used to identify himself.

  

### 1.    2021: Enterprise Members Sex Trafficked, Recruited and Maintained Sex Workers, and Trafficked Drugs

Overt Act No. 4:    On February 9, 2021, while driving in a car together, defendants ARMSTEAD and EVANS possessed with the intent to distribute promethazine, carisoprodol, counterfeit oxycodone that in fact contained fentanyl, Xanax, a scale, and more than $9,000 in cash.

Overt Act No. 5:    On February 11, 2021, defendant ULLOA-FRANCO JR., defendant EVANS, and other unindicted Hoovers gang members appeared in a music video for a song entitled, "THE HOOVAS," in which the rappers, including defendant ULLOA-FRANCO JR., conveyed in coded language that they acquired guns, killed their rivals, and invoked the Hoovers' reputation to induce females into sex trafficking.

Overt Act No. 6:    On April 18, 2021, defendant ISREL physically assaulted his sex worker Victim 1 in Las Vegas, Nevada, striking her with a closed fist in the back of the head.

Overt Act No. 7:    On May 16, 2021, using coded messages on Instagram, defendant ISREL recruited an unidentified female to work

for him, boasting that he was building a new stable of women and claiming that he had a problem with one of his previous sex workers. The unidentified female offered to beat up the problematic sex worker, but defendant ISREL, using coded language, advised that he would catch her and assault her himself.

Overt Act No. 8:    On May 31, 2021, using coded language on Instagram, defendant CROCKHAM posted a drug advertisement offering to sell oxycodone pills at 30 milligram strength.

Overt Act No. 9:    On August 19, 2021, using coded language on Instagram, defendant CROCKHAM posted a drug advertisement offering to sell promethazine with codeine.

Overt Act No. 10:    On September 4, 2021, using coded text messages, defendant AMOAKO ridiculed his unidentified sex trafficking victim for thinking that she only needed to pay him one time and warned her to watch her mouth before he "breaks her jaw."

Overt Act No. 11:    On September 6, 2021, using coded text messages, defendant AMOAKO told an unidentified victim he would get her more condoms when she finished using the three condoms she had.

Overt Act No. 12:    On September 26, 2021, using coded language on Instagram, defendant CROCKHAM posted a drug advertisement offering to sell a full prescription pint of promethazine with codeine for $1,400.

Overt Act No. 13:    On December 9, 2021, defendant ARMSTEAD possessed with the intent to distribute promethazine, carisoprodol, oxycodone, hydrocodone, and $6,000 in cash.

**2.    2022: Enterprise Members Sex and Drug Trafficked and
Attempted to Kidnap Victims for Sex Work**

(a)    <u>Enterprise Members Recruited Sex Workers, Distributed
Drugs, and Brandished Guns to Elevate the Hoovers
Reputation for Violence</u>

<u>Overt Act No. 14</u>:   On January 19, 2022, defendant CROCKHAM posted a video on his Instagram story showing him driving a car while an unidentified co-conspirator in the passenger seat held a gun in his lap and threw gang signs.

<u>Overt Act No. 16</u>:   On May 5, 2022, to promote his own reputation as a pimp and elevate the reputation of the Hoovers Enterprise, defendant CROCKHAM posted a photograph on Instagram showing him fanning a large amount of cash.  A "crown" emoji in the photograph shows that defendant CROCKHAM self-identified as a pimp.

<u>Overt Act No. 17</u>:   On June 22, 2022, using coded language in Instagram messages, defendant ISREL told another Instagram user that he beats up his sex workers with his words, instead of his hands.

<u>Overt Act No. 18</u>:   On June 28, 2022, using coded text messages, defendant AMOAKO told an unidentified person he just sold oxycodone.

<u>Overt Act No. 19</u>:   On July 4, 2022, using coded text messages, defendant AMOAKO told an unidentified person that he was selling pills, believed to be oxycodone, on Manchester and Figueroa.

<u>Overt Act No. 20</u>:   On July 5, 2022, using coded text messages, defendant AMOAKO told an unidentified person that he had oxycodone for sale.

<u>Overt Act No. 21</u>:   On July 8, 2022, using coded language in Instagram messages, defendant ISREL attempted to recruit a sex worker by explaining he only beat sex workers when they stole from him or

31

disrespected him, but not when they failed to generate a certain amount of money.

Overt Act No. 22:  On July 16, 2022, defendant CROCKHAM posted an Instagram story paying homage to the Hoovers with an image setting forth all the Hoovers sets by number and set moniker, with a message at the bottom reading, "716 Gang or Don't Gang," pledging loyalty to the Hoovers.

(b)   Defendant GRAY Attempted to Kidnap Victims for Sex Trafficking

Overt Act No. 23:  On April 21, 2022, defendant GRAY and two unindicted co-conspirators drove into the area of West 6th Street and North G Street, in San Bernardino, California, a street notorious for prostitution activities.

Overt Act No. 24:  On April 21, 2022, defendant GRAY and two unindicted co-conspirators followed suspected sex workers on a known blade in San Bernardino, pulled over their car, and attempted to force two female victims into their car.  Defendant GRAY grabbed one victim, but she broke free.  Then defendant GRAY reversed the car to position it closer to his co-conspirator, who was restraining another victim.  Defendant GRAY exited the car and helped his co-conspirator physically force the woman into the car.  The woman ultimately broke free and ran away.

(c)   Defendant AMOAKO Sex Trafficked Victim 2 Through Force, Fraud, and Coercion from 2022 through 2023

Overt Act No. 25:  On April 6, 2022, in coded text messages, defendant AMOAKO threatened Victim 2, his sex trafficking victim, that he was watching her and that she better stay alert in the car where he saw her sitting.

32

Overt Act No. 26:   On July 24, 2022, through July 25, 2022, using coded text messages, defendant AMOAKO threatened Victim 2, "Imma fracture every bone in yo face."  He then shifted to guilting her, asking, "You really g[o]ne leave DADDY in this cold world . . . Knowing you all I got."  Defendant AMOAKO also claimed that he "elevate[d]" Victim 2 every day.  When defendant AMOAKO did not receive his desired responses, he shifted back to threats, swearing on the Hoovers that he would remember this and adding, "Fuck u bitch die out here on the blade" and "Hope a trick rape [a]nd kill u leave u on the side of a freeway."  He also threatened to kick down Victim 2's mother's door and noted the apartment number to show he knew where she lived.  When Victim 2 said she would go to the police, defendant AMOAKO threatened to have her assaulted for snitching and vowed he would wire her jaw shut.  He further threatened, "Yeah better watch yo dates might be yo last one."

Overt Act No. 27:   On September 12, 2022, using coded text messages, Victim 2 told defendant AMOAKO that she gave him more than $1,000 in commercial sex proceeds, hoping that it would put her back in good standing with him.  Defendant AMOAKO replied that her job was not done and that she needed to continue contributing to the "team" effort.  Later, when Victim 2 wrote to defendant AMOAKO, "Daddy I love you," defendant AMOAKO replied that she was dead to him.

Overt Act No. 28:   On September 16, 2022, in coded text messages, defendant AMOAKO again threatened harm to Victim 2's mother and said he would go to her residence.

Overt Act No. 29:   On June 17, 2023, using coded text messages, Victim 2 told defendant AMOAKO that she wanted to come back to him and prove herself.  Defendant AMOAKO insisted that if she returned,

she would have to follow his rules and instructed her on her role in his stable, including making the other sex workers feel welcome. Defendant AMOAKO said that if she followed his program, Victim 2 would be "granted wit everything [she] wished for," and added, "I needa mold u back into the way I want u."

(d)  Defendant ISREL Sex Trafficked Victim 3 Through Force, Fraud, and Coercion from 2022 through 2024

Overt Act No. 30:   Between at least December 1, 2022 and February 17, 2025, defendant ISREL sex trafficked adult Victim 3 through threats of force, fraud, and coercion and collected proceeds from her sex trafficking, including over Cash App.

Overt Act No. 31:   On May 29, 2023, in Las Vegas, Nevada, Victim 3 got into her car, and as she was attempting to leave defendant ISREL, he threw a large alcohol bottle through her rear passenger window.

Overt Act No. 32:   On November 17, 2023, using coded messages on Instagram, defendant ISREL directed Victim 3 to rob a commercial sex buyer in Las Vegas.  Victim 3 informed defendant ISREL that the commercial sex buyer had a Rolex watch.  She said that she would also take $1,750 in chips, $2,800 in cash, and $450 in Apple Pay.  Victim 3 confirmed that the commercial sex buyer took the watch off and she "got it."

Overt Act No. 33:   On February 10, 2024, defendant ISREL physically assaulted his sex trafficking victim, Victim 3, punching and kicking her in a bathroom.  After Victim 3 fell back onto the toilet, defendant ISREL continued to beat her on her back and side when she curled into a ball to protect herself.

Overt Act No. 34:   On October 23, 2024, using coded language over text messages, Victim 3 reported to defendant ISREL that she "broke" a date for $3,200, and that she made $3,800 in total for the night.  Defendant ISREL directed Victim 3 to send him the money on Cash App.

Overt Act No. 35:   Between approximately October 24, 2024 and October 25, 2024, at defendant ISREL's direction, Victim 3 sent defendant ISREL approximately $2,400 on Cash App.

Overt Act No. 36:   On October 25, 2024, using coded language over text messages, defendant ISREL instructed Victim 3 to pick up oxycodone from his drug contact at the Venetian hotel.

Overt Act No. 37:   On October 25, 2024, using coded text messages, defendant ISREL told Victim 3 that he was saving money and had a goal to save $100,000 to $200,000 so that Victim 3 could take a break from working for him in order to have defendant ISREL's baby. Victim 3 agreed that she would not want to work in sex trafficking while pregnant.  Shortly after, Victim 3 reported to defendant ISREL that she was going up to a hotel room for a commercial sex date, and later reported that she made $700.

Overt Act No. 38:   On or before October 31, 2024, defendant ISREL assaulted Victim 3 and made her face bleed.  Victim 3 had made $20,000 and had given all the money to defendant ISREL.

Overt Act No. 39:   On November 6, 2024, using coded text messages, defendant ISREL and Victim 3 discussed at least three luxury watches that Victim 3 had stolen for defendant ISREL. Defendant ISREL informed Victim 3 that he was on his way to pick her up.

35

Overt Act No. 40:   On November 11, 2024, defendant ISREL asked Victim 3 if she had stolen a certain watch from a specific hotel because he planned to wear it out of the house.

Overt Act No. 41:   On or before November 25, 2024, defendant ISREL ripped out Victim 3's hair, hit her in the face, and caused her knees to bleed from dragging her.

Overt Act No. 42:   On December 21, 2024, using coded text messages, Victim 3, trying to satisfy defendant ISREL's desire for money, told defendant ISREL that she was willing to solicit sex work on the Figueroa Corridor until Christmas Day, if she could not find sex work in the Las Vegas hotels.  Defendant ISREL applied the "love" reaction to the message and told her to keep the faith that she could make money.  Victim 3 reported to defendant ISREL the hotels in which she tried to find dates and reported how much money she had made.

Overt Act No. 43:   On December 22, 2024, defendant ISREL received a report from Victim 3, using coded language over text messages, on which hotels she had attempted to enter, explained that she had been out 11 hours that day, had worked 12 hours the day before, but kept getting kicked out of hotels.

Overt Act No. 44:   On December 29, 2024, using coded language over text messages, Victim 3 told defendant ISREL that she was on a commercial sex date and that she intended to steal a watch for defendant ISREL from the safe in the commercial sex buyer's room. Defendant ISREL instructed Victim 3 to close the safe after she took the watch so the commercial sex buyer did not notice the theft until the morning.  Defendant ISREL also instructed her to calmly leave the room because the security cameras would record her leaving.

Approximately ten minutes later, Victim 3 asked defendant ISREL to pick her up, and he again reminded her to close the safe.

Overt Act No. 45:  On December 29, 2024, using coded language over text messages, defendant ISREL apologized for breaking Victim 3's nose after she pointed a gun at him.

Overt Act No. 46:  On January 4, 2025, in a voice message on Instagram using coded language, defendant ISREL acknowledged to Victim 3 that he had hit her and said he would not do it again. After briefly acknowledging his own violence, defendant ISREL claimed that Victim 3 knew he was not a "bad person" because if he was, she would have pressed domestic violence charges and would not have returned to him.  Defendant ISREL threatened that if Victim 3 could not "control [her] anger," and continued to report his violence to police, he would leave her.

> (e)  Defendant EVANS Sex Trafficked Victim 4 Through Force, Fraud, and Coercion Between 2022 and 2025

Overt Act No. 47:  Between at least December 1, 2022 and January 5, 2025, defendant EVANS sex trafficked Victim 4 through threats of force, fraud, and coercion.

Overt Act No. 48:  On an unknown date, Victim 4 was branded with a tattoo of "J$," in reference to defendant EVANS's moniker, on her face.  During part or all of the time when defendant EVANS trafficked Victim 4, Victim 4 shared her location via her cellphone with defendant EVANS.

Overt Act No. 49:  On July 1, 2024, in coded text messages, defendant EVANS asked Victim 4 to report when she had completed her commercial sex dates, and Victim 4 replied when she had done so.

Overt Act No. 50:   On August 7, 2024, in coded text messages, Victim 4 reported to defendant EVANS that she had made $800 on a commercial sex date and that the money was on her Cash App. Defendant EVANS responded, "Great night."  Victim 4 reported that she was going to see another sex customer who had $600 for her.

Overt Act No. 51:   On the early morning of August 9, 2024, defendant EVANS received from Victim 4 $800 in sex trafficking proceeds over Cash App.

Overt Act No. 52:   On October 17, 2024, defendant EVANS, while driving a car, struck Victim 4, and screamed and berated her for at least 40 minutes.  Multiple times, defendant EVANS threatened to beat her and hit her in the face.  Defendant EVANS told Victim 4 that she owed him money and referred to previously beating her for being a liar.  Defendant EVANS threatened Victim 4 and stated, through coded language, that regardless of where Victim 4 went in Los Angeles, defendant EVANS would "groove" her, referring to following and assaulting her.  Defendant EVANS repeatedly reminded Victim 4 of his status as a pimp to further intimidate her.

Overt Act No. 53:   On November 19, 2024, in coded text messages, defendant EVANS told Victim 4 that she was his number one sex worker and that his other sex workers were just part of "the game," but that he loved her and wanted her to be able to decrease her hours doing sex work.

Overt Act No. 54:   On November 22, 2024, defendant EVANS received a text message from Victim 4 with a screenshot of someone paying Victim 4 $83.

Overt Act No. 55:   On November 24, 2024, through coded text messages, defendant EVANS received reports from Victim 4 of at least

five commercial sex dates, inquiries from Victim 4 asking defendant EVANS if he wanted her to go to another location or keep working where she was, a report from Victim 4 that she had just sent defendant EVANS $80 on Cash App, and Victim 4's projection that, "If I keep going I can make 1500."

### 3. 2023: Enterprise Members Sex and Drug Trafficked, and Committed Assaults in Furtherance of the Enterprise

#### (a) Enterprise Members Worked Together to Sex Traffic Victims and to Instill Fear and Promote the Hoovers' Reputation for Violence

Overt Act No. 56:   On January 1, 2023, using coded language on Instagram, defendant ROBINSON posted an advertisement to "apply" to be his sex worker, noting that all applicants must be obedient.

Overt Act No. 57:   On February 3, 2023, using coded language in Instagram messages, defendant ARMSTEAD told defendant ISREL that a sex worker working for defendant ARMSTEAD was only making $500, and because the room cost $120 and the sex worker needed clothing, defendant ARMSTEAD decided to leave the sex worker on Figueroa Street.

Overt Act No. 58:   On February 16, 2023, using coded language on Instagram, defendant ISREL instructed an unindicted co-conspirator on how to pimp, including moving sex workers around to different states.

Overt Act No. 59:   On March 24, 2023, using coded language on Instagram, defendant CROCKHAM posted an advertisement on Instagram selling promethazine with codeine.

Overt Act No. 60:   On May 27, 2023, using coded language in Instagram messages, defendant AMOAKO asked defendant ISREL if

39

defendant ISREL knew any "good carpets," referring to sex workers who primarily work in hotels and/or casinos.

Overt Act No. 61:   On June 8, 2023, using coded messages on Instagram, defendant LOCKETT offered to sell defendant MELENDEZ a firearm for $700.

Overt Act No. 62:   On June 26, 2023, using coded Instagram messages, defendant ROBINSON recruited a sex worker, enticing her by offering that she could go on tour with him if she started working for him.   Defendant ROBINSON stated that his most motivated sex workers would be going with him, while some stayed back and worked the Figueroa Corridor.

Overt Act No. 63:   On July 5, 2023, in a photograph posted on Instagram, defendants ROBINSON and PHILLIPS, along with an unidentified co-conspirator, fanned cash proceeds which the coded caption to the photograph identified as sex trafficking proceeds.



Overt Act No. 64:   On July 7, 2023, through coded Instagram messages, defendant ROBINSON told an unidentified co-conspirator that defendant ROBINSON was going to go traffic his sex worker and advised

the unidentified co-conspirator to call defendant PHILLIPS so that defendant PHILLIPS could help him make money.

Overt Act No. 65:   On July 11, 2023, defendant ARMSTEAD posted a video of herself beating a woman in a convenience store, holding her down by the hair and repeatedly kicking and kneeing her while demanding that the woman apologize for "dissin the set," and yelling "on Hoovers" as she beat her.  The woman shouted that she was pregnant, but defendant ARMSTEAD continued to beat her, as someone off camera told defendant ARMSTEAD the assault was being captured on surveillance cameras.

Overt Act No. 66:   On September 5, 2023, using coded messages on Instagram, defendant LOCKETT informed defendant MELENDEZ that he had sex workers on the Figueroa Corridor blade.

Overt Act No. 67:   On September 8, 2024, using coded messages on Instagram, defendant PHILLIPS recruited an unidentified sex worker, promising her, "All I need is 30 days we gone have 25,000."

Overt Act No. 68:   On September 16, 2023, using coded messages on Instagram, defendant MELENDEZ informed defendant LOCKETT that he was in Hoovers territory with defendant ULLOA-FRANCO JR.

Overt Act No. 69:   On September 19, 2023, using coded messages on Instagram, defendant LOCKETT and defendant MELENDEZ discussed stealing commercial sex workers' proceeds.

Overt Act No. 70:   On October 18, 2023, defendant MELENDEZ posted a video on Instagram of defendant ULLOA-FRANCO JR. spray painting Hoovers tags and the monikers of both defendant MELENDEZ and defendant ULLOA-FRANCO JR. onto a fence.

Overt Act No. 71:   On October 26, 2023, using coded Instagram messages, defendant AMOAKO explained to an unidentified co-

41

conspirator that his goal was for his sex workers to make $1,500 per night but he accepted $1,000.

Overt Act No. 72:   On October 31, 2023, and again on December 19, 2023 and November 26, 2024, defendant LOCKETT, using coded language on Instagram, asked defendant BROOKS if defendant BROOKS had marijuana for sale.

Overt Act No. 73:   Between November 27, 2023 and March 28, 2024, using coded language on Instagram, defendant MELENDEZ asked to buy Percocet from defendant AMOAKO at least nine times.  Defendant AMOAKO responded affirmatively that he had Percocet for sale at least six times and told defendant MELENDEZ that he was sold out of Percocet at least one time.  Defendant MELENDEZ paid for the Percocet using Cash App at least once.

Overt Act No. 74:   In November or December 2023, defendants GRAY, HARRIS, and BROOKS assaulted a pimp who was in Hoovers territory without Hoovers' permission.  Defendant PHILLIPS filmed the assault.  Defendant PHILLIPS and an unindicted co-conspirator stole the pimp's car and moved it to an alley where other Hoovers members broke it down and sold the pieces.

Overt Act No. 75:   On December 5, 2023, using coded messages on Instagram, defendant PHILLIPS bragged to an unidentified female that he had broken away from the police, hopped a fence, and evaded arrest.

Overt Act No. 76:   On December 10, 2023, using coded language on Instagram, defendant MELENDEZ told defendant BROOKS that defendant BROOKS' sex worker had money in her Cash App account that belonged to defendant MELENDEZ.  Defendants BROOKS and MELENDEZ argued over money and whether their respective sex workers had engaged in commercial

42

sex dates together, whether they shared a motel room for dates, and whether defendant MELENDEZ was owed money.  Defendant BROOKS swore "on Hoova" that he was being truthful and did not owe defendant MELENDEZ a portion of the commercial sex proceeds.

Overt Act No. 77:   On December 28, 2023, using coded messages on Instagram, defendant ROBINSON told defendant PHILLIPS that he had just sent his sex workers to the Figueroa Corridor.

Overt Act No. 78:   On December 29, 2023, using coded language on Instagram, defendant AMOAKO told an unidentified potential drug customer that he had oxycodone for sale.

Overt Act No. 79:   On December 29, 2023, using coded language on Instagram, defendant AMOAKO warned defendant BROOKS regarding the presence of rival gang members in or around their territory. Defendant BROOKS thanked defendant AMOAKO for looking out.

(b)   Defendant LOCKETT Attempted to Recruit Victim 31, a Then-17-Year-Old Girl, for Sex Trafficking

Overt Act No. 80:   On February 25, 2023, using coded messages on Instagram, defendant LOCKETT reached out to Victim 31, a prospective recruit for sex work, and offered her marijuana.

Overt Act No. 81:   On March 8, 2023, using coded messages on Instagram, defendant LOCKETT again contacted Victim 31, who told defendant LOCKETT that she was only 17 years old.  Defendant LOCKETT proceeded to recruit her for sex trafficking, telling her that she was "gorgeous," that she would make $10,000 a night, and that they'd "live a better life," if she let him "guide" her and take her around the country to engage in commercial sex.  When Victim 31 said she did not want to do sex work, defendant LOCKETT continued to press her and promised to "teach" and "elevate" her.  When Victim 31 reminded

43

defendant LOCKETT that she was a minor and that she was scared, defendant LOCKETT pressured her to try it and trust him and reiterated how much money they would make.

Overt Act No. 82:   On March 8, 2023, using coded messages on Instagram, defendant LOCKETT promised to get Victim 31 a fake identification card.  He also promised he would not beat her as long as she obeyed him and did not leave him for another pimp.

Overt Act No. 83:   On March 8, 2023, using coded messages on Instagram, defendant LOCKETT pressured Victim 31 until she agreed to be sex trafficked by him.  Defendant LOCKETT instructed her to never "tell" on him and to lie to the police if asked about her pimp.

Overt Act No. 84:   On March 8, 2023, using coded messages on Instagram, defendant LOCKETT instructed Victim 31 to send him "sexy ass pics" so he could make a commercial sex advertisement for her. When Victim 31 said that she didn't want to start sex work until she was 18 years old, defendant LOCKETT pressured her to start immediately.

Overt Act No. 85:   On March 24, 2023, using coded messages on Instagram, defendant LOCKETT reached out to Victim 31 again and told her that they needed to meet.  Defendant LOCKETT also instructed Victim 31 to send him child sexual abuse materials of herself.  After defendant LOCKETT received the child sexual abuse material, he told Victim 31 that her "pussy" was "so pretty" and "tight."  Defendant LOCKETT also told Victim 31 that they needed to have sex and that he would get them a hotel room.

Overt Act No. 86:   On March 24, 2023, using coded messages on Instagram, defendant LOCKETT ordered Victim 31 to make a child sexual abuse video for him.

44

Overt Act No. 87:   On March 27, 2023, using coded messages on Instagram, defendant LOCKETT again pressured Victim 31 to engage in commercial sex work.

Overt Act No. 88:   On March 27, 2023, using coded messages on Instagram, defendant LOCKETT instructed Victim 31 to make child sexual abuse videos of herself for defendant LOCKETT.

Overt Act No. 89:   On May 18, 2023, using coded messages on Instagram, defendant LOCKETT told Victim 31 that he was coming to pick her up.

Overt Act No. 90:   On September 6, 2023, using coded messages on Instagram, defendant LOCKETT told Victim 31 that he was going to come over and have sex with her.

Overt Act No. 91:   On September 11, 2023, using coded messages on Instagram, defendant LOCKETT enticed Victim 31 with an offer of an ecstasy pill and a hotel room.

(c)   Defendant AMOAKO Sex Trafficked Victim 5 Through Force, Fraud, and Coercion

Overt Act No. 92:   On an unknown date, Victim 5 was branded with a tattoo of "Handz Secure Payments," in reference to defendant AMOAKO's moniker, on her buttocks.

Overt Act No. 93:   On June 21, 2023, defendant AMOAKO and Victim 5 had an argument and Victim 5 briefly left defendant AMOAKO. Over coded text messages, defendant AMOAKO told Victim 5 that she had not given him a chance, implored her to come back, and told her to tell the people who picked her up that he would give them gas money to return her.  Victim 5 ultimately replied, "I'm sorry daddy," and promised that she was not leaving him.  Preparing her for more sex work, defendant AMOAKO ordered that Victim 5 would get waxed and have

her hair and nails done and that they had "a mission to accomplish" together.

Overt Act No. 94:   On July 6, 2023, through coded text messages, defendant AMOAKO ordered Victim 5 to turn on her location monitoring so defendant AMOAKO could track her location.

Overt Act No. 95:   On July 20, 2023, defendant AMOAKO pleaded with Victim 5 to continue working for him, telling her he had no one else, that she was exactly what he needed, and that by leaving she was giving up on their collective "mission" and plans together. Victim 5 reminded defendant AMOAKO that he had left her before and that it had undermined her confidence.  Defendant AMOAKO replied that he only wanted to "encourage" and "motivate" her.  Victim 5 continued to work for defendant AMOAKO.

Overt Act No. 96:   On August 13, 2023, using coded text messages, defendant AMOAKO berated Victim 5 for disobeying his rules of pimping and noted that Victim 5 did not act out when defendant AMOAKO had another sex worker working for him.  Defendant AMOAKO demanded money from Victim 5 and ordered her to stop wasting his time.  He continued to berate her, claiming she was inferior to his other sex workers, that she would always fail, and that he would get other sex workers to ridicule her.  Defendant AMOAKO then demanded $500 from Victim 5 for the value of his time, giving her an ultimatum that she could pay him or stop working on the Figueroa Corridor. Victim 5 agreed to pay defendant AMOAKO after her commercial sex date.  Defendant AMOAKO, thinking that Victim 5 had lied about her location, threatened, "Now imma slap the shit outta u for lying," and ordered her to turn on her location monitoring.  Defendant AMOAKO

46

also claimed that Victim 5 paying him was effectively paying herself because he was "elevat[ing]" her.

Overt Act No. 97:    On February 12, 2024, using coded text messages, defendant AMOAKO told Victim 5 that she was "fired" for disrespecting him and the other sex workers who worked for him. Later the same day, he told her, "Aye bitch figure it out where my money coming from."  Defendant AMOAKO added that he did not want to see Victim 5 until she had $1,500 for him and sent him a photograph of the money first.  Defendant AMOAKO continued to berate Victim 5, calling her "trash" and claiming that his new sex worker was superior.

> (d)    Defendant ROBINSON Sex Trafficked Victim 6 Through Force, Fraud, and Coercion

Overt Act No. 98:    On June 30, 2023, in coded messages on Instagram, defendant ROBINSON ordered Victim 6 to obey his instructions, threatening that he would put his "foot" on her "neck" to enforce his pimping "instructions."

Overt Act No. 99:    On July 3, 2023, Victim 6 sent a $100 Cash App payment to defendant PHILLIPS's Cash App account, which was intended for defendant ROBINSON.

Overt Act No. 100:    On July 11, 2023, in coded messages on Instagram, defendant ROBINSON threatened to "slap" Victim 6 because he did not approve of her Instagram post about her "feelings," which reflected poorly on his brand as a pimp.

Overt Act No. 101:    On July 11, 2023, using coded language in three voice messages on Instagram, defendant ROBINSON told Victim 6 she needed to pay him his $2,500 exit fee if she didn't want to work for him anymore, threatening, "I'll beat you up.  Do you like a dog

at that.  I'm going to fuck you up, it's not going to be one slap. It's going to be multiple cause I had to tell you multiple times . . .  I'm gonna beat you the fuck up."  In another coded audio message, defendant ROBINSON demanded that Victim 6 make $1,000 doing commercial sex work, warning her that she couldn't go anywhere where he couldn't "catch" her or "find" her, and alluded to a previous time he assaulted her, saying, "When I see you it's going to be a different story.  Just like when I seen you at the store you knew I was going to do something to you."

Overt Act No. 102:  From July 21, 2023 through August 7, 2023, through coded messages on Instagram, defendant ROBINSON monitored Victim 6's commercial sex dates, earnings, and movements, and Victim 6 checked in with him to report her earnings, locations, and when defendant ROBINSON could come to her hotel room to collect her proceeds from commercial sex work.

Overt Act No. 103:  On July 27, 2023, defendant ROBINSON distributed marijuana to Victim 6 at the hotel where she was doing commercial sex dates.

Overt Act No. 104:  On August 1, 2023, through coded messages on Instagram, defendant ROBINSON directed Victim 6 to send her commercial sex proceeds to him via Cash App, and provided defendant PHILLIPS's Cash App account information.

Overt Act No. 105:  On August 6, 2023, defendant PHILLIPS received $250 from Victim 6 in defendant PHILLIPS's Cash App account, intended for defendant ROBINSON, as defendant ROBINSON instructed.

Overt Act No. 106:  On August 21, 2023, defendant ROBINSON sent Victim 6 a coded audio message on Instagram threatening to beat her and telling her that she could pay the $2,500 exit fee and do

whatever she wanted, but until then, she was under his control. Defendant ROBINSON further threatened to beat her in front of "everyone" to humiliate her.

          (e)  Defendant ROBINSON Sex Trafficked Victim 7, a then-16-Year-Old Girl

Overt Act No. 107:  In and around July 2023, defendant ROBINSON sex trafficked Victim 7, a then-16-year-old girl.

Overt Act No. 108:  In and around July 2023, defendant ROBINSON had sexual intercourse with Victim 7.

Overt Act No. 109:  In and around July 2023, defendant ROBINSON told Victim 7 that she had to pay him $2,500 in order for him to be her pimp, and that she must make $1,000 per day through commercial sex work.

Overt Act No. 110:  In and around July 2023, defendant ROBINSON told Victim 7 he would physically assault her if she did not make $1,000.

Overt Act No. 111:  In and around July 2023, defendant ROBINSON beat one of his sex trafficking victims in front of Victim 7.

Overt Act No. 112:  In and around July 2023, defendant ROBINSON texted Victim 7 saying she had paid him $500, but needed to pay him an additional $2,000, after which she would be his property.

Overt Act No. 113:  In and around July 2023, defendant ROBINSON texted Victim 7 asking how many commercial sex acts she had completed and how much money she had made.

Overt Act No. 114:  In and around July 16, 2023, at defendant ROBINSON's direction, Victim 7 made two Cash App payments to defendant PHILLIPS's Cash App account totaling $120, which were the proceeds of defendant ROBINSON's sex trafficking of Victim 7.

(f)   Defendant PHILLIPS Sex Trafficked Victim 8 Through Force, Fraud, and Coercion from September 2023 through February 2024

Overt Act No. 115:   On September 2, 2023, through coded Instagram messages, defendant PHILLIPS directed Victim 8 to go to the blade and solicit commercial sex dates, and to let him know when she returned.

Overt Act No. 116:   On September 3, 2023, through coded Instagram messages, Victim 8 advised defendant PHILLIPS that she secured a commercial sex date.   Defendant PHILLIPS sent her a screenshot of his Cash App account information, and Victim 8 paid him $120 on Cash App.

Overt Act No. 117:   On September 5, 2023, through coded Instagram messages, defendant PHILLIPS asked Victim 8 if she had caught any more dates or had advertised her sex services online. Over the next month, defendant PHILLIPS continued to ask her multiple times a day if she had caught commercial sex dates and demanded that she should be making more than $500 a day.

Overt Act No. 118:   On January 2, 2024, through coded Instagram messages, Victim 8 reported that she caught a date.   Throughout the rest of the month, defendant PHILLIPS demanded payment for Victim 8's sex work.

Overt Act No. 119:   On February 19, 2024, as defendant PHILLIPS continued to demand payment and audit Victim 8's time, he also told Victim 8 that he had "just slapped the shi[t] out of this bitch," who he identified as "Red."   Victim 8 told him that the things he did were "scary."   Defendant PHILLIPS threatened that those were the consequences for anyone who played games with him.   He then shifted tactics, claiming that he was going to "elavate [sic]" her and that

50

he was only hard on her because he knew she was capable of more. Later that day when Victim 8 said she needed to go to sleep because she couldn't keep her eyes open, defendant PHILLIPS ordered her to go outside and catch more dates.

Overt Act No. 120:  On February 23, 2024, Victim 8 saw an Instagram post relating to defendant PHILLIPS beating a woman in a grocery store and told defendant PHILLIPS on Instagram, "This why I say you scare me."  Defendant PHILLIPS attempted to call Victim 8 on Instagram and when she did not immediately answer, defendant PHILLIPS, using coded language on Instagram, threatened to beat her. That night Victim 8 went out and attempted to catch dates and reported her progress to defendant PHILLIPS.  For the next few days, defendant PHILLIPS continued to demand payment from Victim 8 and required Victim 8 to account for all the money she had spent.

Overt Act No. 121:  On February 28, 2024, defendant PHILLIPS received $200 through Cash App from Victim 8 after Victim 8 reported that she had money to send to defendant PHILLIPS.

(g)  Defendant PHILLIPS Sex Trafficked Victim 9 Through Force, Fraud, and Coercion

Overt Act No. 122:  In and around September 2023, through a series of Instagram messages and calls, and an in-person meeting, defendant PHILLIPS recruited Victim 9 to work for him as his sex worker.  Defendant PHILLIPS told her, in coded messages, that he gave her an "interview" even though she did not bring him the required initiation fee.

Overt Act No. 123:  On October 2, 2023, defendant PHILLIPS received from Victim 9 $200 in commercial sex proceeds over two Cash App payments.

Overt Act No. 124:  On October 18, 2023, through coded messages on Instagram, defendant PHILLIPS reprimanded Victim 9 for not taking her commercial sex work seriously and said it was the reason she had gotten "nowhere."

Overt Act No. 125:  On October 27, 2023, defendant PHILLIPS received from Victim 9 $80 in commercial sex proceeds over Cash App.

Overt Act No. 126:  On November 21, 2023, defendant PHILLIPS received from Victim 9 $120 in commercial sex proceeds in two Cash App payments.

Overt Act No. 127:  On December 17, 2023, and throughout the rest of the month, using coded messages on Instagram, defendant PHILLIPS demanded payment, ordered Victim 9 to reveal her location, and warned her to stop playing games.

Overt Act No. 128:  On December 18, 2023, using coded messages on Instagram, defendant PHILLIPS threatened to beat Victim 9 and told her that her options were to pay him or be beaten.  He then demanded to know her location so he could beat her.  When Victim 9 asked defendant PHILLIPS why he was going to beat her, defendant PHILLIPS instructed her to "ask" about his reputation, advising she would learn that he beat his trafficking victims if they were disobedient. Defendant continued to threaten her: "w[h]en I catch u" "Ima knock u out" "where the trap."  Defendant PHILLIPS proceeded to leave Victim 9 a stream of voice memos threatening to track her down and beat her, and warning that she would never be able to work on the Figueroa Corridor again.

Overt Act No. 129:  From the end of December 2023 through approximately January 16, 2024, in coded messages on Instagram,

52

defendant PHILLIPS continued to berate Victim 9, demand payment, and demand to know her location.

Overt Act No. 130:  On February 14, 2023, through coded messages on Instagram, defendant PHILLIPS again demanded payment, but also stated that he had "fired" Victim 9.  Victim 9 asked defendant PHILLIPS if he would consider taking her back.  Defendant PHILLIPS replied that there would be a fee and that Victim 9 would have to be on a "new program."

Overt Act No. 131:  On February 19, 2024, defendant PHILLIPS assaulted Victim 9, stating, in his own words, that he "slapped the shi[t]" out of her.

> (h)   Defendant LOCKETT Sex Trafficked Victim 32 Through Force, Fraud, and Coercion

Overt Act No. 132:  Defendant LOCKETT sex trafficked Victim 32 in and around October 2023.

Overt Act No. 133:  On October 18, 2023, defendant LOCKETT posted an Instagram story in which he used coded language to berate Victim 32 for performing certain sex acts without a condom.  When Victim 32 attempted to respond, defendant LOCKETT yelled, "Shut up bitch!  On Criminals Bitch!  Imma knock your dumbass out you funky back ass bare back ass bitch!"  Defendant LOCKETT yelled at her to get out of the car, pointed the camera at her, and yelled, "If yall ever see this bitch on the track, make sure yall bleed this bitch back cause she can't come back out here.  Bitch I gave you specific instructions, bitch!" -- thereby encouraging his Instagram followers to beat Victim 32 if they saw her engaged in commercial sex work because she had disobeyed his pimping instructions and was forbidden from working in his territory.  Defendant LOCKETT also spit on Victim

32 and yelled, "All day long bitch you get spit on!  And clean that shit off my fucking window you ignorant bitch!  Right now!  Clean it off my window, bitch, don't grab shit.  Use your fucking mouth bitch cause you already dirty bitch," further publicly humiliating her to coerce her to comply with his rules.

### 4. 2024: Enterprise Members Sex and Drug Trafficked, Committed Robberies, Illegally Acquired Guns, and Elevated the Hoovers Reputation through Violence

#### (a) Defendant ISREL Used Victim 3 to Straw Purchase Firearms He Used to Promote the Hoovers Enterprise

Overt Act No. 134:  On November 24, 2023, using direct messages on Instagram, defendant ISREL sent Victim 3 a photograph of what appeared to be a Century Arms Mini Draco Pistol, along with coded messages indicating that he wanted this gun and that it cost $1,100. Victim 3 replied that she did not really "know guns" but that defendant ISREL should get it if it was a good price and he wanted it.

Overt Act No. 135:  On February 13, 2024, at defendant ISREL's direction, Victim 3 purchased a Micro Draco pistol, serial #: 23PMD-47926 (the "Draco Pistol") and a Five-Seven pistol, serial #: 386445475 (the "FN Pistol") from the dealer S&S Wholesale Arms LLC in Henderson, Nevada.

Overt Act No. 136:  After Victim 3 purchased the Draco Pistol and FN Pistol on February 13, 2024, defendant ISREL paid Victim 3 $1,100 in three Cash App payments between February 17, 2024 and February 27, 2024, which was the purchase price defendant ISREL quoted for the Draco Pistol in his Instagram messages to Victim 3.

Overt Act No. 137:  Between February 14, 2024 and May 14, 2024, in Los Angeles, California, defendant ISREL filmed a music video in

which defendant ISREL was wearing luxury clothing brands and was seen holding the Draco Pistol, along with large sums of cash, high-value watches, and expensive alcohol.  In the video, defendant ISREL promoted the Enterprise by making several statements glorifying the Hoovers, portraying a luxurious pimping lifestyle as a means of recruitment, and brandishing firearms to instill fear in Hoovers' rivals, victims, and the community, including the following: (1) "She don't wanna fuck me she want to fuck my car.  Draco with the drum.  It's to get the job done," glorifying the use of a firearm to recruit women; (2) "screaming our city they don't come across Florence.  TinyLok, that's an awful lot of orange," referencing rivals not crossing Florence Avenue because they will run into defendant ISREL ("TinyLok") and other Hoovers (wearing their gang color orange) in Hoovers territory; and (3) "three hoes with me but the SRT two-door, Louboutin stepping bloody sole on the floor," referring to having three sex workers, and playing on the double entendre of the designer Louboutin shoe having a red sole and the phrase "bloody stepping," which refers to sex workers who walk the blade until their feet bleed.



Overt Act No. 138:  On May 19, 2024, in Las Vegas, Nevada, defendant ISREL, a convicted felon, was found in possession of the FN Pistol in a car.

           (b)   Defendant MELENDEZ Sex Trafficked Victim 33, a Then-14-Year-Old Girl, and Victim 34, a Then-17-Year-Old Girl, Through Force, Fraud, and Coercion

Overt Act No. 139:  From January 5, 2024, until at least January 26, 2024, defendant MELENDEZ sex trafficked Victim 33, a 14-year-old minor.

Overt Act No. 140:  On January 5, 2024, defendant MELENDEZ met Victim 33 and took her to his home, where defendant MELENDEZ had sex with Victim 33.

Overt Act No. 141:  On January 6, 2024, defendant MELENDEZ locked Victim 33 in a room.

Overt Act No. 142:  On January 6, 2024, defendant MELENDEZ gave lingerie to Victim 33 and demanded that she wear it to engage in commercial sex work.

Overt Act No. 143:  On January 6, 2024, defendant MELENDEZ threatened to hurt Victim 33 and her family if she did not make at least $1,000 in commercial sex proceeds daily.  Defendant MELENDEZ possessed a gun on the day he made these threats, leading Victim 33 to believe he'd shoot her or her family if she did not comply.

Overt Act No. 144:  From approximately January 6, 2024, until at least January 26, 2024, defendant MELENDEZ regularly drove Victim 33 to the Figueroa Corridor, and occasionally drove her to Western Avenue and Long Beach Boulevard, all for the purpose of sex trafficking Victim 33.

Overt Act No. 145:  From approximately January 6, 2024, until at least January 26, 2024, defendant MELENDEZ collected all proceeds that Victim 33 earned through commercial sex work.

Overt Act No. 146:  On January 24, 2024, defendant MELENDEZ beat Victim 33, including punching her at least five times in the face while holding a heavy watch and dragging her by her hair, as punishment after Victim 33 did not make enough money from commercial sex work.

Overt Act No. 147:  At various times between approximately January 6, 2024 and January 26, 2024, defendant MELENDEZ kicked and punched Victim 33 all over her body.

Overt Act No. 148:  On multiple occasions between approximately January 6, 2024 and January 26, 2024, defendant MELENDEZ threatened Victim 33 with a firearm, including pointing the firearm at Victim 33 and requiring that Victim 33 shoot the firearm into the air around rival gang members.

Overt Act No. 149:  On multiple occasions between approximately January 6, 2024, until at least January 25, 2024, defendant MELENDEZ supplied Percocet, ecstasy, heroin, and Xanax to Victim 33.

Overt Act No. 150:  On two occasions, between approximately January 6, 2024 and January 25, 2024, defendant MELENDEZ engaged in sexual intercourse with Victim 33.

Overt Act No. 151:  From a date unknown until at least January 26, 2024, defendant MELENDEZ sex trafficked Victim 34, a then-17-year-old girl.

Overt Act No. 152:  On January 24, 2024, defendant MELENDEZ disciplined Victim 34 by beating her, including punching Victim 34 in the face while holding a heavy watch, until she bled, and requiring

Victim 33 to participate in the beating.  Defendant MELENDEZ then left Victim 34 in rival gang territory.

(c) Defendant ULLOA-FRANCO JR. Sex Trafficked Victim 35 Through Force, Fraud, and Coercion

Overt Act No. 153:  On January 18, 2024, in a voice message on Instagram, defendant ULLOA-FRANCO JR. threatened to kill Victim 35 by shooting her in the face if she did not give him the proceeds from her commercial sex work.

Overt Act No. 154:  On May 13, 2024, through coded Instagram messages, defendant ULLOA-FRANCO JR. asked Victim 35 to send him $1,000 dollars of sex trafficking proceeds.

Overt Act No. 155:  On July 29, 2024, through coded Instagram messages, defendant ULLOA-FRANCO JR. asked Victim 35 for her sex trafficking proceeds.

Overt Act No. 156:  On April 13, 2025, through coded Instagram messages, defendant ULLOA-FRANCO JR. threatened Victim 35, writing, "Ill stuff yo face" and "Don't talk with yo mou[th] full."

(d) Defendant MELENDEZ Sex Trafficked Victim 36 Through Force, Fraud, and Coercion

Overt Act No. 157:  In or around February 2024, defendant MELENDEZ began courting Victim 36 on Instagram, making Victim 36 believe that he wanted to be her boyfriend.  During an in-person meeting, MELENDEZ revealed that he wanted her to set up ruse commercial sex dates and rob the sex customers once they arrived. Later, defendant MELENDEZ instructed her to engage in commercial sex for money and remit proceeds to him.

Overt Act No. 158:  On February 17, 2024, until at least July 5, 2024, defendant MELENDEZ sex trafficked Victim 36 through force on

the Figueroa Corridor at multiple motels, including the Hoover Motel. During this time, defendant MELENDEZ required Victim 36 to work nearly every day, make at least $1,000 per day, and remit all proceeds to him, either by handing it to defendant MELENDEZ or leaving it in a box in his bedroom.  Defendant MELENDEZ tracked Victim 36's location through the Find My iPhone application and directed Victim 36 to never send substantive messages about sex work and to instead send an emoji when she had a commercial sex date scheduled.

Overt Act No. 159:  On February 17, 2024, using coded messages on Instagram, defendant MELENDEZ informed defendant ULLOA-FRANCO JR. that Victim 36 engaged in sex work and had made defendant MELENDEZ $800.

Overt Act No. 160:  In or around March 2024, until at least July 5, 2024, defendant MELENDEZ assaulted Victim 36 by slapping and kicking her and pulling her hair.

Overt Act No. 161:  In or around March 2024, until at least July 5, 2024, defendant MELENDEZ strangled Victim 36 until she was unconscious at least two times.  During one of these strangulations, defendant MELENDEZ told Victim 36 he would kill her if he missed the birth of his child from another woman, due to Victim 36.

Overt Act No. 162:  In or around March 2024, defendant MELENDEZ became enraged that Victim 36 had spoken back to him and hit Victim 36 in the face using the back of his hand.

Overt Act No. 163:  In or around March 2024, defendant MELENDEZ punched Victim 36 in the thighs, causing large bruising.  Due to her injuries, commercial sex buyers declined to hire Victim 36.

Subsequently, defendant MELENDEZ adjusted his beatings, attempting not to leave marks on Victim 36 that jeopardized his profits.

Overt Act No. 164:  On March 6, 2024, defendant MELENDEZ and defendant ULLOA-FRANCO JR. picked up Victim 36 on the Figueroa Corridor in a car.  Inside the car, Los Angeles Police Department officers found six condoms and a motel key for the E1 Racho Motel. Following this law enforcement encounter, defendant MELENDEZ required Victim 36 to Uber herself to the blade and to buy her own lingerie and condoms.

Overt Act No. 165:  On or before March 18, 2024, after defendant MELENDEZ encouraged Victim 36 to get branded with his moniker, Victim 36 agreed to get the tattoo, and defendant MELENDEZ drove her to the tattoo shop and paid for the tattoo of his moniker on her buttocks.

Overt Act No. 166:  In or around April or May 2024, defendant MELENDEZ began living in a sober living facility pursuant to a court order, from which he directed Victim 36 to continue engaging in sex work and remitting money to him.

Overt Act No. 167:  On April 29, 2024, using coded messages on Instagram, defendant MELENDEZ informed defendant ULLOA-FRANCO JR. that Victim 36 engaged in commercial sex work and that defendant MELENDEZ wouldn't stop pimping her until he had a hundred thousand dollars, to which defendant ULLOA-FRANCO JR. suggested he continue the scheme "even after that."

Overt Act No. 168:  On July 5, 2024, defendant MELENDEZ took Victim 36's phone and purse and attempted to use her mobile banking application to pay for gas.  Defendant MELENDEZ directed Victim 36 to help him use her mobile banking application, at which time she took her phone and called an Uber to escape from him.  After she escaped,

defendant MELENDEZ Facetime video called Victim 36 and showed her that he was at her grandfather's home.  Defendant MELENDEZ showed Victim 36 that her grandfather was outside of the home and threatened to hurt her grandfather if she did not return to defendant MELENDEZ. Due to this threat, Victim 36 returned to defendant MELENDEZ and the two went to a motel on Western Avenue where defendant MELENDEZ beat Victim 36, giving her two black eyes.  Defendant MELENDEZ later left the motel to get makeup for Victim 36 to cover her injuries so she could continue to engage in commercial sex work.

Overt Act No. 169:  In or around May 2024, defendant MELENDEZ pointed a firearm at Victim 36's head.

Overt Act No. 170:  In or around June 2024, defendant MELENDEZ became angry at Victim 36 while they were in a car.  Defendant MELENDEZ got into the backseat and held her down while she tried to escape.  When they arrived at defendant MELENDEZ's home, he beat Victim 36, retrieved a firearm, and put the firearm in Victim 36's face and threatened to shoot her.

Overt Act No. 171:  In or around June 2024, defendant MELENDEZ threatened Victim 36 with a firearm for a third time.

(e)  Defendant GRAY Led a Retail Robbery Involving Defendants CROCKHAM and ROBINSON and Other Unindicted Enterprise Members

Overt Act No. 172:  On March 22, 2024, defendant GRAY and five unindicted co-conspirators robbed LensCrafters, a commercial business, in Beverly Hills, California during store hours and while employees were present in the store.

Overt Act No. 173:  On March 22, 2024, defendant GRAY and his co-conspirators ran into the store and grabbed designer glasses and sunglasses from stands and displays throughout the store.  Defendant

GRAY directed his co-conspirators to grab the more valuable Cartier products, so the co-conspirators broke the glass display cases to obtain the protected merchandise.  Defendant GRAY and his co-conspirators stole approximately $150,000 in merchandise and caused approximately $5,000 in property damage.

Overt Act No. 174:  On March 22, 2024, defendant GRAY and his co-conspirators fled in three different cars.

Overt Act No. 175:  On March 22, 2024, within minutes of and while fleeing from the LensCrafters robbery, defendant GRAY sent a private message to an Instagram user attempting to sell the stolen merchandise.

Overt Act No. 176:  On March 22, 2024, within minutes of and while fleeing from the LensCrafters robbery, defendant GRAY messaged one co-conspirator using Instagram, "Tell him drive faster." Defendant GRAY messaged another co-conspirator using Instagram, "Why u driving like that?"

Overt Act No. 177:  On March 25, 2024, using coded language on Instagram, defendant GRAY and an unindicted co-conspirator discussed defendant GRAY selling stolen LensCrafters merchandise.  The unindicted co-conspirator asked defendant GRAY to remind defendant ROBINSON to bring payment for a pair of stolen glasses.

Overt Act No. 178:  On March 28, 2024, defendant CROCKHAM drove defendant GRAY and an unindicted co-conspirator with merchandise stolen during the LensCrafters robbery in the trunk of the car.

Overt Act No. 179:  Between at least March 24, 2024 and April 5, 2024, defendant GRAY messaged multiple Instagram users attempting to sell merchandise from the LensCrafters robbery.  Defendant GRAY

included in his messages photographs of designer glasses still bearing their LensCrafters' tags.

(f)    Enterprise Members Worked Together to Recruit, Maintain, and Sex Traffic Victims; Held a Gang Meeting; Committed Assaults to Further the Hoovers Reputation; and Distributed Drugs

Overt Act No. 180:  On January 2, 2024, using coded messages on Instagram, defendant ULLOA-FRANCO JR. asked defendant MELENDEZ to assault his unidentified sex worker, which defendant MELENDEZ agreed to do the next time he saw her.

Overt Act No. 181:  On January 5, 2024, defendant ARMSTEAD received a $50 Cash App payment for her sale of promethazine with codeine.

Overt Act No. 182:  On January 16, 2024, through coded messages on Instagram, defendant YOUNG told defendant ULLOA-FRANCO JR. that defendant YOUNG had three sex workers working for him and that he was on Century Boulevard, implying that he was in the streets doing the criminal work of the Hoovers.

Overt Act No. 183:  On January 17, 2024, using coded language on Instagram, defendant BROOKS asked Victim 37 how much she had made in commercial sex proceeds.  Defendant BROOKS then directed Victim 37 to go back on the blade that evening.

Overt Act No. 184:  On January 17, 2024, using coded language over Instagram, defendant ARMSTEAD purchased a black-market Mega Personals account and had an unidentified co-conspirator post a sex advertisement for defendant ARMSTEAD's sex worker.

Overt Act No. 185:  On January 17, 2024, defendant ARMSTEAD sent an unidentified co-conspirator $80 via Cash App for a black-market Mega Personals account.

Overt Act No. 186:  On January 21, 2024, defendant ARMSTEAD received a $69 Cash App payment from an unindicted co-conspirator on behalf of another unindicted co-conspirator for the sale of promethazine with codeine.

Overt Act No. 187:  On January 25, 2024, using coded language on Instagram, defendant BROOKS asked defendant ARMSTEAD for a place to stay where he could "duck low for a few months."

Overt Act No. 188:  On January 27, 2024, using coded messages on Instagram, an unindicted co-conspirator complained to defendant EVANS that Hoovers were hanging out without any guns and thus making the gang look weak.  Defendant EVANS replied that they should start having a gang meeting every week.

Overt Act No. 189:  On January 27, 2024, using coded messages on Instagram, defendant ARMSTEAD recruited a sex worker and enticed her to go to Las Vegas with defendant ARMSTEAD and an unindicted co-conspirator to engage in commercial sex work.

Overt Act No. 190:  On February 2, 2024, defendant ARMSTEAD, using coded messages on Instagram, demanded a $1,500 "choosing fee" from a potential sex worker who told defendant ARMSTEAD she was "ready to come home," meaning ready to work for defendant ARMSTEAD.

Overt Act No. 191:  On February 8, 2024, using coded language on Instagram, defendant ARMSTEAD offered to sell an unidentified drug customer promethazine with codeine for $200 a pint or $25 a line, referring to the dosage line on the bottle cap.

Overt Act No. 192:  On February 15, 2024, defendant AMOAKO and five other known Hoovers gang members were found at defendant ARMSTEAD's residence at 527 West 88th Street, a residence Hoovers Enterprise members used to house sex trafficking victims.  Inside the

residence, there were outfits consistent with commercial sex work, a bed, and condoms.  As law enforcement approached the residence, an unidentified person threw a blue-steel, semi-automatic handgun out of a window.

Overt Act No. 193:  On February 15, 2024, using coded language on Instagram, defendant MILLER told defendant ULLOA-FRANCO JR. that they needed to rob a house that evening that belonged to a commercial sex buyer who defendant MILLER knew through his sex trafficking victim.

Overt Act No. 194:  On February 16 and 17, 2024, using coded messages on Instagram, defendant MELENDEZ and an unidentified Instagram user discussed recruiting a new sex trafficking victim, and defendant MELENDEZ stated he purchased an outfit for the victim.

Overt Act No. 195:  On February 17, 2024, using coded messages on Instagram, defendant ULLOA-FRANCO JR. informed defendant MELENDEZ that defendant ULLOA-FRANCO JR. fired a sex worker because she did not make enough money, to which defendant MELENDEZ responded, "Trash ass whore."

Overt Act No. 196:  On February 17, 2024, using coded messages on Instagram, defendant ARMSTEAD told defendant EVANS they were having a gang meeting, which defendant EVANS agreed to attend.

Overt Act No. 197:  On February 17, 2024, using coded language on Instagram, defendant ARMSTEAD informed an unindicted co-conspirator about the Hoovers gang meeting to take place in a park in Hoovers territory.

Overt Act No. 198:  On February 18, 2024, using coded messages on Instagram, defendant PHILLIPS recruited an unidentified sex worker, told her that he had "elavated [sic]" his "bottom bitch,"

65

that his other sex workers were "weak," and that his "come home fee is 2000," meaning she had to pay a fee of $2,000 to work for him, to which the unidentified sex worker replied that was "easy" and told defendant PHILLIPS to come to her apartment to pick her up.

Overt Act No. 199:  On February 18, 2024, using coded language on Instagram, defendant BROOKS told defendant AMOAKO that he needed Percocet.  Defendant AMOAKO offered to sell Percocet and provided his Cash App username to defendant BROOKS for payment.

Overt Act No. 200:  On February 18, 2024, using coded messages on Instagram, defendant BROOKS asked defendant AMOAKO for oxycodone, and defendant AMOAKO agreed to provide it to defendant BROOKS at the Stadium Inn.  Defendant BROOKS advised defendant AMOAKO when he arrived at the Stadium Inn.  Defendant AMOAKO gave defendant BROOKS his Cash App name for defendant BROOKS to send payment.

Overt Act No. 201:  On February 18, 2024, defendant BROOKS sent defendant AMOAKO $20 on Cash App for oxycodone pills.

Overt Act No. 202:  On February 19, 2024, using coded messages on Instagram, defendant ARMSTEAD recruited a sex worker who previously worked for her and told her that she had another sex worker working for her.  Defendant ARMSTEAD enticed her former sex worker to "come home," sent an Uber to pick her up, and told her to go to 222 South Figueroa Street with all of her belongings.  The sex worker told defendant ARMSTEAD that once she arrived, she had an "outcall" date for $300.

Overt Act No. 203:  On February 19, 2024, using coded messages on Instagram, defendant MELENDEZ informed defendant ULLOA-FRANCO JR. that Victim 36 engaged in three commercial sex dates and earned $520.

Overt Act No. 204:  On February 20, 2024, through coded messages on Instagram, defendant ULLOA-FRANCO JR. asked to buy Percocet pills from defendant AMOAKO, and defendant AMOAKO agreed to sell them to him.

Overt Act No. 205:  On February 20, 2024, using coded messages on Instagram, defendant ARMSTEAD asked defendant EVANS where he was and defendant EVANS replied, "Set now," referring to their Hoovers territory.  Defendant ARMSTEAD wrote that she was "in the gunnits," referring to the hundreds blocks in Hoovers territory.

Overt Act No. 206:  On February 20, 2024, using coded messages on Instagram, an unindicted co-conspirator asked defendant ARMSTEAD if she wanted to purchase his sex worker for $1,000, noting that if she did not, he would sell her organs across the border.  Defendant ARMSTEAD replied by asking what the sex worker looked like.

Overt Act No. 207:  On February 23, 2024, defendant PHILLIPS posted a video on Instagram, filmed by defendant ROBINSON, showing defendant PHILLIPS approach his sex trafficking victim in a store, pull her to the ground, then repeatedly punch and kick her.  The video is captioned "Chop Season" – a reference to defendant PHILLIPS's moniker "Chop Em," and a hashtag reads, "#idontpromoteviolence" with three "laughing" emojis.

Overt Act No. 208:  On February 23, 2024, defendant ARMSTEAD sent defendant EVANS an Instagram video showing defendant PHILLIPS assaulting his sex trafficking victim.  Defendant EVANS replied with five "laughing" emojis and asked, "Waylon?" referring to defendant PHILLIPS (an amalgam of "Jalon" and his moniker "Waymo," also known as "Chop Em," which is referenced in the caption "Chop Season").  Defendant EVANS replied again with three more "laughing" emojis and

added, "If you ever be needing that lmk I got it," offering to assault defendant ARMSTEAD's sex workers.  Defendant ARMSTEAD replied, "HooVa st."

Overt Act No. 209:  On February 23, 2024, using coded language on Instagram, defendant ARMSTEAD offered to sell promethazine with codeine and oxycodone to an unidentified customer.

Overt Act No. 210:  On February 24, 2024, using coded language on Instagram, defendant ARMSTEAD offered to sell a prospective drug customer promethazine with codeine.  Defendant ARMSTEAD told the customer to meet at 222 South Figueroa.

Overt Act No. 211:  On February 24, 2024, using coded messages on Instagram, defendant MELENDEZ informed defendant ULLOA-FRANCO JR. that Victim 36 engaged in a commercial sex date.

Overt Act No. 212:  On February 25, 2024, using coded language on Instagram, defendant EVANS reprimanded his sex worker, criticizing her for not acting properly, not making enough money for him, and thereby tarnishing his public image.

Overt Act No. 213:  On February 27, 2024, using coded language, defendant ARMSTEAD told an unidentified co-conspirator that that she was on Gage Avenue in Hoovers territory recruiting commercial sex workers.

Overt Act No. 214:  On February 27, 2024, in coded messages on Instagram, defendants AMOAKO and ARMSTEAD discussed their respective sex workers getting in a fight, to which defendant ARMSTEAD wrote that she was "pullin up" and would "get on that bitch."

Overt Act No. 215:  On February 28, 2024, using coded language on Instagram, defendants EVANS and AMOAKO discussed their sex workers.  Defendant EVANS told defendant AMOAKO that defendant BROOKS

68

needed defendant EVANS's help because defendant EVANS's sex worker was drunk and acting out of line.

Overt Act No. 216:  On February 29, 2024, defendant ARMSTEAD distributed 25 prescription oxycodone pills to an unindicted co-conspirator and agreed to drop off the drugs at the House of Hotties.

Overt Act No. 217:  On February 29, 2024, defendant ARMSTEAD received a Cash App payment of $375 from an unidentified person using a Cash App account with account name "House of Hotties."

Overt Act No. 218:  On February 29, 2024, defendant MELENDEZ posted a video on Instagram of an unidentified victim handing him a stack of cash.

Overt Act No. 219:  On March 1, 2024, defendant ARMSTEAD told an unindicted co-conspirator that she was at the Stadium Inn.

Overt Act No. 220:  On March 3, 2024, in coded language on Instagram, defendant ARMSTEAD exchanged messages with a prospective sex worker about doing "dates," and defendant ARMSTEAD told the prospective sex worker that defendant ARMSTEAD was sending an Uber to pick her up.

Overt Act No. 221:  On March 4, 2024, using coded language on Instagram, defendant AMOAKO asked defendant ARMSTEAD to physically assault Victim 5 because she was disobeying defendant AMOAKO's orders.

Overt Act No. 222:  On March 4, 2024, using coded language on Instagram, defendant ARMSTEAD asked defendant AMOAKO where Victim 5 was and confirmed that defendant ARMSTEAD would physically beat Victim 5 to ensure Victim 5's compliance with defendant AMOAKO's orders.

Overt Act No. 223:  On March 4, 2024, in coded language on Instagram, defendant ARMSTEAD attempted to recruit a sex worker and told her that she had two sex workers but that one left her, stating "Okay you can have me to yourself."

Overt Act No. 224:  On March 5, 2024, defendant ISREL posted to Instagram a photograph of himself holding a semi-automatic pistol with a caption that read, "Get yo sht together u can ball like me too."

Overt Act No. 225:  On March 6, 2024, using coded language on Instagram, Victim 10 asked defendant AMOAKO if he had oxycodone, and defendant AMOAKO responded affirmatively and told her that he was at the Stadium Inn.

Overt Act No. 226:  On March 6, 2024, using coded messages on Instagram, defendant MELENDEZ informed defendant ULLOA-FRANCO JR. that a gang member was disciplined for selling a firearm, and for damaging a car belonging to defendant AMOAKO's mother.

Overt Act No. 227:  On March 6, 2024, using coded messages on Instagram, defendant MELENDEZ and defendant ULLOA-FRANCO JR. discussed the location of a shared firearm.

Overt Act No. 228:  On March 7, 2024, using coded language on Instagram, defendant MILLER told defendant ARMSTEAD that he had 50 Percocet pills for sale, to which defendant ARMSTEAD responded by asking the price for the illicit drugs.

Overt Act No. 229:  On March 7, 2024, using coded language on Instagram, defendant MILLER told defendant ULLOA-FRANCO JR. that he had Percocet and other pills to sell.

Overt Act No. 230:  On March 7, 2024, an unindicted co-conspirator, using coded language, solicited and offered to pay

defendant ARMSTEAD and another unindicted co-conspirator to physically assault and rob two sex workers who were refusing to work for a Hoovers pimp, to which defendant ARMSTEAD responded, "Where they be at."

Overt Act No. 231:  On March 9, 2024, using coded messages on Instagram, defendant ULLOA-FRANCO JR. bragged to defendant MELENDEZ that a commercial sex worker made defendant ULLOA-FRANCO JR. $2,200, stating, "That's the most this black bitch has ever brought me."

Overt Act No. 232:  On March 10, 2024, using coded messages on Instagram, defendant ARMSTEAD asked defendant EVANS to get a hotel room for her.  Defendant EVANS reported that he tried to get defendant ARMSTEAD a room, but he was rejected because he tried to use a false identification.

Overt Act No. 233:  On March 10, 2024, using coded messages on Instagram, defendant ARMSTEAD's prospective sex worker told defendant ARMSTEAD that she had a friend who could also work for defendant ARMSTEAD, and defendant ARMSTEAD said that she wanted both women to work for her.

Overt Act No. 234:  On March 10 through 12, 2024, using coded messages on Instagram, defendant ARMSTEAD told defendant HARRIS to book a hotel room for her and that she would pay him when she arrived.  Defendant HARRIS advised that he had left the hotel but offered to go back.  Defendant HARRIS told defendant ARMSTEAD that he was not able to get her a room, and defendant ARMSTEAD asked to use his rooms for her sex worker.  Defendant HARRIS agreed and told defendant ARMSTEAD he was in Room 12 and the door was open. Defendant ARMSTEAD told defendant HARRIS she might need him to pick up her sex worker, and defendant HARRIS agreed to do so.  Defendant

71

ARMSTEAD advised that her sex worker needed the room for a commercial sex date, and defendant HARRIS replied that his sex worker was on a date in the room.  Defendant ARMSTEAD said that her sex worker would do "car dates" and would only need the room for one or two commercial sex dates, to which defendant HARRIS agreed.

Overt Act No. 235:  On March 14, 2024, using coded messages on Instagram, defendant LENOX told an unindicted co-conspirator and Hoovers gang member that he was selling drugs, believed to be ecstasy, and needed additional product for sale.

Overt Act No. 236:  On March 16, 2024, using coded language, defendant ISREL told defendant ARMSTEAD that he was getting his gun fixed, after which he would be back in their set of Hoovers territory.

Overt Act No. 237:  On March 17, 2024, using coded language on Instagram, defendant ARMSTEAD told defendant AMOAKO that she needed oxycodone.

Overt Act No. 238:  On March 19, 2024, using coded messages on Instagram, an unindicted co-conspirator offered to sell defendant ARMSTEAD 100 oxycodone pills for $9 per pill, for further distribution.

Overt Act No. 239:  On March 19, 2024, defendant ROBINSON sent an audio message to defendant ARMSTEAD, saying, in coded language, that an unknown male, who was "not from the set," is going to be brought to "the set" and would be robbed again.

Overt Act No. 240:  On March 20, 2024, using coded language on Instagram, defendant ARMSTEAD warned an unidentified co-conspirator not to return to "the spot" because it was under investigation and

people would go to jail, including defendant ARMSTEAD, adding, "so tell everybody don't go back right there."

Overt Act No. 241:  On March 21, 2024, using coded language on Instagram, defendant HARRIS told defendant YOUNG that defendant HARRIS was on his way back to the Figueroa Corridor with defendant ARMSTEAD and that defendants HARRIS and YOUNG would recruit new sex workers that night.

Overt Act No. 242:  On March 23, 2024, using coded messages on Instagram, defendant ARMSTEAD bragged to defendant AMOAKO that a sex worker who defendant ARMSTEAD wanted to see assaulted was about to get assaulted without defendant ARMSTEAD having to lay a hand on her.

Overt Act No. 243:  On March 23, 2024, defendant ROBINSON sent an audio message to defendant ARMSTEAD, saying that he pimped and pandered a minor that was over 16 years old and under 18 years old.

Overt Act No. 244:  On March 23, 2024, using coded language on Instagram, defendant EVANS instructed defendant HARRIS to allow him to use defendant HARRIS's car while defendant EVANS's sex worker completed a commercial sex date.

Overt Act No. 245:  On March 23, 2024, an unidentified third party sent defendant ARMSTEAD a video, posted on Instagram, in which defendant ARMSTEAD and others are seen kicking and punching a woman on the ground while she screams for help.  Defendant ARMSTEAD confirmed that she was the assailant in the video and explained that the victim had beat up one of her sex workers.

Overt Act No. 246:  On March 23, 2024, defendant BROOKS and at least four unindicted co-conspirators assaulted a person in furtherance of the Hoovers Enterprise.  During the assault, one unindicted co-conspirator yelled, "on Hoover."  Defendant BROOKS

73

punched the victim at least five times during the assault.  The assault was filmed and an unidentified co-conspirator sent the video to defendant CROCKHAM.

Overt Act No. 247:  On March 24, 2024, using coded messages on Instagram, defendant ARMSTEAD told an unidentified drug customer that defendant ARMSTEAD was at the Stadium Inn.  The unidentified customer asked defendant ARMSTEAD if she had oxycodone for sale.

Overt Act No. 248:  On March 24, 2024, using coded language on Instagram, defendant CROCKHAM asked defendant ARMSTEAD for oxycodone.

Overt Act No. 249:  On March 24, 2024, using coded messages on Instagram, defendant ARMSTEAD asked defendant AMOAKO for oxycodone, to which defendant AMOAKO responded that he was approaching her location with an unindicted co-conspirator.

Overt Act No. 250:  On March 25, 2024, using coded language on Instagram, defendant MILLER asked defendant ARMSTEAD how much money he could sell 16 ounces of promethazine with codeine for.

Overt Act No. 251:  On March 27, 2024, defendant MELENDEZ posted a video on Instagram of a stack of cash and the text "Choosing ain't cheating."

Overt Act No. 252:  On March 27, 2024, defendant MELENDEZ made a post on Instagram that offered to sell promethazine for $25 "a line."

Overt Act No. 253:  On March 27, 2024, using coded language on Instagram, defendant EVANS advised defendant ARMSTEAD that he and defendant AMOAKO were on their way to sell oxycodone "in the grapes," referring to Grape Street gang territory.

Overt Act No. 254:  On March 27, 2024, using coded language in Instagram messages, defendant ROBINSON told defendant ARMSTEAD he was waiting for a sex worker to finish a sex act.

Overt Act No. 255:  On March 29, 2024, defendant MELENDEZ posted on Instagram an offer to sell promethazine for $20 "a line."

Overt Act No. 256:  On March 30, 2024, using coded messages on Instagram, defendant ARMSTEAD arranged to sell and deliver oxycodone pills for $20 per pill to an unidentified drug customer.

Overt Act No. 257:  On April 1, 2024, in coded messages on Instagram, defendant EVANS asked defendant ARMSTEAD about a sex worker who contacted defendant EVANS on Instagram.  Defendant ARMSTEAD confirmed that she had seen the sex worker before and that she was not an undercover police officer.

Overt Act No. 258:  On April 3, 2024, defendant ARMSTEAD, using coded language on Instagram, asked defendant AMOAKO to call an Uber for her sex worker and promised to give him "the hoovz," meaning pay him back.

Overt Act No. 259:  On April 4, 2024, using coded language on Instagram, defendant ARMSTEAD recruited a sex worker, but the sex worker stated she was "nervous" because defendant ARMSTEAD had beaten several sex workers.  The unidentified sex worker reported to defendant ARMSTEAD that she had a "house call" date for $600.

Overt Act No. 260:  On April 6, 2024, using coded messages on Instagram, defendant EVANS asked defendant ARMSTEAD if she still had a gun.  The next day, defendant EVANS asked defendant ARMSTEAD if she was in the hotel room and she responded affirmatively.  Defendant EVANS replied that he was going to go to the hotel and get the gun, and defendant ARMSTEAD responded that it was in room 17 in a drawer and that the door was open.

Overt Act No. 261:  On April 6, 2024, in coded messages on Instagram, defendant ARMSTEAD and an unidentified person messaged about defendant ARMSTEAD selling oxycodone.

Overt Act No. 262:  On April 6, 2024, using coded messages on Instagram, an unindicted co-conspirator asked defendant ARMSTEAD for oxycodone.

Overt Act No. 263:  On April 6, 2024, defendant MELENDEZ recruited sex workers with the implicit promise of increasing their profits by posting a photograph on Instagram of stacks of money with the caption, "Fig ain't gone fig till you w me".

Overt Act No. 264:  On April 7, 2024, defendants ARMSTEAD, EVANS, HARRIS, and BROOKS were together at the parking lot of the Stadium Inn, with defendant BROOKS in possession of oxycodone, and defendant HARRIS in possession of promethazine in the center console of defendant HARRIS's car.

Overt Act No. 265:  On April 9, 2024, using coded language in a series of Instagram messages, an unindicted co-conspirator told defendant ARMSTEAD she left promethazine with codeine in defendant HARRIS's car and that he was stashing it for her.

Overt Act No. 266:  On April 13, 2024, using coded language on Instagram, as part of a recruitment tactic, defendant YOUNG told Victim 10 that he was going to visit her on the Figueroa Corridor, to which Victim 10 told defendant YOUNG that she was already being pimped by defendant BROOKS.

Overt Act No. 267:  On April 13, 2024, defendant ARMSTEAD sent defendant EVANS an Instagram profile for "theeladyjayy," and defendant EVANS, using coded language, replied that she looked like his sex worker and that he wanted her to work for him.  Defendant

76

ARMSTEAD encouraged defendant EVANS to recruit her, writing, "She would look good in yo stable," referring to defendant EVANS's collection of sex workers.

Overt Act No. 268:  On April 14, 2024, using coded messages on Instagram, defendant ARMSTEAD asked defendant EVANS to send an Uber for one of defendant ARMSTEAD's sex workers.  Defendant EVANS asked defendant ARMSTEAD if the sex worker arrived, and defendant ARMSTEAD replied that she missed the car.  Defendant EVANS offered to send another Uber car.

Overt Act No. 269:  On April 14, 2024, in coded messages on Instagram, defendant EVANS asked defendant ARMSTEAD if she had any oxycodone to sell to another pimp who also rented a room at the hotel.  Defendant ARMSTEAD confirmed that she did and went to the hotel to meet the customer.  Defendant EVANS asked defendant ARMSTEAD to send her $40 and she confirmed she would.  Defendant ARMSTEAD asked where the customer was, and defendant EVANS said he stepped away but that his room was near defendant HARRIS's room.  Defendant ARMSTEAD advised that she would come back to the hotel later, and defendant EVANS said he would contact her as soon as the police left the hotel.  Defendant EVANS informed defendant ARMSTEAD when the police left and defendant ARMSTEAD returned to the hotel to sell the oxycodone.

Overt Act No. 270:  On April 15, 2024, defendant ARMSTEAD knocked on a hotel room door and told defendant EVANS, using coded messages on Instagram, that she was going to put a gun in the room.

Overt Act No. 271:  On April 16, 2024, using coded language, defendant ARMSTEAD told an unidentified third party that she was selling drugs in defendant EVANS's room at a hotel.

Overt Act No. 272:  Between April 16 and 17, 2024, defendants ARMSTEAD and EVANS, using coded messages on Instagram, discussed selling oxycodone out of their shared hotel room.

Overt Act No. 273:  On April 18, 2024, using coded language on Instagram, defendant ARMSTEAD recruited an unidentified woman as a sex worker and demanded $1,000 by the end of her first night.

Overt Act No. 274:  On April 18, 2024, using coded Instagram messages, defendant ARMSTEAD identified a person in a photograph as a law enforcement cooperator, adding, "HooVa want his head!!"

Overt Act No. 275:  On April 20, 2024, using coded messages on Instagram, defendant ARMSTEAD directed an unindicted co-conspirator to loan his car to defendant ARMSTEAD so that she could run someone over with it.

Overt Act No. 276:  On April 20, 2024, using coded messages on Instagram, defendant HARRIS asked defendant YOUNG to book him a hotel room where his sex workers could engage in commercial sex.

Overt Act No. 277:  On April 23, 2024, using coded language on Instagram, defendant MILLER asked defendant ARMSTEAD how much money he could sell a 16-ounce bottle of promethazine with codeine for, and defendant ARMSTEAD responded that it would be worth $180.

Overt Act No. 278:  On April 23, 2024, using coded messages on Instagram, defendant HARRIS asked defendant ARMSTEAD for oxycodone and a car ride.

Overt Act No. 279:  On April 24, 2024, through coded messages on Instagram, defendant ARMSTEAD recruited an unidentified sex worker by offering her drugs and fine dining experiences.  The unidentified sex worker told defendant ARMSTEAD that she was scared of her because defendant ARMSTEAD assaulted people.  Defendant ARMSTEAD claimed that

she did not beat her sex workers, claiming that one of the people she beat had stolen $3,500 that defendant ARMSTEAD was owed from a bank scam.

Overt Act No. 280:  On April 25, 2024, through Instagram messages, defendant ARMSTEAD told an unidentified third party that she was at the Stadium Inn.

              (g)   Defendant ARMSTEAD Sex Trafficked Victim 11, a then-14-Year-Old Girl, While Drug Trafficking with Defendant EVANS

Overt Act No. 281:  On April 26, 2024, through at least April 29, 2024, defendants ARMSTEAD and EVANS utilized hotel rooms at the Stadium Inn for their sex workers, including Victim 11, a 14-year-old girl, to use for commercial sex dates with "Johns."

Overt Act No. 282:  On April 26 and 27, 2024, using coded messages on Instagram, defendant EVANS advised defendant ARMSTEAD he was at the hotel room they were sharing.

Overt Act No. 283:  On April 27, 2024, using coded messages on Instagram, defendant EVANS asked defendant ARMSTEAD to take him to the "10" because "DD" owed him $1,000.  Defendant ARMSTEAD replied that she was on her way.

Overt Act No. 284:  On April 28, 2024, defendant CROCKHAM flashed a Hoovers gang sign in the parking lot of the Stadium Inn.

Overt Act No. 285:  On April 28, 2024, defendant ARMSTEAD took Victim 11 to the House of Hotties in order to purchase clothing for commercial sex work.

Overt Act No. 286:  On April 28, 2024, defendant ARMSTEAD took Victim 11 to a store called "Sluts" located at 7612 S Figueroa Street

in Los Angeles, in order to purchase clothing for commercial sex work.

Overt Act No. 287:  On April 28, 2024, defendant ARMSTEAD gave Victim 11 instructions about how to engage in commercial sex work, including telling Victim 11 not to talk to Black men and other commercial sex workers.

Overt Act No. 288:  On April 28, 2024, while defendant ARMSTEAD was sex trafficking Victim 11, defendant EVANS paid for and picked up food for defendant ARMSTEAD, for which defendant ARMSTEAD told defendant EVANS she would reimburse him.

Overt Act No. 289:  On April 28, 2024, using coded messages on Instagram, defendant ARMSTEAD told defendant EVANS to instruct his sex worker to take oxycodone out of the hotel room after she finished her commercial sex date.  Defendant ARMSTEAD then asked defendant EVANS to take five oxycodone pills to the person in the BMW that was parked in front of the hotel room at Stadium Inn, which defendant EVANS agreed to do.  Defendant ARMSTEAD advised that the customer sent $60 to defendant ARMSTEAD and would give defendant EVANS an additional $40.  Hours later, defendant ARMSTEAD told defendant EVANS that she needed all the remaining oxycodone and asked him to bring her all of it.

Overt Act No. 290:  On April 29, 2024, defendant ARMSTEAD gave Victim 11 a narcotic pill while Victim 11 was engaging in commercial sex acts, which resulted in Victim 11 being under the influence.

Overt Act No. 291:  On April 29, 2024, at approximately 1:01 a.m., defendant ARMSTEAD received a notification from Victim 11 over Instagram messages that Victim 11 did not have condoms.

Overt Act No. 292:  On April 29, 2024, at approximately 1:52 a.m., defendant ARMSTEAD received an Instagram message from Victim 11 informing defendant ARMSTEAD that Victim 11 was leaving the Stadium Inn.

Overt Act No. 293:  On April 29, 2024, at approximately 2:15 a.m., defendant ARMSTEAD sent an Instagram message to Victim 11 asking how much money Victim 11 made from commercial sex work, to which Victim 11 responded that she made $85 but only had $80 because she spent $5 on condoms.

Overt Act No. 294:  On April 29, 2024, at approximately 2:58 a.m., defendant ARMSTEAD received Instagram messages from Victim 11 saying Victim 11 needed more condoms.

Overt Act No. 295:  On April 29, 2024, at approximately 3:44 a.m., defendant ARMSTEAD received an Instagram message from Victim 11 informing defendant ARMSTEAD that Victim 11 was leaving the Stadium Inn.

Overt Act No. 296:  On April 29, 2024, at approximately 4:36 a.m., defendant ARMSTEAD sent an Instagram message to Victim 11, directing her to get five more commercial sex dates.

Overt Act No. 297:  On April 29, 2024, at approximately 8:05 p.m., Victim 11 sent Instagram messages to defendant ARMSTEAD, saying she forgot condoms again, to which defendant ARMSTEAD directed Victim 11 to have somebody else buy them.

Overt Act No. 298:  On April 29, 2024, at approximately 10:22 p.m., defendant ARMSTEAD sent an Instagram message to Victim 11, asking where she was, to which Victim 11 stated she was in a car "doing a blow job."  Defendant ARMSTEAD asked if Victim 11 closed the

door.   Victim 11 said she thought she did close the door, to which defendant ARMSTEAD responded, "Don't close door."

Overt Act No. 299:  On April 29, 2024, defendant ARMSTEAD received three separate Cash App payments from Victim 11, totaling $184.94.

Overt Act No. 300:  On April 29, 2024, using coded messages on Instagram, defendant EVANS told defendant ARMSTEAD that he "fired" his sex worker and asked defendant ARMSTEAD to get her gun and oxycodone, and defendant EVANS's gun, out of their hotel room. Defendant EVANS told defendant ARMSTEAD that he had $80 of hers. Defendant ARMSTEAD agreed to get defendant EVANS's gun and put it in another room she was renting.

Overt Act No. 301:  On April 30, 2024, at approximately 2:46 a.m., defendant ARMSTEAD sent an Instagram message to Victim 11 asking how much money she made.  Victim 11 responded at approximately 2:53 a.m., saying she made $152 but would stay out working until she made $500.  Later, at approximately 3:03 a.m., defendant ARMSTEAD received a request from Victim 11 asking defendant ARMSTEAD to bring her pepper spray and a knife.

Overt Act No. 302:  On April 30, 2024, at approximately 4:00 p.m., defendant ARMSTEAD received Instagram messages from Victim 11 saying that Victim 11 had $2,000 for defendant ARMSTEAD.

Overt Act No. 303:  On April 30, 2024, defendant ARMSTEAD informed defendant GRAY that she was renting Room 15 at the Stadium Inn.

Overt Act No. 304:  On April 30, 2024, defendant GRAY informed defendant ARMSTEAD that he was renting Room 21 at the Stadium Inn.

Overt Act No. 305:  On April 29, 2024, defendant ARMSTEAD offered to sell oxycodone to a suspected sex worker and said she was at the Stadium Inn.

Overt Act No. 306:  On May 1, 2024, using coded messages on Instagram, defendant ARMSTEAD and an unindicted co-conspirator discussed defendant ARMSTEAD's sex trafficking of Victim 11. Defendant ARMSTEAD stated that the trafficking made defendant ARMSTEAD look like a "child predator," after Victim 11's family picked Victim 11 up in the parking lot of the Stadium Inn.  The unindicted co-conspirator informed defendant ARMSTEAD that he was contacted by Victim 11's family.

> (h)  Defendant ULLOA-FRANCO JR. Sex Trafficked Victim 38 Through Force, Fraud, and Coercion

Overt Act No. 307:  Between approximately April 14, 2024 and at least October 13, 2025, defendant ULLOA-FRANCO JR. sex trafficked Victim 38 through violence, threats of violence, and coercive tactics, including alternating between displays of affection or abuse, and promises of a future that is prosperous or bleak, all to manipulate Victim 38 to engage in commercial sex for his financial gain.

Overt Act No. 308:  On April 14, 2024, using a series of Instagram messages and phone calls, defendant ULLOA-FRANCO JR. recruited Victim 38 to work for him as a commercial sex worker by telling her that he wanted to see her "win," that she would enjoy an extravagant lifestyle with him, and that he would not "use" her because he had his own money.

Overt Act No. 309:  On April 21, 2024, defendant ULLOA-FRANCO JR. sent Victim 38 an address for the El Don Motel on Figueroa Street in Los Angeles, to facilitate sex trafficking her there.

Overt Act No. 310:  On April 24, 2024, using coded messages on Instagram, defendant ULLOA-FRANCO JR. told Victim 38 that they needed to change their commercial sex practices to evade law enforcement detection and sent her a post from defendant AMOAKO warning other traffickers regarding law enforcement action on Figueroa Street.

Overt Act No. 311:  From April 27, 2024 through April 29, 2024, defendant ULLOA-FRANCO JR. sex trafficked Victim 38 at the Stadium Inn.

Overt Act No. 312:  On April 27, 2024, at approximately 9:29 a.m., at defendant ULLOA-FRANCO JR.'s direction, Victim 38 entered Room 15 of the Stadium Inn.  Around the same time, defendant EVANS exited Room 11, and defendants EVANS and PHILLIPS left the Stadium Inn on foot, walking toward Vermont Avenue.

Overt Act No. 313:  On April 27, 2024, at approximately 7:55 p.m., defendant ULLOA-FRANCO JR. picked up Victim 38 from the Stadium Inn in a car.

Overt Act No. 314:  On April 27, 2024, at approximately 8:33 p.m., defendant ULLOA-FRANCO JR. entered Room 6 at the Stadium Inn.  Approximately 15 minutes later, defendant ULLOA-FRANCO JR. and Victim 38 exited Room 6, entered defendant ULLOA-FRANCO JR.'s car, and left the Stadium Inn.  Approximately 22 minutes later, defendant ULLOA-FRANCO JR. and Victim 38 returned to the Stadium Inn in a sex customer's car.  At the Stadium Inn, the sex customer and Victim 38 entered Room 6.  Approximately 11 minutes later, the sex customer

84

left Room 6 and drove away from the Stadium Inn, at which point defendant ULLOA-FRANCO JR. entered Room 6.

Overt Act No. 315:  On April 29, 2024, at approximately 3:13 a.m., defendants ULLOA-FRANCO JR. and EVANS, and an unindicted Hoovers gang member, stood in the parking lot of the Stadium Inn and monitored Victim 11's commercial sex dates.

Overt Act No. 316:  On April 29, 2024, at approximately 11:45 p.m., defendant ULLOA-FRANCO JR. and an unindicted co-conspirator and Hoovers gang member stood in the parking lot of the Stadium Inn and monitored Victim 11's commercial sex dates.

Overt Act No. 317:  Between April 29, 2024 and May 17, 2024, defendant ULLOA-FRANCO JR. enticed and maintained Victim 38 through displays of affection and affirmation, repeatedly telling her that he loved her and encouraging her to "work" for her "dream."

Overt Act No. 318:  On May 21, 2024, in a series of Instagram messages, defendant ULLOA-FRANCO JR. berated Victim 38 for speaking to another pimp.

Overt Act No. 319:  Throughout September 2024, defendant ULLOA-FRANCO JR. sex trafficked Victim 38 through psychological harm, alternating between acting like a "boyfriend pimp" and an "aggressive pimp."  Through Instagram messages on September 1, 2024, defendant ULLOA-FRANCO JR. told Victim 38 that he loved her, then later the same day, he called her an "ungrateful ass bitch."  On September 11, 2024, he called her a "rat," then wrote on September 24, 2024, "The only thing I keep u around for is money and now u can't even do that," "Bitch your [sic] literally white trash," and "Ain't good for nothing but being a hoe."  When Victim 38 replied that she did a "good job" for being by herself, defendant ULLOA-FRANCO JR. wrote,

"Bitch wat good job?" and "You're a prostitute."  Defendant ULLOA-FRANCO JR. mocked Victim 38 for telling her family that she was a dancer, writing, "But you don't dance" and "U sell that cochie on fig."  When Victim 38 asked if defendant ULLOA-FRANCO JR. wanted to make her feel bad about what she does, defendant ULLOA-FRANCO JR. replied, "Nah just making sure u don't think u doing some cause u sell pussy."  Defendant ULLOA-FRANCO JR. continued to degrade her, writing, "Like u literally don't even do shit," "U a hoe bitch," "U on fig with lingerie on," "U a whore," and "How it feel to sell that coochie and u still can't even keep a nkigga."

Overt Act No. 320:  On September 24, 2024, using coded language on Instagram, defendant ULLOA-FRANCO JR. posted a message conveying that if a sex worker was disobedient, he responded with violence or threats of violence.

Overt Act No. 321:  On October 27, 2024, through a series of coded Instagram messages and audio messages, defendant ULLOA-FRANCO JR. berated Victim 38 for disobeying his orders to take a Plan B pill and said that her disobedience was an "embarrassment" that he wouldn't tolerate.  Defendant ULLOA-FRANCO JR. warned that he would leave Victim 38 if she didn't make money for him, and he taunted that he could "shit on" her "easily."  Defendant ULLOA-FRANCO JR. told Victim 38 she should "be happy" that he brought her home and didn't leave her on Figueroa Street like he usually did.  Defendant ULLOA-FRANCO JR. told Victim 38 to keep her $1,000 because he had other sex workers who pay him without being disobedient.  Defendant ULLOA-FRANCO JR. then coerced her to keep working, and claimed that he was building for their retirement with her sex trafficking proceeds: "And it's not all your money cause I guarantee you when u graduate from

the game in a couple of years and u living off everything I put in motion for 50 year plus u gone be glad u put in your part in the beginning and now u just reap the benefits from it [crown emoji] that's what staying down is."

Overt Act No. 322:  On November 16, 2024, through a coded audio message on Instagram, defendant ULLOA-FRANCO JR. yelled at Victim 38 and stated that she was a pimp's "worst nightmare" because she was disobedient and did not make enough money.  Through coded Instagram messages, defendant ULLOA-FRANCO JR. warned Victim 38 not to come into his territory or he would shoot her with a paintball gun.  The next day, defendant ULLOA-FRANCO JR. told Victim 38 that he loved her.

Overt Act No. 323:  On November 23, 2024, through coded messages on Instagram, defendant ULLOA-FRANCO JR. called Victim 38 a "snitch" and repeatedly berated her for reporting him to the police. Defendant ULLOA-FRANCO JR. taunted that he was "too smart" to go to jail because "I'm like a physic [sic] I see things before they happen."  In a coded audio message the same day, defendant ULLOA-FRANCO JR. boasted that he intentionally degraded Victim 38 to "test" her and it worked "every time" because she had low self-esteem.

Overt Act No. 324:  On December 6, 2024, defendant ULLOA-FRANCO JR. sent Victim 38 a series of Instagram messages accusing her of choosing up to a different pimp and deriding her for it.  The next day, in a coded Instagram message, defendant ULLOA-FRANCO JR. threatened Victim 38 that she would be robbed or assaulted if she tried to work on Figueroa Street without him.

Overt Act No. 325:  On December 14, 2024, in an Instagram message, defendant ULLOA-FRANCO JR. told Victim 38 that he loved her.

Overt Act No. 326:  On December 28, 2024, in an Instagram message, defendant ULLOA-FRANCO JR. wrote to Victim 38, "Im a pimp I don't move with feelings or make bitches fall in love so they can pay me I play the game how it goes and that gets me and my people the best results not when we act on emotions."

Overt Act No. 327:  On January 3, 2025 and January 4, 2025, in a series of Instagram messages, defendant ULLOA-FRANCO JR. showered Victim 38 with affection, including writing, "I love you and I love the life we creating."

Overt Act No. 328:  On January 18, 2025, in a series of coded Instagram messages, defendant ULLOA-FRANCO JR. repeatedly insulted Victim 38 and her family when he thought that she had stopped engaging in commercial sex work for his benefit.  He wrote, "Im not romantic," "Im a pimp bitch," "I though u knew," "Dumbass bitch." When Victim 38 told defendant ULLOA-FRANCO JR. that she was still going to work on Figueroa Street but would not turn over her proceeds to him, he threatened, "Oh u on fig still?  Watch this bitch.  Ima make yo night hell . . . Watch this."  When Victim 38 told him that she would make money without him, he threatened, "Not on my blade tho . . . Watch."  Defendant ULLOA-FRANCO JR. further threatened that once Victim 38 made money on Figueroa Street, he would bring an unidentified third party to beat her up and drag her through the street.  Defendant ULLOA-FRANCO JR. repeatedly claimed control over sex trafficking activities on the Figueroa Corridor, writing, "This my set," "Ima know," "And ima have my way," "Watc[h], "Ima get u that fade tho," with "fade" referring to a beating.  In a coded audio message invoking the name of the "Westside Hoovers," defendant ULLOA-FRANCO JR. threatened to have Victim 38 beaten to make her comply

with defendant ULLOA-FRANCO JR.'s orders to pay him her sex trafficking proceeds, adding, "Now I'm hurting you . . . I'll get you a fade."

Overt Act No. 329:  On January 20, 2025, through coded Instagram messages, defendant returned to recruiting Victim 38, telling her he was there for her and asking if she was going to keep her commercial sex proceeds on her, implying that she should give them to defendant ULLOA-FRANCO JR. for her own safety.

Overt Act No. 330:  On March 9, 2025, through coded messages on Instagram, defendant ULLOA-FRANCO JR. called Victim 38 a "snitch" and said, "that's worse than anything," to which Victim 38 responded that defendant ULLOA-FRANCO JR. beats women.

Overt Act No. 331:  On April 2, 2025, in a series of coded audio messages on Instagram, defendant degraded Victim 38, asserting that she was a worthless "prostitute" because she came from a family of drug addicts, in contrast to defendant ULLOA-FRANCO JR.'s "good" family who imbued him with work ethic.  When Victim 38 asked defendant ULLOA-FRANCO JR. to leave her alone and remove her from his Instagram posts, defendant ULLOA-FRANCO JR. refused to remove content about Victim 38, telling her that he was using photographs of the apartment he got her and her designer shoes to recruit other sex workers.

Overt Act No. 332:  On April 3, 2025, defendant ULLOA-FRANCO JR. asked Victim 38 for her sex trafficking proceeds.

Overt Act No. 333:  On April 5, 2025, through coded messages on Instagram, defendant ULLOA-FRANCO JR. told Victim 38 that he loved her, but then later wrote that he'd never marry her and that it would be "embarrassing" to have a wife who was previously a sex worker.

Three days later, he again wrote that he loved her.  Two days after that, defendant ULLOA-FRANCO JR. told Victim 38 that she was his "baby," and that he was a "pimp to these other hoes," but that Victim 38 was his "lover."  Two days later, on April 12, 2025, defendant ULLOA-FRANCO JR. told Victim 38 that he was "banging" on her door for "some trap," and added, "other then [sic] that I don't need you."

Overt Act No. 334:  On May 21, 2025, through coded messages on Instagram, defendant ULLOA-FRANCO JR. berated Victim 38 for following other pimps on Instagram and accused her of being disloyal.

Overt Act No. 335:  On July 11, 2025, through coded messages on Instagram, defendant ULLOA-FRANCO JR. pitted Victim 38 against Victim 35, saying Victim 35 wanted her "spot," meaning as defendant ULLOA-FRANCO JR.'s primary sex worker, and that Victim 38 was the "type" to "hand it" to her, implying that Victim 38 wasn't working hard enough for defendant ULLOA-FRANCO JR.

Overt Act No. 336:  On July 18, 2025, through coded messages on Instagram, defendant ULLOA-FRANCO JR. told Victim 38 that he abused her because she did not show him respect as his sex worker; that she was not "smart enuff [sic]" to get her way with him; and that she was a "bottom[] of the barrel" sex worker who required mistreatment.  He threatened that if she did not continue to perform commercial sex work, he would spend all the money she earned and she would be left with nothing.

Overt Act No. 337:  On July 30, 2025, through coded messages on Instagram, defendant ULLOA-FRANCO JR. taunted Victim 38, calling her and her family "white trash" and asserting that she was "not good for nothing but selling pussy," but that she wouldn't be able to do that once defendant ULLOA-FRANCO JR. told his associates that she was

"fired" and was a "renegade."  He furthered threatened that his associates would take her phone and taunted that he "want[ed]" her to attempt to do commercial sex work so that he could "embarrass" her.

Overt Act No. 338:  On July 30, 2025, through coded messages on Instagram, defendant ULLOA-FRANCO JR. threatened Victim 38, "Bitch u gone get beat [the fuck] up" and asserted that it was his "set" and he could move through it however he wanted.

Overt Act No. 339:  On September 28, 2025, in a coded audio message on Instagram, defendant ULLOA-FRANCO JR. told Victim 38 that she was "replaceable" and that "on Hoover," if she left him for another pimp, he'd replace her with someone more obedient.

(i)    Defendant LENOX Sex Trafficked Victim 39, a then-17-Year-Old Girl, Produced Child Sexual Abuse Material of Her, and Transported Victim 39 Across State Lines for Sex Trafficking

Overt Act No. 340:  Between at least June 22, 2024, and July 7, 2024, defendant LENOX sex trafficked Victim 39, a then-17-year-old girl.  While trafficking Victim 39, defendant LENOX tracked her location via her cellphone.

Overt Act No. 341:  Between June 22, 2024 and June 27, 2024, defendant LENOX sex trafficked Victim 39 out of a Motel 6 in Phoenix, Arizona, and during this time collected at least $575 of Victim 39's commercial sex proceeds through four Cash App payments.

Overt Act No. 342:  Throughout June 24 and 25, 2024, while in Phoenix, Arizona, defendant LENOX used coded Instagram messages to sex traffic Victim 39, including telling her to secure 16 sex dates in one evening, instructing her to secure another date before she could stop for the night, and having Victim 39 report her dates and remit her earnings to defendant LENOX.

Overt Act No. 343: On June 26, 2024, while at a Motel 6 in Phoenix, Arizona, defendant LENOX produced child sexual abuse material of Victim 39, which included a video of Victim 39 performing oral copulation on defendant LENOX.

Overt Act No. 344: On June 27, 2024, while at a Motel 6 in Phoenix, Arizona, defendant LENOX produced child sexual abuse material of Victim 39, which included a video of defendant LENOX having vaginal intercourse with Victim 39.

Overt Act No. 345: On June 28, 2024, defendant LENOX transported Victim 39 from Phoenix, Arizona to Los Angeles, California.

Overt Act No. 346: Between June 28, 2024 and July 7, 2024, defendant LENOX sex trafficked Victim 39 out of the Stadium Inn and photographed her lying on a bed at the Stadium Inn.

Overt Act No. 347: Between June 28, 2024 and June 30, 2024, defendant LENOX received at least $350 in commercial sex proceeds from Victim 39 in two Apple Pay payments.

Overt Act No. 348: On July 4, 2024, during the time defendant LENOX trafficked Victim 39 and using coded Instagram messages, defendant LENOX told an unidentified Instagram user that his sex trafficking victim told him she was 18 years old but that she was probably a minor.

Overt Act No. 349: Between July 9, 2024 and November 3, 2024, after Victim 39 was no longer working for him, using coded text messages, defendant LENOX attempted to recruit Victim 39 to come back and work for him in Arizona. Defendant LENOX told Victim 39 he had two other sex workers working for him.

Overt Act No. 350:  In July 2024, defendant LENOX recorded multiple rap songs glorifying pimping.  In one July 25, 2024 song, defendant LENOX said, "Break her and go brick her.  Take her to the blade and blade her," and "Fuck the macaroni bitch, I told you I need the cheese first.  How good do your feet work?  Get back on Fig first," referring to sex workers making money on Figueroa Street.

> (j)  Defendant LENOX Sex Trafficked Victim 19 on Defendant HARRIS's Behalf while Defendant HARRIS was in Custody

Overt Act No. 351:  Between at least July 10, 2024 and August 20, 2024, defendant LENOX sex trafficked Victim 19 while defendant HARRIS was in custody for pimping and attempted murder in Los Angeles, California.

Overt Act No. 352:  On July 10, 2024, using coded language in text messages, defendant LENOX messaged Victim 19 on defendant HARRIS's behalf, instructing her to provide money for defendant HARRIS's bail.

Overt Act No. 353:  On July 18, 2024, defendant LENOX text messaged Victim 19 asking her whether she had been earning money.

Overt Act No. 354:  On August 11, 2024, using coded language in text messages, defendant LENOX instructed Victim 19 to engage in commercial sex and put the proceeds in defendant HARRIS's commissary account.

Overt Act No. 355:  On August 13, 2024 and again on August 19, 2024, using coded language in text messages, defendant LENOX told Victim 19 that he was going to collect the money she earned through commercial sex work for defendant HARRIS's benefit, including to pay his lawyer.

Overt Act No. 356:  On August 20, 2024, in coded text messages, defendant LENOX told an unindicted co-conspirator that Victim 19 was not responding to his messages.  Defendant LENOX agreed with the co-conspirator that Victim 19 "need[ed] her ass beat."

Overt Act No. 357:  On August 21, 2024, using coded text messages, defendant LENOX relayed defendant HARRIS's message to Victim 19, calling her a "bull shit bitch" and warning that defendant HARRIS would "be out soon," referring to defendant HARRIS's incarceration.

Overt Act No. 358:  On September 11, 2024, through coded Instagram messages, defendant LENOX told Victim 19 that he would provide defendant HARRIS with her new phone number and asked Victim 19 to put more money in defendant HARRIS's jail account.

(k)   Defendant YOUNG Sex Trafficked Victim 12, a then-17-Year-Old Girl, Through Force, Fraud, and Coercion

Overt Act No. 359:  In June 2024, defendant YOUNG sex trafficked Victim 12, who was a 17-year-old girl at the time.

Overt Act No. 360:  Between June 18, 2024, until at least June 27, 2024, using coded text messages, defendant YOUNG received reports from Victim 12 of her movements, informing defendant YOUNG whether a commercial sex date would occur in a motel room or in the commercial sex buyer's car.

Overt Act No. 361:  On June 19, 2024, using coded text messages, defendant YOUNG told Victim 12 that the motel room was available for her to engage in a commercial sex date, and instructed her to inform him when the commercial sex buyer left the room.

Overt Act No. 362:  On or before June 19, 2024, defendant YOUNG physically assaulted Victim 12.

Overt Act No. 363:  On June 23, 2024, using coded text messages, defendant YOUNG directed Victim 12 to have a commercial sex buyer send payment to defendant YOUNG's Cash App account.  When the payment did not work, defendant YOUNG directed Victim 12 to take the commercial sex buyer to an ATM.

Overt Act No. 364:  On June 25, 2024, using coded text messages, defendant YOUNG told Victim 12 that he publicly beat her because she disrespected him in front of other people.

(l)  Defendant YOUNG Sex Trafficked Victim 13 Through Force, Fraud, and Coercion

Overt Act No. 365:  On June 28, 2024, using coded messages on Instagram, defendant YOUNG's sex trafficking victim, Victim 13, reported details of her commercial sex date to defendant YOUNG and advised that she sent the proceeds of this date to defendant YOUNG via Cash App.

Overt Act No. 366:  On June 29, 2024, using coded messages on Instagram, defendant YOUNG instructed Victim 13 to keep the hotel room door open when she used the room for a commercial sex date.

Overt Act No. 367:  On June 29, 2024, using coded messages on Instagram, defendant YOUNG required Victim 13 to remit her earnings from commercial sex work to him, and they discussed which money application to use to transmit her earnings.

Overt Act No. 368:  On June 29, 2024, using coded messages on Instagram, defendant YOUNG instructed Victim 13 about how to arrange dates with commercial sex buyers and the language to use for these communications.  Victim 13 reported to defendant YOUNG that she had a date with two commercial sex buyers and would receive $100 per buyer.

Overt Act No. 369:  On June 29, 2024, using coded messages on Instagram, defendant YOUNG directed Victim 13 to tell commercial sex buyers to use certain payment platforms, in order for defendant YOUNG to be paid directly, after Victim 13 had engaged in commercial sex acts.  Defendant YOUNG confirmed he received a $200 payment.

Overt Act No. 370:  On June 30, 2024, defendant YOUNG received reports from Victim 13, through coded messages on Instagram, that she received $220 for a commercial sex date and that defendant YOUNG would receive her earnings via Cash App.

Overt Act No. 371:  On June 30, 2024, defendant YOUNG informed Victim 13, through coded language on Instagram, that he would bring condoms to her motel room for a commercial sex date.

Overt Act No. 372:  Throughout late June and early July 2024, defendant YOUNG received reports from Victim 13 about her commercial sex dates and confirmed that she would remit her proceeds to him via Cash App or have commercial sex buyers send payments to defendant YOUNG directly via Apple Pay.

Overt Act No. 373:  On July 9, 2024, defendant YOUNG received a report from Victim 13, through coded language on Instagram, that Victim 13 received $300 from a commercial sex buyer who was a "regular."

Overt Act No. 374:  On July 12, 2024, defendant YOUNG manipulated and controlled Victim 13 by pitting her against his new sex worker, telling Victim 13 that the new sex worker could earn $2,500 from commercial sex because she was obedient, unlike Victim 13.  To further demean Victim 13, he told Victim 13 that he robbed some of the commercial sex buyers that Victim 13 worked with and made

$2,500, implying that he had to intervene because she was not making enough on her own.

Overt Act No. 375:  On July 12, 2024, through coded messages on Instagram, Victim 13 confronted defendant YOUNG about pimping minors. Defendant YOUNG did not deny pimping minors, and instead taunted Victim 13, noting that he made $2,500 from Victim 12's sex work. Defendant YOUNG repeatedly told Victim 13 that she was worthless and could not make nearly as much as his other sex workers, including Victim 12.  He further taunted her, asserting that Victim 12 made him enough money to get "multiple cars," and instructed Victim 13, "Keep up bitch."  He wrote that she was "pressured up" to make more money because defendant YOUNG impregnated Victim 12 and thus Victim 12 would eventually need to take leave from commercial sex work.

Overt Act No. 376:  On July 12, 2024, defendant YOUNG sent Victim 13 a coded audio message on Instagram, threatening, "You ain't gonna touch nothing but death bitch.  Somebody going to kill you bitch.  A trick, a pimp, somebody bitch, ME!  Dead homies."

Overt Act No. 377:  On July 12, 2024, defendant YOUNG sent Victim 13 a coded audio message on Instagram, threatening, "Don't ever let me see you down bitch, nigga going to knock you the fuck out bitch.  Like I slapped your dumb ass head into the wall bitch."

        (m)   Defendant YOUNG Sex Trafficked Victim 14, a then-15-Year-Old Girl, and Produced Child Sexual Abuse Material of Her

Overt Act No. 378:  Beginning on July 6, 2024, defendant YOUNG sex trafficked Victim 14, a then-15-year-old girl, out of the Stadium Inn.

Overt Act No. 379:  On July 9, 2024, while at the Stadium Inn, defendant YOUNG produced child sexual abuse material of Victim 14,

which included a video of Victim 14 performing oral copulation on defendant YOUNG, which was taken from defendant YOUNG's point of view while he held the camera.

Overt Act No. 380:  On July 9, 2024, while at the Stadium Inn, defendant YOUNG produced child sexual abuse material of Victim 14, which included a video of defendant YOUNG having vaginal intercourse with Victim 14 in a shower.

Overt Act No. 381:  On July 12, 2024, using coded messages on Instagram, defendant YOUNG told Victim 10 that Victim 14 was his only loyal sex worker.

Overt Act No. 382:  On July 18, 2024, defendant YOUNG produced child sexual abuse material of Victim 14, which included a video of Victim 14 performing oral copulation on defendant YOUNG, which was taken from defendant YOUNG's point of view while he held the camera.

Overt Act No. 383:  On July 27, 2024, until at least July 29, 2024, defendant YOUNG facilitated the posting of commercial sex advertisements for Victim 14.

> (n)  Defendant HARRIS Sex Trafficked Victim 15, a then-17-Year-Old Girl

Overt Act No. 384:  On an unknown date, but before July 8, 2024, Victim 15 was branded with a tattoo of defendant HARRIS's first name on her buttocks.  She was also branded with a tattoo, on her face, of the first letter of defendant HARRIS's name, "N," and a crown, which represented that defendant HARRIS was her pimp.

Overt Act No. 385:  On July 8, 2024, defendant HARRIS and his sex trafficking victim, Victim 15, who was a 17-year-old girl at the time, appeared in a video filmed in a hotel room.  In the video, Victim 15 was lying on a bed and defendant HARRIS had a stack of

money in his hand.  Victim 15 stated she had $370 and needed four more commercial sex dates to get where she needs to go.  Defendant HARRIS rhetorically asked where she needed to go and Victim 15 stated to get a "band," referring to making $1,000.  Defendant HARRIS belittled her and asked if she was "a thousand-dollar bitch."  In the video, Victim 15 was dressed in a see-through fish-net style dress that showed her buttocks.

Overt Act No. 386:  On July 8, 2024, using coded language in text messages, Victim 15 asked defendant HARRIS if she could stop sex work for the night, and defendant HARRIS denied her request.

(o)  Defendant HARRIS Continued to Sex Traffic Victim 15 as an Adult through Violence and Threats of Violence; Defendant YOUNG Attempted to Recruit Victim 15

Overt Act No. 387:  On November 24, 2024, using coded language in text messages, Victim 15, who had since become an adult, reported to defendant HARRIS that she needed more condoms for commercial sex dates, to which defendant HARRIS replied he needed money.  Victim 15 directed defendant HARRIS to her Cash App account.

Overt Act No. 388:  On November 28, 2024, using coded language in text messages, Victim 15 reported to defendant HARRIS that she was at the House of Hotties and needed more condoms for commercial sex dates.  Defendant HARRIS advised Victim 15 of his location while she was engaging in dates.

Overt Act No. 389:  On November 30, 2024, using coded language in text messages, Victim 15 begged defendant HARRIS for permission to stop working and to go inside out of the cold, noting that other pimps were allowing their sex workers to go inside due to the weather.  Defendant HARRIS denied her request.  Victim 15 continued

to plead, telling him, "my feet hurt Naziz, real bad."  Eventually, defendant HARRIS permitted her to stop working and take shelter.

Overt Act No. 390:  On December 3, 2024, using coded text messages, Victim 15 told defendant HARRIS that her head hurt. Ignoring her, defendant HARRIS replied that he got more condoms for her commercial sex dates.  Victim 15 again told defendant HARRIS her head hurt, and he asked if she needed to go to the hospital.  Victim 15 indicated that she could not go to the hospital because she would not be able to explain the bruises on her face, and continued to work despite her pain.

Overt Act No. 391:  On December 7, 2024, using coded language in text messages, defendant HARRIS threatened to slap Victim 15 if she persisted to be clingy and ordered her not to turn off the location monitoring feature on her phone that allowed defendant HARRIS to track her.

Overt Act No. 392:  On December 8, 2024, using coded language in text messages, defendant HARRIS told Victim 15 about a new sex worker he started pimping.

Overt Act No. 393:  On December 12, 2024, using coded language in text messages, defendant HARRIS instructed Victim 15 to inform him if she secured a commercial sex date.

Overt Act No. 394:  On December 22, 2024, using coded language in text messages, defendant YOUNG texted Victim 15 in an attempt to recruit her.  Victim 15 told defendant YOUNG that defendant HARRIS trafficked minors and that defendant HARRIS was trafficking a young woman who was pregnant with defendant YOUNG's child.  During the conversation, using coded language, defendant YOUNG stated he bought $700 worth of promethazine with codeine.

100

(p)    Defendant MILLER Sex Trafficked Victim 40 Through Force, Fraud, and Coercion

Overt Act No. 395:  From approximately September 7, 2024 to October 27, 2024, defendant MILLER sex trafficked Victim 40 in and around Los Angeles.  Defendant MILLER dictated when Victim 40 worked and when she was permitted to rest.  He required Victim 40 to turn over all her earnings to him and monitored her.  He threatened to beat her and to beat other sex workers working for defendant MILLER.

Overt Act No. 396:  On September 6 and 12, 2024, using coded language on Instagram, defendant MILLER offered Victim 40 marijuana.

Overt Act No. 397:  On September 7, 2024, using coded language on Instagram, defendant MILLER recruited Victim 40 to work for him as a commercial sex worker.  Defendant MILLER stated that he would collect commercial sex proceeds from Victim 40 after every two commercial sex dates, and he warned that he was monitoring her on the blade.

Overt Act No. 398:  On September 7, 2024, until at least December 1, 2024, using coded language on Instagram, defendant MILLER required Victim 40 to report when she had a commercial sex date and how much money she earned from the dates.  Defendant MILLER transported Victim 40 to and from the blade and required her to seek permission from him before she took a break from commercial sex work.

Overt Act No. 399:  On September 8, 2024, using coded language on Instagram, defendant MILLER directed Victim 40 not to get in a car with another sex worker's pimp.

Overt Act No. 400:  On September 8, 2024, using coded language on Instagram, defendant MILLER told Victim 40 that the tattoo of his brand on her body needed to be big.

Overt Act No. 401:  Between September 8 and 10, 2024, at defendant MILLER's direction, Victim 40 was branded with a tattoo of defendant MILLER's moniker, "FY3."

Overt Act No. 402:  On September 11, 2024, in coded messages and audio messages on Instagram, defendant MILLER directed Victim 40 to send her sex trafficking proceeds to a Cash App account linked to the House of Hotties, then told her to send him a screenshot of the payment, to which Victim 40 responded with the requested screenshot.

Overt Act No. 403:  On September 11, 2024, in a coded audio message on Instagram, defendant MILLER told Victim 40 that another sex worker had "a mouth on her" and that he would knock out the other sex worker.

Overt Act No. 404:  On September 12, 2024, using coded language on Instagram, defendant MILLER directed Victim 40 to finesse commercial sex buyers and make more money, but not to lower prices.

Overt Act No. 405:  On September 13, 2024, in a coded audio message on Instagram, defendant MILLER directed Victim 40 to stop giving her phone number to commercial sex buyers for free, and to charge them for her number.  He also directed her to get back on the blade.  When Victim 40 responded that she was only off the blade for a short time to get food, defendant MILLER stated he was aware she was back on the blade because he drove by to check.

Overt Act No. 406:  On September 13, 2024, using coded language on Instagram, defendant MILLER directed Victim 40 to wear certain lingerie for the purpose of commercial sex work.

Overt Act No. 407:  On September 13, 2024, in response to an Instagram message from Victim 40 asserting that defendant MILLER had been mean to another sex worker, defendant MILLER stated in a coded

audio message, "I ain't trying to be mean but I would have yelled at yo ass too, the fuck, and you woulda got chopped.  Bitches get beat up for that."

Overt Act No. 408:  On September 14, 2024, using coded language on Instagram, Victim 40 informed defendant MILLER that a commercial sex buyer would send the money she earned from a commercial sex date to defendant MILLER through Apple Pay and defendant MILLER said, "I'm waiting."  Less than a minute later, Victim 40 sent defendant MILLER a screenshot of a person sending a $250 Apple Pay payment.

Overt Act No. 409:  On September 14, 2024, using coded language on Instagram, defendant MILLER told Victim 40, "On hoova get more baby," when she reported a sex buyer was willing to pay her $600. When Victim 40 told defendant MILLER that the buyer gave her $700 but had more money, defendant MILLER directed her to get $2,000 so that defendant MILLER could buy things for Victim 40 and so that defendant MILLER had additional money while Victim 40 was away.

Overt Act No. 410:  On September 15, 2024, in a coded audio message on Instagram, defendant MILLER told Victim 40 she was allowed to take a break from commercial sex work, and that he would inform her when she needed to go back out.

Overt Act No. 411:  On October 26, 2024, using coded language on Instagram, defendant MILLER told Victim 40, "Well I told u I'm here just want some money that's it," after Victim 40 told him that she had a chest cold, had been working outside, was not happy with life, and needed him.  Victim 40 went on to say she wanted defendant MILLER to hug her so that she could stop feeling worthless and then stated she could have a commercial sex buyer send $40 to defendant MILLER. Ignoring Victim 40's requests for comfort, defendant MILLER responded

that the buyer should send money to his Cash App.  Later in the conversation, Victim 40 told defendant MILLER she was depressed and wanted him by her side.  Defendant MILLER responded with a coded audio message directing her to get focused because he needed money and demanded that Victim 40 tell him exactly how much money she had and directed her not to "tuck" any of the money.

(q)    Defendant LOCKETT Sex Trafficked Victim 41 Through Force, Fraud, and Coercion

Overt Act No. 412:  Between at least November 2024 and November 19, 2025, defendant LOCKETT sex trafficked Victim 41, a then-18-year-old woman, through assaults, threatened assaults, false promises, and alternating between affection and verbal abuse.

Overt Act No. 413:  On November 25, 2024, defendant LOCKETT, using a series of coded text messages, directed Victim 41 where to engage in commercial sex, instructed her to report her earnings, sent her an Uber, apprised her of police presence, and demanded she delete all their text messages evidencing him sex trafficking her. Defendant LOCKETT, through coded messages, told her they would work out of the Stadium Inn because they couldn't find an Airbnb.

Overt Act No. 414:  On November 26, 2024, defendant LOCKETT beat Victim 41 in the back and ribs and bit off a chunk of her cheek. After he beat her, defendant LOCKETT gave Victim 41 a Percocet pill and sent her to the hospital to get stiches.  As Victim 41 waited at the hospital, defendant LOCKETT sent her a series of coded text messages, writing that they were "both wrong for [their] actions," that he would marry her and had saved money for them, and that he couldn't go into the hospital with her because "they gone take me to jail."  Victim 41 replied that she loved him, apologized for being

"selfish," and promised to make $1,000 in commercial sex proceeds the next day.  Defendant LOCKETT coached Victim 41 to lie to the police at the hospital and say that her sister bit her face during a fight and that she did not want to make a report.  He also demanded that she delete his number, their messages, and her call log.

Overt Act No. 415:  On November 26, 2024, defendant LOCKETT sent a photograph of the bite he took out of Victim 41's face to defendant EVANS over Instagram messages:

Overt Act No. 416:  On November 27, 2024, at defendant LOCKETT's direction, Victim 41 engaged in commercial sex and reported her earnings to defendant LOCKETT through coded text messages.  She also told defendant LOCKETT that her jaw hurt and asked him to change her bandages.

Overt Act No. 417:  On November 29, 2024, through a series of coded text messages, defendant LOCKETT mocked and berated Victim 41 for thinking defendant LOCKETT was her "boyfriend" and called her an "emotional lil girl."  Later the same day, defendant LOCKETT repeatedly told Victim 41 that he loved her and criticized her for being erratic.  Defendant LOCKETT shifted again to scolding her for thinking they were in a relationship, then shifted once more to expressing his love for her and calling her his "baby."

Overt Act No. 418:  On December 3, 2024, through coded text messages, defendant LOCKETT took credit for Victim 41 obtaining a downpayment on a car from a sex customer, told Victim 41 that it was a product of her obeying defendant LOCKETT, demanded that she get him a set of keys, and warned that she better not leave him now that she had a car.  Defendant LOCKETT directed Victim 41 that they would use the car to recruit other sex workers.

Overt Act No. 419:  On December 5, 2024, through coded text messages, defendant reprimanded Victim 41, writing, you "being outta pocket in my hood is unacceptable," conveying that she must obey him, particularly in his gang territory.  Throughout December 2024, defendant tracked Victim 41's commercial sex proceeds, ordered her to continue working and send him her earnings, and coached her to recruit others to do sex work for him.

Overt Act No. 420:  On December 18, 2024, through coded text messages, Victim 41 reported to defendant LOCKETT that she deposited $330 in commercial sex proceeds into his account.  Defendant LOCKETT told her to keep working even if she could not find any customers.

Overt Act No. 421:  On December 18, 2024, through coded text messages, defendant LOCKETT instructed Victim 41 to recruit girls, including a girl defendant LOCKETT knew to be a minor, to perform commercial sex work for defendant LOCKETT.

Overt Act No. 422:  On December 29, 2024, through coded text messages, defendant LOCKETT berated Victim 41 for not answering his calls.  When Victim 41 explained that she had been stopped by police, defendant LOCKETT ordered her to delete all their messages and calls to avoid the police discovering he was her trafficker.

Overt Act No. 423:  From approximately January 9 to January 11, 2025, through coded text messages, defendant LOCKETT directed Victim 41 on how to behave while she was on a weekend trip with a commercial sex buyer, including telling Victim 41 to play a "role" and warning that she better come back to him at the end of the trip, then love bombing her with false promises that they would get an apartment together and build a "happy home."  Defendant LOCKETT also threatened Victim 41, "If u fuck up this money [just] know ur going down

everyday," "24hrs I promise," meaning that if the sex buyer did not pay Victim 41 $5,000 for the weekend trip, Victim 41 would have to work on the blade every day around the clock to make up for it.  To further pressure Victim 41 to secure payment, defendant LOCKETT falsely promised that he was trying to make them rich so they could buy a house together and bring Victim 41's family to Los Angeles.

Overt Act No. 424:  On January 16, 2025, through coded text messages, defendant LOCKETT directed Victim 41 to put the $300 she made from commercial sex work into his account.

Overt Act No. 425:  On January 22, 2025, through coded text messages, defendant LOCKETT directed Victim 41 to put the $680 she made from commercial sex work into his account.

Overt Act No. 426:  On February 28, 2025, through coded text messages, defendant LOCKETT directed Victim 41 to tattoo his moniker "Jankie" on her lower back.

Overt Act No. 427:  Between the late hours on July 10, 2025 and the early morning hours of July 11, 2025, through coded text messages, defendant LOCKETT directed Victim 41 to go solicit commercial sex dates with an unidentified co-conspirator's sex worker, reminding Victim 41 not to engage with any young black men and instructing her to delete their messages and calls when her sex customer arrived and to make the dates "fast."

Overt Act No. 428:  On July 22, 2025, through coded text messages, defendant LOCKETT told Victim 41, "U got my name stamped/Don't ever betray me," referring to Victim 41 getting defendant LOCKETT's moniker "Jankie" tattooed on her back at defendant LOCKETT's direction.

Overt Act No. 429:  Throughout September 2025, while Victim 41 was receiving money from her regular sex customer and working at a strip club, defendant LOCKETT love bombed her and promised, "Imma give u the world one day," to maintain control over her and the money she generated.

Overt Act No. 430:  On November 10, 2025, defendant LOCKETT beat Victim 41 on her face, causing a knot.  Defendant LOCKETT then demanded that if Victim 41 wanted her belongings back, she had to talk to him in person, adding, "ur scared to come in here because u feel like ur going to get hit[.]  Thats ur problem," shifting the blame of his pattern of abuse to her.  Defendant LOCKETT then finessed Victim 41, telling her that he loved her and asking her to skip work so he could make her dinner.

Overt Act No. 431:  Between November 13 and 15, 2025, using coded text messages, defendant LOCKETT told Victim 41 to make $1,000 through commercial sex work and instructed her on how to recruit other females to perform commercial sex work for him.

(r)  Enterprise Members Committed Assaults to Advance the Hoovers Reputation, Acquired and Stored Guns, Recruited and Sex Trafficked, and Distributed Drugs

Overt Act No. 432:  On unknown dates, but no earlier than January 1, 2024, defendant MOUTON posted photographs of rifles, handguns, and shotguns on Instagram.  In some photographs, the firearms appear to be loaded with drum magazines and extended magazines.

Overt Act No. 433:  On an unknown date, but no earlier than January 1, 2024, defendant MOUTON posted on Instagram a video of what appears to be a woman being repeatedly shot with a firearm. Defendant MOUTON captioned the post, "to all dem setup bitches,"

warning his sex trafficking victims not to take money from him or report him to law enforcement.

Overt Act No. 434:  On an unknown date, but no earlier than January 1, 2024, defendant MOUTON posted on Instagram a photograph of the number "5200" with the digits 00 crossed out with an orange line, an homage to the "5 deuce" set of the Hoovers and a sign of disrespect to the Rollin 100s, a rival gang to the Hoovers Enterprise.

Overt Act No. 435:  On January 10, 2024, using coded language on Instagram, defendant BROOKS requested to purchase "tris" from another Instagram user, and the Instagram user instructed defendant BROOKS to contact defendant ARMSTEAD in order to make the purchase.

Overt Act No. 436:  On May 3, 2024, using coded language on Instagram, defendant ARMSTEAD told a third party that defendant ARMSTEAD "beat [the fuck] outta" an unidentified person, and added, "like read bad."

Overt Act No. 437:  On May 4 and 5, 2024, using coded language in Instagram messages, defendants ISREL and ARMSTEAD discussed oxycodone, and defendant ISREL left a coded audio message regarding buying drugs from defendant ARMSTEAD and another person.

Overt Act No. 438:  On May 5, 2024, defendant ISREL sent an audio message to defendant ARMSTEAD, using coded language, explaining that his sex trafficking victim was informing others that defendant ISREL "pistol-whipped her."

Overt Act No. 439:  On May 8, 2024, in a car in the parking lot of the Stadium Inn, defendant ARMSTEAD possessed oxycodone with the intent to distribute it.

Overt Act No. 440:  On May 12, 2024, in coded messages on Instagram, defendant EVANS advised defendant CROCKHAM to move his new sex workers around frequently because it makes them "dependent on you," reducing the chance of them being able to leave.

Overt Act No. 441:  On May 13, 2024, using coded language on Instagram, defendant EVANS attempted to recruit an unidentified victim to be his sex worker, fraudulently claiming he specialized in "upgrading lives and investing money," and that he had "been doing this shit so long it's kinda different" for him because he "already got rich out the game" and now he just "elevate[s] girls and put[s] them in position . . . car bank act credit apartment surgeries traveling etc."

Overt Act No. 442:  On May 14, 2024, using coded messages on Instagram, defendant EVANS directed his sex worker to attempt to steal watches and to try to get regular sex customers, boasting that he has mastered trafficking sex workers on the blade, on the internet, and across state lines.

Overt Act No. 443:  On May 16, 2024, in order to recruit sex workers by curating an image of a lavish lifestyle, defendant AMOAKO posted on Instagram a photograph of himself in the U.S. Virgin Islands donning a fancy watch, including a caption on the photograph that read, "Take You Out The Country To Island . . . Lets Explore I Wonder If $he Want . . . ."

Overt Act No. 444:  On May 17, 2024, using coded messages on Instagram, defendant ULLOA-FRANCO JR. told defendant MELENDEZ that defendant ARMSTEAD had an assault rifle style firearm available for $1,500, to which defendant MELENDEZ replied that he was "trying to get it."

Overt Act No. 445:  On May 17, 2024, after defendant ULLOA-FRANCO JR. reported to defendant MELENDEZ that defendant MELENDEZ's sex worker had not been working hard, defendant MELENDEZ told defendant ULLOA-FRANCO JR., in coded messages on Instagram, that defendant MELENDEZ had verbally accosted his sex worker, threatened her that he had "eyes and ears everywhere," and ordered her to work harder.  Defendant MELENDEZ boasted that he'd "break her for everything," referring to taking all her money from commercial sex work.

Overt Act No. 446:  On May 18, 2024, using coded messages on Instagram, defendant MELENDEZ inquired about purchasing a firearm from another Instagram user.

Overt Act No. 447:  On May 20, 2024, using coded language on Instagram, defendants HARRIS and EVANS discussed the sale of drugs.

Overt Act No. 448:  On May 23, 2023, and again on July 9, 2024, using coded messages on Instagram, defendant ARMSTEAD agreed to sell oxycodone to an unidentified pimp.

Overt Act No. 449:  On May 24, 2024, using coded messages on Instagram, defendant EVANS told defendant ARMSTEAD that he was checking out of their room and that he had her gun.  Defendant ARMSTEAD asked defendant EVANS to get the gun to a trustworthy Hoovers member at the hotel and defendant EVANS indicated it would be with defendant CROCKHAM in hotel room number 7.  On May 30, 2024, using coded language, defendant ARMSTEAD told defendant EVANS to get her gun from defendant CROCKHAM.

Overt Act No. 450:  On May 24, 2024, using coded language on Instagram, defendant EVANS told defendant HARRIS that he wanted

111

defendant HARRIS to hold onto defendant ARMSTEAD's gun for safekeeping, but that it was now with defendant CROCKHAM.

Overt Act No. 451:  On May 25, 2024, using coded language on Instagram, defendant MOUTON attempted to recruit an Instagram user to be his sex worker, writing, "I was waiting for you to show me some to make me happy," and including a "hand out" emoji and a "money bag" emoji, common emojis used to refer to pimping.

Overt Act No. 452:  On May 25, 2024, using coded language on Instagram, defendant ARMSTEAD agreed to pick up defendant PHILLIPS from defendant GRAY's house.

Overt Act No. 453:  On May 26, 2024, defendant ARMSTEAD sent an unidentified co-conspirator a video she filmed showing at least four persons beating to the ground a man who shoplifted from House of Hotties.  On the video, defendant ARMSTEAD screamed at the shoplifter, "Get the fuck out . . . Don't steal shit in the set . . . On Hoover . . . What groove out."

Overt Act No. 454:  On May 26, 2024, to curate an image of himself as a wealthy and powerful pimp, defendant AMOAKO posted a story on Instagram including a photograph of him wearing an expensive watch, with bundles of cash and a firearm at his feet.

Overt Act No. 455:  On May 27, 2024, using coded messages on Instagram, defendant ARMSTEAD sent a video of law enforcement activity to defendant HARRIS and advised him to "laylow" because he was "hot," indicating that he was engaged in criminal activity that could be detected by police.  Defendant HARRIS replied, in coded messages, that he had left the area with his gun to avoid police detention.  Defendant ARMSTEAD again said defendant HARRIS was "hot,"

and defendant HARRIS replied that police were "grabbing bitches off fig."  Defendant ARMSTEAD replied, "They looking for minors."

Overt Act No. 456:  On June 3, 2024, using coded language on Instagram, defendant ARMSTEAD told defendant EVANS to get her gun from defendant CROCKHAM and put it in defendant EVANS's hotel room. Defendant EVANS told her he would bring it to hotel room number 17.

Overt Act No. 457:  On June 4, 2024, using coded language on Instagram, defendant ARMSTEAD told one of her sex workers, who she perceived as disrespecting her, "If I SEE IM SMASHING U," "bitch I'm beating yo ass . . . And your gonna see," and "Bitch ima kill u."  On June 17, 2024, in coded messages over Instagram, defendant ARMSTEAD threatened to rob the sex worker and her new pimp.  On July 2, 2024, defendant ARMSTEAD threatened the sex worker again, writing, "Drunccc ass bitch be careful outside the opps getting popped," meaning that sex workers working for rival gang members are getting assaulted or shot.

Overt Act No. 458:  On June 4, 2024, through messages on Instagram, defendant ULLOA-FRANCO JR. contacted defendant ARMSTEAD to find an apartment for his sex trafficking victim, Victim 38.

Overt Act No. 459:  On June 4, 2024, defendant YOUNG posted a story on Instagram, which showed defendants YOUNG and EVANS, and other unindicted Hoovers gang members, one of which is heard saying, "West Side Hoovers."

Overt Act No. 460:  On June 7, 2024, using coded audio messages on Instagram, defendant MOUTON threatened an Instagram user, saying, "all you going to do is make it worse for your cousin.  I'm going to beat the fuck out of her."  Defendant MOUTON sent another audio message, saying, "[I] put my hands on females.  I slap bitches.  I do

it all on Hoover, especially to hoes like her.  She's a 304 bitch, dead homies, that's on Sierra Highway.  Hoover.  That bitch getting slapped up when I see her."  In a final audio message, defendant MOUTON told the Instagram user, "On Hoover I'm going to make sure the bitch gets stomped out.  I'm going to stomp her out myself.  You know all the hoes get slapped on the dead homies, we slap bitches out."

Overt Act No. 461:  On June 11, 2024, defendant HARRIS, using coded language, asked defendant ARMSTEAD to send him $40 so he could send his sex worker an Uber ride.

Overt Act No. 462:  On June 15, 2024, using coded language in Instagram messages, defendant ARMSTEAD told defendant ROBINSON that she "got the bitch snow she jus ran up the choosing fee," indicating that a sex trafficking victim would have to pay an increased fee to work for defendant ARMSTEAD.

Overt Act No. 463:  On June 16, 2024, through coded messages on Instagram, defendant ULLOA-FRANCO JR. agreed to purchase marijuana for defendant AMOAKO and deliver it to him.

Overt Act No. 464:  On June 16, 2024, using coded language on Instagram, defendant MILLER asked an unindicted co-conspirator where defendant YOUNG was and informed the co-conspirator that he needed Hoovers gang members to engage in a "lick," referring to illicit activities such as robbery.

Overt Act No. 465:  On June 16, 2024, using coded language on Instagram, defendant BROOKS told defendant AMOAKO that defendant BROOKS had reacquired his main sex worker the previous night, to which defendant AMOAKO replied that it was all a part of "the Game."

Overt Act No. 466:  On June 22, 2024, through coded messages on Instagram, defendant ARMSTEAD agreed to sell promethazine with codeine to defendant ULLOA-FRANCO JR.

Overt Act No. 467:  On June 25, 2024, using coded language on Instagram, defendant EVANS told defendant ARMSTEAD that he had to take his sex worker to get food.

Overt Act No. 468:  On June 26, 2024, through coded messages on Instagram, defendants ULLOA-FRANCO JR. and BROOKS discussed getting hotel rooms where they would sex traffic their sex workers.

Overt Act No. 469:  On June 26, 2024, using coded messages on Instagram, defendant EVANS and defendant HARRIS discussed their sex workers.  Defendant HARRIS told defendant EVANS he no longer had a Mexican sex worker, and that his Black sex worker did not make the same amount of money.

Overt Act No. 470:  On July 2, 2024, using coded messages on Instagram, defendant EVANS instructed defendant HARRIS to allow him to use defendant HARRIS's car while defendant EVANS's sex worker completed a commercial sex date.  Defendant EVANS told defendant HARRIS that he needed to stay close to the commercial sex date in case the commercial sex buyers did anything to his sex worker, explaining that his sex worker was servicing two commercial sex buyers.

Overt Act No. 471:  On July 2, 2024, using coded language on Instagram, defendant HARRIS told defendant EVANS that he was going to drop his sex worker off on the Figueroa Corridor.

Overt Act No. 472:  On July 4, 2024, using coded language on Instagram, defendant YOUNG attempted to recruit Victim 10 to be a sex worker for him, promising to buy her a phone.

Overt Act No. 473:  On July 4, 2024, using coded language on Instagram, defendant YOUNG told Victim 10 that he was going to pick her up along with two other sex workers he recruited that "chose up" with him, that is, agreed to be his sex workers.

Overt Act No. 474:  On July 5, 2024, in coded messages on Instagram, defendant ROBINSON asked to purchase promethazine with codeine from defendant ARMSTEAD, and they arranged a meeting place to complete the transaction.

Overt Act No. 475:  On July 5, 2024, defendant ROBINSON sent defendant ARMSTEAD screenshots of coded text messages between defendant ROBINSON and an unknown sex worker in which the sex worker asked defendant ROBINSON to leave her alone since he had new sex workers.  In the messages with the sex worker, defendant ROBINSON threatened that he and another person would physically assault the sex worker.

Overt Act No. 476:  Between July 8, 2024 and August 3, 2024, using coded language on Instagram, defendant MOUTON attempted to recruit another Instagram user to be his sex worker, claiming that they would make money together and that by choosing defendant MOUTON, the Instagram user "can't go wrong."  Defendant MOUTON told the Instagram user that she would need to earn a "choosing fee" and that he would only require her to pay him half her earnings.

Overt Act No. 477:  On July 8, 2024, through coded messages on Instagram, defendant ARMSTEAD agreed to sell promethazine with codeine and Percocet pills to defendant ULLOA-FRANCO JR.

Overt Act No. 478:  On July 8, 2024, using coded language on Instagram, defendant YOUNG told Victim 10 that he was going to

116

instruct her on how to conduct herself as his sex worker, once she recovered from an injury.

Overt Act No. 479:  On July 9, 2024, defendant YOUNG received a request from Victim 10, using coded language on Instagram, that Victim 10 needed an outfit from House of Hotties.

Overt Act No. 480:  On July 13, 2024, in coded Instagram messages, defendant EVANS recruited a prospective sex worker by telling her that if she paid him and represented him "properly," she and her kids could have "anything," and that his fee to work for him was $5,000.

Overt Act No. 481:  On July 16, 2024, defendant AMOAKO, using coded language on Instagram, told defendant ARMSTEAD that he needed his sex trafficking victim, Victim 5, physically assaulted to ensure her compliance.

Overt Act No. 482:  On July 16, 2024, defendant ARMSTEAD, using coded language on Instagram, agreed to physically assault defendant AMOAKO's sex trafficking victim, Victim 5, to discipline her and gain her compliance.

Overt Act No. 483:  On July 17, 2024, defendant ARMSTEAD, using coded messages on Instagram, told an unindicted co-conspirator that defendant AMOAKO offered defendant ARMSTEAD and the unindicted co-conspirator $1,500 to physically assault his sex worker Victim 5 and that Victim 5 was currently on Figueroa Street.  The unindicted co-conspirator confirmed that defendant AMOAKO told her the same thing and asked defendant ARMSTEAD to pick her up.

Overt Act No. 484:  On July 18, 2024, using coded language, defendant EVANS told defendant ARMSTEAD that he had been collecting money from sex workers on Long Beach Boulevard for the past few days.

117

Defendant ARMSTEAD, using coded language, asked him to send the address of defendant EVANS's location.

Overt Act No. 485:  On July 28, 2024, defendant ARMSTEAD, using coded language on Instagram, offered to sell an unindicted co-conspirator promethazine with codeine for "$100 a line."

Overt Act No. 486:  On July 31, 2024, using coded messages on Instagram, defendant ARMSTEAD and defendant ROBINSON discussed transporting sex workers from the San Fernando Valley.

Overt Act No. 487:  On August 1, 2024, using coded language on Instagram, defendant MOUTON attempted to recruit an Instagram user to be his sex worker by asking if she had a pimp.  When she responded that she did not have a pimp and asked defendant MOUTON whether he was a pimp, he replied, "I could be you know[.]  I get to the bag myself so building with a bitch would be lovely[.]"

Overt Act No. 488:  On August 8, 2024, through coded messages on Instagram, defendants ULLOA-FRANCO JR. and BROOKS discuss their whereabouts; defendant BROOKS wrote that he was headed toward Figueroa Street and defendant ULLOA-FRANCO JR. wrote that he was on Figueroa Street already.

Overt Act No. 489:  On August 8, 2024, using coded language on Instagram, defendant LENOX and another Instagram user discussed trying to recruit a sex worker who had posted on social media that she had recently left her pimp.

Overt Act No. 490:  On August 13, 2024, using coded language on Instagram, defendant PHILLIPS recruited a potential sex worker by promising, among other things, "All I need is 30 days we gone have everything car and house."  Defendant PHILLIPS further told her that he only wanted to pimp her short term to accumulate wealth, which

they would do together because she would make $1,000 a day.  He promised that she would eat well, be treated well, and would never want to leave him.  The unidentified female agreed to work for defendant PHILLIPS, and they discussed when she would start.

Overt Act No. 491:  On August 16, 2024, using coded language on Instagram, defendant PHILLIPS told an unidentified person that he currently had two sex workers.  The unidentified person criticized defendant PHILLIPS for beating his sex workers.

Overt Act No. 492:  On September 23, 2024, while defendant HARRIS was in custody for pimping and attempted murder in Los Angeles, California, defendant LENOX gave defendant HARRIS Victim 15's contact information.

Overt Act No. 493:  On September 26, 2024, using coded language on Instagram, Victim 10 asked defendant YOUNG to help her after she was raped by a commercial sex buyer and left naked on the highway.

Overt Act No. 494:  On September 26, 2024, defendant YOUNG and an unindicted co-conspirator drove a car with Victim 16, a then-15-year-old girl, around the Figueroa Corridor, while attempting to recruit another victim who was walking on the blade.

Overt Act No. 495:  On September 29, 2024, using coded language on Instagram, defendant YOUNG told Victim 10 that he found a third party to make a Megapersonals.com account for Victim 10 to post sex advertisements.

Overt Act No. 496:  On September 30, 2024, defendant MOUTON posted a photograph on Instagram of a woman from the waist down in clothing worn for commercial sex work.  Defendant MOUTON captioned the photograph with the "open hands" emoji, which is commonly associated with paying a pimp money for commercial sex work.

119

Overt Act No. 497:  On October 3, 2024, using coded messages on Instagram, defendant EVANS told an unidentified person that he had previously trafficked a minor victim known as "Temptation." Defendant EVANS explained that defendant ARMSTEAD also used to pimp "Temptation" when the victim was a minor.

Overt Act No. 498:  On October 4, 2024, on Instagram, defendant PHILLIPS told an unidentified female, "baby i live Ina hoovas I be with them everyday," claiming his allegiance to the Hoovers gang.

Overt Act No. 499:  On October 9, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that his sex workers left him, explaining that one female ran out of the room begging defendant EVANS not to beat her.

Overt Act No. 500:  On October 11, 2024, in coded messages on Instagram, defendant ULLOA-FRANCO JR. arranged to purchase Percocet pills from defendant AMOAKO.

Overt Act No. 501:  On October 21, 2024, using coded language on Instagram, defendant LENOX attempted to recruit another Instagram user to be his sex worker by stating that he wanted to recruit her away from her current pimp.

Overt Act No. 502:  On October 22, 2024, using coded language on Instagram, defendant BROOKS told defendant EVANS that his sex worker had a "Hp," also known as a hoe partner, who was "feelin" defendant EVANS.

Overt Act No. 503:  On October 24, 2024, using coded language on Instagram, defendant MOUTON offered to broker a sale of oxycodone between defendant ULLOA-FRANCO JR. and an unidentified source. Defendant MOUTON told defendant ULLOA-FRANCO JR. that it would cost $10 per pill for approximately 400 pills of oxycodone.

Overt Act No. 504:  On October 24, 2024, using Instagram, defendant EVANS sent defendant BROOKS a posted advertisement for the sale of verified accounts on various commercial sex platforms, to assist defendant BROOKS in his sex trafficking.

Overt Act No. 505:  On October 24, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that he was picking up a sex worker from an "out-call" and that he just got a new sex worker, who he described as a "Lil Spanish hoe from San Diego." Defendant EVANS stated he saw the new sex worker at the Stadium Inn and that he recruited her on Figueroa Street.  Defendant EVANS explained that the new sex worker responded to defendant EVANS's Instagram story and then defendant EVANS picked her up and recruited her away from her previous pimp.

Overt Act No. 506:  On October 28, 2024, using coded language on Instagram, defendant ULLOA-FRANCO JR. told defendant BROOKS that defendant BROOKS was amassing a collection of sex workers and defendant BROOKS affirmed that he was feverishly recruiting sex workers.

Overt Act No. 507:  On October 28, 2024, using coded messages on Instagram, defendant AMOAKO asked defendant EVANS where defendant EVANS was, to which defendant EVANS replied that he was in the hundreds blocks in Hoovers territory and that defendant BROOKS needed his help resolving an issue between two sex workers.

Overt Act No. 508:  On October 30, 2024, using coded messages on Instagram, defendant EVANS asked defendant AMOAKO for oxycodone and defendant AMOAKO replied that he had two pills left.  Defendant EVANS said he would pick up his sex worker and then get the oxycodone from defendant AMOAKO.

121

Overt Act No. 509:  On October 30, 2024, defendant ISREL posted a video on Instagram featuring defendant ISREL and three unidentified females, in which defendant ISREL recruits the women, exclaiming, "We gonna go to the top."  One of the women stated, "I thought yo bitch was the prize," referring to his sex worker.  Defendant ISREL replied, "I'm the prize in the situation that's why I come with a choosing fee you know."

Overt Act No. 510:  On November 2, 2024, which is the 112 Hoovers "Hood Day," defendant EVANS posted an Instagram story of himself holding two semi-automatic pistols while wearing a shirt that read "112 General," referencing the 112 Hoovers.

Overt Act No. 511:  On November 3, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that he would pick them up but he was waiting for one of his sex workers to finish an "in-call" date.

Overt Act No. 512:  On November 10, 2024, using coded messages on Instagram, defendant EVANS told an unindicted co-conspirator that defendant EVANS made his sex workers work 12-hour shifts and that he was aspiring to make their feet bleed, their bunions burst, and make them "stand outside forever like the Statue of Liberty."

Overt Act No. 513:  On November 15, 2024, using coded Instagram messages, defendant ISREL asked defendant AMOAKO for oxycodone, to which defendant AMOAKO replied that he was at House of Hotties.

Overt Act No. 514:  Between November 15 and 18, 2024, using coded messages on Instagram, defendants EVANS and LOCKETT discussed the conditions on various blades to determine which would be the most lucrative.  Defendant EVANS said that he was headed to Bakersfield, California to sex traffic after he got a new rental car in Los

Angeles, to which defendant LOCKETT replied that he'd go with him to Bakersfield and split the cost of renting a truck.

Overt Act No. 515:  On November 16, 2024, defendant BROOKS received an audio message in which Victim 42, using coded language, accused defendant BROOKS of beating his sex worker.  Defendant BROOKS did not deny the assault and instead asked, using coded language, why Victim 42 was not with the assaulted sex worker that day.

Overt Act No. 516:  On November 23, 2024, through coded messages on Instagram, defendant BROOKS asked defendant ULLOA-FRANCO JR. about his sex trafficking and if he was working on the Figueroa Corridor. Defendant ULLOA-FRANCO JR. told defendant BROOKS that defendant ULLOA-FRANCO JR.'s sex worker had just made $900 off two commercial sex customers.

Overt Act No. 517:  On November 23, 2024, using coded messages on Instagram, defendant PHILLIPS asked defendant ROBINSON to connect him with a drug dealer from Grape Street, an ally gang, to sell defendant PHILLIPS a pint of promethazine.  Defendant ROBINSON agreed to contact him immediately.

Overt Act No. 518:  Between November 24, 2024 and November 29, 2024, defendants HARRIS and LENOX discussed earning money to pay for a rental car and a hotel room to sex traffic victims.  While discussing how to get someone to leave after having sex, defendant HARRIS told defendant LENOX, "H UP ON HOOVA."

Overt Act No. 519:  On November 25, 2024, using coded language on Instagram, defendant BROOKS threatened Victim 42, called her a "fagget" numerous times, and warned her, "don't let me see u on my trac . . . still ain't have sent me no $ Dhz."  Defendant BROOKS then sent his Cash App username to Victim 42, suggesting the only way

Victim 42 would be safe was if she sent money to defendant BROOKS' Cash App.

Overt Act No. 520:  On November 30, 2024, using coded messages on Instagram, defendants AMOAKO and BROOKS discussed their sex workers' current locations and dates.  Defendants AMOAKO and BROOKS bragged that they were intrinsically skilled pimps.

Overt Act No. 521:  On November 30, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that his sex worker was stabbed by another sex worker who was drunk, and that he wanted revenge.  Defendant EVANS and the unidentified co-conspirator discussed whether defendant EVANS exacting revenge would cause strife within the Hoovers gang.  The other user reminded defendant EVANS that "Ain't nobody bigger than the program," referring to the Hoovers.  Defendant EVANS expressed frustration that he let his sex worker get threatened and did not retaliate "for the bigger cause of the set."

Overt Act No. 522:  On December 9, 2024, using coded language on Instagram, defendant EVANS told an unidentified person that he was out of town with his sex worker, and that his sex worker was on a commercial sex date.

Overt Act No. 523:  On December 11, 2024, using coded language on Instagram, defendant EVANS told an unidentified co-conspirator which streets were used as blades in Vallejo and Oakland, and explained that the blade in San Francisco was shut down.

Overt Act No. 524:  On December 14, 2024, using coded language on Instagram, defendant EVANS and an unidentified co-conspirator discussed a sex worker that they both trafficked.  Defendant EVANS said that when he "got her" she had already been with five other

124

pimps.  A week later, on December 21, 2024, using coded messages on Instagram, the unidentified co-conspirator asked EVANS for advice on whether a sex worker should be beaten for being too comfortable with a sex buyer, to which defendant EVANS responded, "Hell yea," and confirmed that disciplinary action was necessary.

Overt Act No. 525:  On December 15, 2024, in coded text messages, defendant LOCKETT attempted to recruit an unidentified victim to engage in commercial sex work, telling her, "I love hoes and prostitu[t]es" and "Let's get rich together."

Overt Act No. 526:  On December 17, 2024, through coded messages on Instagram, defendant EVANS told an unidentified person, "I'm from Hoova I pimp that's my income but I ain't no fkn soft ass pimp," also adding that he and defendant ARMSTEAD had "been holding the set down hooves wise for years now" and that it was time for defendant EVANS to increase his profits.

Overt Act No. 527:  On December 19, 2024, using Instagram messages, defendant LOCKETT asked defendant EVANS to call him because defendant LOCKETT needed "pimp advice."

Overt Act No. 528:  On December 23, 2024, using coded language on Instagram, defendant YOUNG told defendant HARRIS that defendant YOUNG was "trapping selling all drugs," referring to distributing drugs.

Overt Act No. 529:  On December 25, 2024, using coded language on Instagram, defendant YOUNG told defendant HARRIS that he knew defendant HARRIS was pimping minors and that it was dangerous. Defendant YOUNG then told defendant HARRIS that he had one of defendant HARRIS's sex workers and that defendant HARRIS could not have her back.

Overt Act No. 530:  On December 27, 2024, defendant BROOKS sent defendant ULLOA-FRANCO JR. a video of them together with another unindicted Hoovers gang member throwing Hoovers gang signs and using coded language to disrespect the Rollin 100s, a rival gang.

Overt Act No. 531:  On December 28, 2024, using coded language on Instagram, defendant LENOX attempted to recruit another Instagram user to be his sex worker by promising they would earn money together and that he could get her into clubs for commercial sex work.

Overt Act No. 532:  On December 28, 2024, using coded language in text messages, defendant LENOX attempted to recruit a sex worker, claiming she could earn money right away and that she would be defendant LENOX's "trap queen."

Overt Act No. 533:  On December 30, 2024, using coded language in Instagram messages, defendant ISREL told defendant AMOAKO to come to Las Vegas so defendant ISREL could teach him about how to use prostitutes to steal from commercial sex buyers, also known as "reaching."  Defendant ISREL stated he made $10,000 to $100,000 from watches stolen from commercial sex buyers.  Defendant ISREL said that he and defendant AMOAKO make Hoovers pimps look good now, as past perceptions of Hoovers pimps were bad.

(s)  Defendant HARRIS, Aided and Abetted by Defendant LENOX, Sex Trafficked Victim 17, a then-16-Year-Old Girl, Produced Child Pornography of Victim 17, Provided Victim 17 With a Fake Identification Card, and Transported Victim 17 Around the Country for Sex Trafficking

Overt Act No. 534:  In and around November 2024, while defendant HARRIS was in custody, defendant LENOX used defendant HARRIS's Instagram account to recruit Victim 17, a then-16-year-old girl, to be defendant HARRIS's commercial sex worker.  Defendant LENOX asked

126

Victim 17 for her phone number so that he could share it with defendant HARRIS.  Defendant HARRIS then began communicating with Victim 17 directly.

Overt Act No. 535:  In and around December 2024 until at least February 2025, defendant HARRIS engaged Victim 17 in commercial sex, including by grooming and recruiting Victim 17 for commercial sex work, promising to buy her clothing, beauty treatments, and anything she wanted, if she worked for him, and teaching Victim 17 the "rules" of commercial sex work.

Overt Act No. 536:  In and around December 2024, defendant HARRIS provided a fake California identification card to Victim 17, with a birthdate in 1999.  Defendant HARRIS instructed Victim 17 to use this false identification to rent hotel rooms, Airbnbs, and cars, and to use the false identification any time production of identification was required, including for contact with law enforcement.

Overt Act No. 537:  From December 2024 until at least February 2025, defendant HARRIS told Victim 17 that his sex workers were required to work seven days a week, and required a quota of $1,500 to $2,000 per day for sex work.  During this period, Victim 17 made approximately $14,000 per week for sex work, and gave all of the earnings to defendant HARRIS.

Overt Act No. 538:  In or around December 2024 until at least February 2025, defendant HARRIS directed Victim 17 to engage in commercial sex acts at the Stadium Inn.

Overt Act No. 539:  In or around December 2024 until at least February 2025, defendant HARRIS transported Victim 17 from Los

Angeles, California to Phoenix, Arizona, for the purpose of commercial sex work, approximately four times.

Overt Act No. 540:  In February 2025, defendant HARRIS transported Victim 17 to different states for the purpose of commercial sex work and directed her to conduct commercial sex dates on blades in Los Angeles and San Diego, California, Phoenix, Arizona, and Denver, Colorado.

Overt Act No. 541:  In or around December 2024 until at least February 2025, defendant HARRIS directed Victim 17 to charge specific prices for commercial sex work.

Overt Act No. 542:  In or around December 2024 until at least February 2025, defendant HARRIS took photographs of Victim 17, and directed her to take photographs, to be posted as online advertisements for commercial sex, including on Megapersonal.com.

Overt Act No. 543:  In or around December 2024 until at least February 2025, defendant HARRIS punched, smacked, and beat Victim 17 to discipline her and ensure compliance in being sex trafficked.

Overt Act No. 544:  In or around December 2024 until at least February 2025, defendant HARRIS distributed oxycodone to Victim 17 to make her more compliant, and to exert control over Victim 17 by fostering a drug dependency.

Overt Act No. 545:  On December 12, 2024, using coded text messages, defendant HARRIS directed Victim 17 to send him photographs so he could post a sex advertisement for her.

Overt Act No. 546:  On December 23, 2024, defendant HARRIS monitored Victim 17 while she was working on the street to pick up commercial sex dates.  Using coded language in text messages, defendant HARRIS and Victim 17 discussed the prices of her commercial

sex dates and Victim 17 confirmed she would give defendant HARRIS the earnings from her dates.

Overt Act No. 547:  On December 23, 2024, using coded language in text messages, defendant HARRIS directed Victim 17 to bring a commercial sex buyer to an ATM in order to withdraw money to pay for a commercial sex act, and then directed Victim 17 to tell the commercial sex buyer to give $70 cash and pay the rest of the money to defendant HARRIS via Zelle.

Overt Act No. 548:  On December 23, 2024, defendant HARRIS received reports from Victim 17, using coded language in text messages, about the money Victim 17 had earned for him from multiple commercial sex dates.

Overt Act No. 549:  On December 24, 2024, using coded language in text messages, Victim 17 reported to defendant HARRIS that Victim 17 needed to use the bathroom and defendant HARRIS gave her permission to do so.

Overt Act No. 550:  On December 25, 2024, using coded text messages, Victim 17 reported to defendant HARRIS regarding her commercial sex dates and asked defendant HARRIS to take her to get more condoms.  They discussed a commercial sex date involving two commercial sex buyers, and defendant HARRIS directed Victim 17 to charge more because the date was taking more than the allotted time.

Overt Act No. 551:  Between December 27, 2024, and December 30, 2024, using coded text messages, defendant HARRIS and Victim 17 continued to discuss the details of Victim 17's commercial sex dates and the proceeds of these dates.

Overt Act No. 552:  On December 30, 2024, using coded language in text messages, defendant HARRIS instructed Victim 17 to wait

outside a hotel room for another sex worker to finish using the room, directing Victim 17 to enter the room once the other sex worker exited.  Victim 17 later reported that she left the proceeds from the dates for defendant HARRIS in the hotel dresser.

Overt Act No. 553:  On January 2, 2025, defendant HARRIS sent a photo to Victim 17 depicting a hand holding pink pills with "K, 56" stamped on them, resembling oxycodone pills.  Victim 17 indicated that she had a buyer for the pills and asked defendant HARRIS how much they were, to which defendant HARRIS told Victim 17 they cost $20.

Overt Act No. 554:  In or around January 2025, defendant ROBINSON recruited Victim 17 to work for him, including driving her to the Stadium Inn to collect her belongings from defendant HARRIS. When they arrived, defendant HARRIS was at the hotel, and both defendants HARRIS and ROBINSON instructed Victim 17 to choose one of them as her pimp.  Victim 17 chose defendant ROBINSON.  Defendant HARRIS asked defendant ROBINSON for permission to hit Victim 17 as an exit fee, which defendant ROBINSON allowed.  Defendant HARRIS hit Victim 17 in the face.  Following the assault, defendant ROBINSON took Victim 17 back to the Figueroa Corridor to continue commercial sex work.  Soon after, Victim 17 called defendant HARRIS to pick her up, and started working for him again.

Overt Act No. 555:  In early January 2025, defendant HARRIS transported Victim 17 from Los Angeles, California, to San Diego, California, for the purpose of commercial sex work.

Overt Act No. 556:  On January 4, 2025, defendant HARRIS provided Victim 17 with defendant LENOX's phone number so that Victim

130

17 could send defendant LENOX the proceeds of her commercial sex work via Apple Pay.

Overt Act No. 557:  On January 29, 2025, while in Los Angeles, defendant HARRIS produced child sexual abuse material of Victim 17, which included a video of Victim 17 performing oral copulation on defendant HARRIS, which was taken from defendant HARRIS's point of view while he held the camera.

Overt Act No. 558:  On February 6, 2025, defendant HARRIS, defendant LENOX, and others transported Victim 17 from 88th Street to 103rd Street, along Figueroa Street, to engage in commercial sex work.

Overt Act No. 559:  On February 9, 2025, until at least February 12, 2025, defendant HARRIS produced approximately two child sexual abuse material videos of Victim 17, which included defendant HARRIS recording Victim 17 performing oral copulation on defendant HARRIS, and defendant HARRIS engaging in vaginal intercourse with Victim 17 in different positions.

Overt Act No. 560:  On February 11, 2025, defendant ROBINSON and an unknown co-conspirator drove up to Victim 17 while she was on the blade in Hoovers territory, and the unknown co-conspirator beat Victim 17.

Overt Act No. 561:  In or around February 2025, in Phoenix, Arizona, defendant HARRIS directed Victim 17, Victim 18, Victim 43, and Victim 44 to engage in commercial sex work and earn $1,000 each, so that he could purchase a firearm.

Overt Act No. 562:  In or around February 2025, defendant HARRIS transported Victim 17, Victim 18, Victim 43, and Victim 44 to

Phoenix, Arizona and Denver, Colorado for the purpose of commercial sex work.

Overt Act No. 563:  In or around February 2025, in Denver, Colorado, defendant HARRIS directed Victim 17 and Victim 18 to engage in commercial sex work and forced Victim 17 and Victim 18 to walk the blade in the snow.

Overt Act No. 564:  On February 21, 2025, defendant HARRIS transported Victim 17, Victim 18, Victim 43, and Victim 44 from Denver, Colorado to Ogallala, Nebraska, with the intent to drive through Nebraska to Chicago, Illinois and sex traffic the victims in Chicago.  While in Ogallala, Nebraska, law enforcement stopped the car on the highway and found defendant HARRIS's firearm in the car. To avoid being arrested, defendant HARRIS directed Victim 17 to tell law enforcement that his firearm belonged to Victim 17 because Victim 17 was a minor.

(t)  While in Custody, Defendant HARRIS Worked with Defendant LENOX to Continue Sex Trafficking Victims

Overt Act No. 565:  On March 5, 2025, defendant HARRIS was arrested on charges related to sex trafficking Victim 17 and was transported to, and held in custody in, Nebraska.

Overt Act No. 566:  From approximately March 24, 2025, to March 30, 2025, while defendant HARRIS was in custody in Nebraska for sex trafficking Victim 17, defendants HARRIS and LENOX continued to sex traffic defendant HARRIS's sex workers.  Through jail calls, defendants HARRIS and LENOX discussed the sex workers, and defendant HARRIS directed defendant LENOX to pass messages to the sex workers, including directing them to testify in his case.  During a call on March 28, 2025, defendant LENOX stated that he did not have any money

and asked defendant HARRIS if he should pick up a new sex worker who could earn money.

Overt Act No. 567:  On March 25, 2025, while defendant HARRIS was in custody in Nebraska for sex trafficking Victim 17, he continued to sex traffic females, including Victim 18, who reported to him in a phone call that she was engaging in commercial sex dates.

Overt Act No. 568:  On March 26, 2025, while defendant HARRIS was in custody in Nebraska for sex trafficking Victim 17, he called defendant LENOX, who connected a three-way call with Victim 19, and defendant HARRIS directed Victim 19 to testify in his sex trafficking case in a manner favorable to defendant HARRIS.

Overt Act No. 569:  From approximately March 27, 2025, until at least March 31, 2025, while defendant HARRIS was in custody in Nebraska for sex trafficking Victim 17, he continued to sex traffic Victim 15 and directed her over jail calls.  In these calls, using coded language, Victim 15 apprised defendant HARRIS of the proceeds that she earned for him through commercial sex work.  During a call on March 31, 2025, using coded language and to manufacture an alibi for why he was in Chicago, defendant HARRIS instructed Victim 15 to search for concerts in Chicago and send him information so he could claim he was traveling to Chicago for a concert, and not to sex traffic Victim 17.  Defendant HARRIS berated Victim 15 during this call, repeatedly calling Victim 15 "dumb" for not understanding he was trying to speak in code.

Overt Act No. 570:  On June 29, 2025, while defendant HARRIS was in custody in Nebraska for sex trafficking Victim 17, defendant HARRIS instructed defendant LENOX to post defendant HARRIS "on the

apps," to recruit additional sex workers.  Defendant LENOX responded, "I'm definitely getting that together."

Overt Act No. 571:  On July 22, 2025, while defendant HARRIS was in custody in Nebraska for sex trafficking Victim 17, defendant HARRIS told defendant LENOX and another individual that he needed "some bitches, I can't be in this bitch poor," referring to needing additional money added to his commissary account.  Defendant HARRIS repeated, "I need some bitches, Grane slacking," referring to defendant LENOX's recruitment of commercial sex workers not being sufficient.

**5.    2025 and 2026: Enterprise Members Distributed Drugs; Sex Trafficked Minors and Through Force, Fraud, and Coercion; Assaulted and Robbed Victim Who Shunned Sex Trafficking Recruitment Efforts**

(a)    Defendant HARRIS Sex Trafficked Victim 18 Through Force, Fraud, and Coercion

Overt Act No. 572:  In or around January 2025, through coded language in Instagram messages, defendant HARRIS recruited Victim 18 for sex work, complimenting her and asking her to "interview" with him.  The same day, defendant HARRIS went to Victim 18's hotel room at the Patio Inn, recruited her to work for him, told her that he was a Hoovers gang member, instructed her to pack a bag, and took Victim 18 to the Stadium Inn to sex traffic her.  Defendant HARRIS collected $700 from Victim 18 on her first night as a "choosing fee."

Overt Act No. 573:  In or around January 2025, defendant HARRIS informed Victim 18 of his rules as a pimp, which included that Victim 18 must not speak to other pimps, must start working at 7:00 p.m., must make a daily quota of at least $1,000 or she would stay outside

until 6 a.m., must remit all proceeds to defendant HARRIS, and must share her phone's location with him at all times.

Overt Act No. 574:  In or around January 2025 until at least March 5, 2025, defendant HARRIS sex trafficked Victim 18 on Figueroa Street and Long Beach Boulevard.  Defendant HARRIS sex trafficked Victim 18, and other victims, requiring them to perform commercial sex dates at the Stadium Inn, where a strong Hoovers Enterprise presence prevented them from attempting to leave defendant HARRIS. Defendant HARRIS told Victim 18 she could not leave the Stadium Inn without his permission, and he hit her multiple times when she discussed leaving.  Defendant HARRIS collected all of Victim 18's commercial sex proceeds and made her entirely reliant on him for necessities.

Overt Act No. 575:  In or around January 2025 until at least March 5, 2025, defendant HARRIS possessed a firearm, which he often stored in a microwave at the Stadium Inn.

Overt Act No. 576:  In or around January or February 2025, while Victim 18 was at the Stadium Inn, defendant HARRIS became angry at Victim 18 for turning off her location monitoring and entered Victim 18's room and hit her on the back of her head.

Overt Act No. 577:  In or around January 2025 until at least March 5, 2025, defendant HARRIS provided Victim 18 with "whippets" after he beat her, in order to calm her down.

Overt Act No. 578:  In or around February 2025, defendant HARRIS engaged in sexual intercourse with Victim 18, and required Victim 18 to engage in a threesome with defendant HARRIS and Victim 43.

Overt Act No. 579:  On February 1, 2025, defendant HARRIS took a photograph of himself standing on Victim 18's back.  In the photograph he also displayed a firearm, Percocet pills, and money.

Overt Act No. 580:  From approximately February 5, 2025, until at least March 1, 2025, using coded language over text messages and at defendant HARRIS' direction, Victim 18 informed defendant HARRIS when she obtained a commercial sex date by sending him an orange heart emoji or a trophy emoji.

Overt Act No. 581:  On February 5, 2025, using coded language over text messages, defendant HARRIS reprimanded Victim 18 for turning off her location, directed her to "have that trap ready," and instructed her on securing more commercial sex dates.

Overt Act No. 582:  On February 6, 2025, using coded language over text messages, defendant HARRIS threatened to slap Victim 18 and told her to turn on her location monitoring.

Overt Act No. 583:  On February 6, 2025, defendant HARRIS drove to Victim 18's location on the Figueroa Corridor, jumped out of the car, accused Victim 18 of talking to another pimp, and punched her. Victim 18 fell to the ground and defendant HARRIS kicked her and dragged her down the street.  When Victim 18 attempted to escape by running into the street and calling 9-1-1, defendant HARRIS ordered Victim 18 to get back in his car and took her back to the Stadium Inn, where he drew a firearm, clocked it back, and pointed it at Victim 18.  Defendant HARRIS hit Victim 18 all over her body. Defendant HARRIS then forced Victim 18 to clean herself up and return to the Figueroa Corridor to engage in commercial sex work.

Overt Act No. 584:  On February 7, 2025, using coded text messages, defendant HARRIS asked Victim 18 how much money she earned

136

from a commercial sex buyer.  Later the same day, defendant HARRIS threatened Victim 18, "I'm [going to] fuck u up."

Overt Act No. 585:  On February 12, 2025, using coded text messages, Victim 18 referred to defendant HARRIS assaulting her, to which defendant HARRIS replied, "U literally playing w me," "WHERE MY TRAP."  Defendant HARRIS also threatened, "Ima show u im not the one to play w," if Victim 18 did not give him her sex trafficking proceeds.

Overt Act No. 586:  On February 26, 2025, using coded text messages, defendant HARRIS told Victim 18, "that's why u get [your] ass beat," "U wonder why I hit u," and ordered her to go earn more money from commercial sex.

Overt Act No. 587:  In or around February 2025, while in Phoenix, Arizona, defendant HARRIS broke the window of Victim 18's hotel room, jumped through it, and punched and kicked Victim 18 in the face, then pulled her hair and dragged her around the room, inflicting a head injury.

Overt Act No. 588:  In or around February 2025, defendant HARRIS took Victim 18, Victim 43, and Victim 44 to Chicago, Illinois for the purpose of commercial sex work.  Defendant HARRIS directed the victims to find commercial sex buyers on French Street.

Overt Act No. 589:  In or around February or March 2025, defendant HARRIS ordered Victim 18 to engage in sex work in Orange County, directing her to continue sending him updates about her commercial sex work, including sending emojis when she secured a date, and sending defendant HARRIS all of her commercial sex proceeds.

Overt Act No. 590:  In or around March 2025, after defendant HARRIS was incarcerated in San Bernadino County, defendant LENOX contacted Victim 18 and directed her to send defendant LENOX money, so that defendant LENOX could put it in defendant HARRIS's commissary account.  At defendant LENOX's direction, Victim 18 sent him $200 in commercial sex proceeds.  Defendant HARRIS contacted Victim 18 from jail and directed her to continue engaging in commercial sex and earning him money.  At defendant HARRIS's direction, Victim 18 sent defendant HARRIS approximately $1,500 in commercial sex proceeds over two months.

Overt Act No. 591:  In or around March 2025, after defendant HARRIS was transferred from San Bernadino custody to a jail in Nebraska, defendant HARRIS directed Victim 18 to continue engaging in commercial sex work and earning money for defendant HARRIS.  Victim 18 loaded hundreds of dollars into defendant HARRIS's commissary account in Nebraska.

(b)  Defendant BROOKS Sex Trafficked Victim 21, a then-17-Year-Old Girl, Through Force, Fraud, and Coercion

Overt Act No. 592:  In or around November 2024, Victim 21, a then-17-year-old girl, was taken by defendant BROOKS to be branded with a tattoo of defendant BROOKS's moniker, "Buddha," across her neck.

Overt Act No. 593:  From approximately December 2024, until at least April 2025, defendant BROOKS trafficked Victim 21 on the Figueroa Corridor, in the Hollywood area, and in Long Beach. Defendant BROOKS determined how much Victim 21 charged for commercial sex acts, how often she would work, and who she was permitted to speak to.  Defendant BROOKS required that all of Victim 21's earnings

138

be turned over to him.  If Victim 21 needed food or clothing, she relied on defendant BROOKS to purchase it for her.

Overt Act No. 594:  From approximately December 2024, until at least April 2025, defendant BROOKS took Victim 21's birth certificate, identification card, and bank card into his possession and did not return them to Victim 21.

Overt Act No. 595:  From approximately December 2024, until at least April 2025, defendant BROOKS threatened to hurt Victim 21's family if she misbehaved, tried to run away from him, or stated she wanted to stop sex work.

Overt Act No. 596:  From approximately December 2024, until at least April 2025, defendant BROOKS repeatedly assaulted Victim 21, including stabbing her with scissors, repeatedly yanking out her earrings until her earlobes ripped, slapping, punching, and kicking her, pulling her hair, and causing injuries including black eyes, busted lips, and bruises, as well as trapping Victim 21 in his bedroom, locking the door, and putting a stick in the window to prevent Victim 21 from escaping.

Overt Act No. 597:  In or around December 2024, defendant BROOKS obtained a fake identification card for Victim 21 to use for the purpose of renting hotel rooms for commercial sex dates.

Overt Act No. 598:  In or around January 2025, defendant BROOKS put his hand over Victim 21's mouth, picked her up, and forced her into the trunk of his car.  Defendant BROOKS drove Victim 21 from Los Angeles to Riverside, California, with Victim 21 in the trunk of his car the entire time, and upon arriving at a home in Riverside, defendant BROOKS beat Victim 21.  From approximately December 2024, until at least April 2025, defendant BROOKS took Victim 21 to

Riverside, California, more than fifteen different times and beat her, before locking her in a bedroom that had no escape route.

Overt Act No. 599:  In or around January 2025, defendant BROOKS kicked Victim 21 in the stomach, one week after Victim 21 told defendant BROOKS that she was pregnant with his child.

Overt Act No. 600:  In or around January 2025, defendant BROOKS refused to take Victim 21 to the hospital when she bled profusely from her vagina, days after he kicked her in the stomach.

Overt Act No. 601:  On or about January 29, 2025, using coded language on Instagram, defendant BROOKS reassured Victim 21 that they were accomplishing goals together, referring to making money through commercial sex work.

Overt Act No. 602:  From approximately February 2025, until at least April 2025, defendant BROOKS provided drugs to Victim 21, including oxycodone, codeine, promethazine, and cocaine, to keep Victim 21 awake and warm while working long hours as a sex worker on the street, in order to prolong her ability to engage in sex work.

Overt Act No. 603:  In or around January or February 2025, defendant BROOKS stabbed Victim 21 in the leg with a pair of scissors.

Overt Act No. 604:  In or around February 2025, defendant BROOKS attempted to shoot Victim 21 in the foot, discharging a firearm, resulting in the bullet hitting the floor.

Overt Act No. 605:  On an unknown date, while driving a car, defendant BROOKS shot a firearm at Victim 21, nearly missing her face.

Overt Act No. 606:  In or around April 2025, defendant BROOKS punched Victim 21 so hard that she flew back off her feet and onto the ground, causing road rash on Victim 21's back.

Overt Act No. 607:  On an unknown date, defendant BROOKS took Victim 21 to an isolated place and beat her so badly she thought she was going to die.

Overt Act No. 608:  In or around April 2025, defendant BROOKS hit Victim 21 in the mouth so hard that her tooth chipped and a bracket from her braces fell off.

Overt Act No. 609:  On or about May 21, 2025, using coded language on Instagram, defendant BROOKS received a message from an Instagram user stating that she saw defendant BROOKS assaulting a sex worker on the Western blade.  Defendant BROOKS denied the beating at first, but when the user clarified that the victim was a "lightskin bitch w red hair," referring to Victim 21, defendant BROOKS responded, "lol ohhhhh."  Defendant BROOKS then asked how much the user made as a sex worker and which blades she worked.  The user asked defendant BROOKS how much money his sex workers made, and defendant BROOKS responded, "Yea whenever I say stop yanno."

Overt Act No. 610:  On October 12, 2025, while defendant BROOKS was in federal custody for the original Indictment in United States v. Armstead, et al., 2:25-cr-0651-JFW, he called Victim 21 and told her that he wanted to marry Victim 21 and stated she could not leave him.

            (c)    Defendant YOUNG Sex Trafficked Victim 20, a then-16-Year-Old Girl

Overt Act No. 611:  In or around February 2025, defendant YOUNG recruited Victim 20, a then-16-year-old girl, on the Figueroa

141

Corridor by having Victim 23 approach and recruit Victim 20 for sex work on defendant YOUNG's behalf.  Defendant YOUNG ushered Victim 20 into his car, where Victim 20 met Victim 22.  Defendant YOUNG started sex trafficking Victim 20 at the Mission Inn on Long Beach Boulevard the same day.

Overt Act No. 612:  In or around February 2025 until at least March 2025, defendant YOUNG sex trafficked Victim 20 out of the Stadium Inn and Mission Motel.  During this time, defendant YOUNG purchased lingerie and other sex work attire for Victim 20 at House of Hotties, transported her to and from the Figueroa Corridor and Long Beach Boulevard for sex work, tracked Victim 20's cellphone, set prices for her commercial sex dates, instructed her to send him an orange heart emoji when she secured commercial sex dates, and took all her commercial sex proceeds, making Victim 20 entirely reliant on defendant YOUNG for food, shelter, and hygiene products.

Overt Act No. 613:  In or around February 2025 until at least March 2025, defendant YOUNG provided condoms for sex work, as well as alcohol and marijuana, to Victim 20.

Overt Act No. 614:  In or around February 2025, defendant YOUNG, in front of Victim 20, pushed and slapped Victim 23 and left her on the Figueroa Corridor to fend for herself.

Overt Act No. 615:  On February 21, 2025, using coded language on Instagram, defendant YOUNG and Victim 20 discussed picking up a female friend of hers, who would also perform sex work for defendant YOUNG.

Overt Act No. 616:  On February 23, 2025, using coded language on Instagram, Victim 20 informed defendant YOUNG that her regular sex

142

customer was going to pick her up and asked if defendant YOUNG could get her a room for the commercial sex date.

Overt Act No. 617:  On February 25, 2025, using coded language on Instagram, Victim 20 informed defendant YOUNG that her regular sex customer was going to pick her up and she would inform defendant YOUNG when she had money for him.

Overt Act No. 618:  On February 25, 2025, using coded language on Instagram, Victim 20 informed defendant YOUNG that she would pay him for a pair of heels but would likely not work for him after this payment because he already had other sex workers.

Overt Act No. 619:  On April 8, 2025, after Victim 20 left defendant YOUNG, defendant YOUNG told Victim 20 that he wanted her to come back and work for him again.  Defendant YOUNG picked Victim 20 up in his car, and shortly after directed her to get out of the car. Defendant YOUNG then directed two unindicted co-conspirators to beat Victim 20, as defendant YOUNG shouted, "you get grooved out here," "dumbass bitch," "stupid bitch"," "beat that bitch up on Hoovers," "drag that hoe," "dead homies stupid bitch," while the co-conspirators punched, dragged, and kicked Victim 20, pulled her hair, and stomped on her head.  Defendant YOUNG left Victim 20 on the street after the assault and took Victim 20's phone with him.

(d)  Defendant YOUNG Sex Trafficked Victim 22, a then-17- and 18-Year-Old Girl, Through Force, Fraud, and Coercion

Overt Act No. 620:  In or around June 2024, before Victim 22 turned 18 years old, defendant YOUNG told Victim 22 the rules for his sex trafficking, purchased sex working outfits for Victim 22, and told Victim 22 to walk the blade to solicit sex dates.  Defendant YOUNG told Victim 22 his rules, including not to be "out of pocket,"

143

that is, disobedient to him, and not to talk to black men.  Defendant YOUNG instructed Victim 22 to charge $80 for oral copulation and $120 for "full service" which included oral copulation and vaginal intercourse, and to leave the door of the hotel room door open while engaging in sex work.  Defendant YOUNG instructed Victim 22 to always use a condom, that he would give her 10 condoms, and that she would have to use them all, and threatened to beat Victim 22 if she did not secure 10 dates and use all the condoms.

Overt Act No. 621:  From June 9, 2024, until August 4, 2024, defendant YOUNG sex trafficked Victim 22 while she was a minor.

Overt Act No. 622:  On August 3, 2024, defendant YOUNG took Victim 22 to the Figueroa Corridor, told her to take off her normal clothing, and directed her to stand on the corner to solicit commercial sex dates.  Victim 22 called a friend to pick her up and take her home; however, when she got home, defendant YOUNG was waiting for her at her house.  Defendant YOUNG pulled Victim 22 by her hair and into his car, and shut the door of the car.

Overt Act No. 623:  From approximately June 2024, until at least April 2025, defendant YOUNG determined how much Victim 22 charged for commercial sex acts, how often she would work, and who she was permitted to speak to.

Overt Act No. 624:  From approximately June 2024, until at least April 2025, defendant YOUNG collected money directly after Victim 22 completed commercial sex dates, ordering her to take the money to him if she engaged in a "car date," and leave the money in the hotel room if she engaged in a "hotel date."

Overt Act No. 625:  From approximately June 2024, until at least April 2025, in addition to Victim 22, defendant YOUNG also sex

144

trafficked at least three other minors, including Victim 20, Victim 23, and Victim 12, out of the Mission Motel in Long Beach and the Stadium Inn.

Overt Act No. 626:  From approximately June 2024, until at least April 2025, defendant YOUNG picked up Victim 22 when she was done working as a sex worker for the night and directed her to put on normal clothes before entering the car in order to avoid law enforcement attention.

Overt Act No. 627:  From approximately June 2024, until at least April 2025, defendant YOUNG distributed drugs to Victim 22 in order to help her stay awake while she was engaging in commercial sex work.

Overt Act No. 628:  From approximately August 2024, until at least February 19, 2025, defendant YOUNG beat Victim 22 nearly every day, including slapping Victim 22 in the face and body, and pulling her wig so hard that she would fall to the ground and pieces of her hair would come out.

Overt Act No. 629:  On a day between approximately June 2024, and at least April 2025, defendant YOUNG threatened to have a Hoovers enforcer, "Lady Poke," beat Victim 22 if she ever tried to leave him or if he went to jail.

Overt Act No. 630:  From approximately June 2024, until at least April 2025, defendant YOUNG required Victim 22 to work on the Figueroa Corridor, Long Beach Avenue, and Sepulveda Boulevard, while defendant YOUNG monitored her from his car.  If Victim 22 tried to hide from defendant YOUNG, he would sometimes hit her in the face, but more often in the arms, legs, or torso, in order to preserve her face for commercial sex dates.

Overt Act No. 631:  On multiple days between approximately June 2024, and at least April 2025, defendant YOUNG threatened to shoot up the home of Victim 22's family member if she ever left him.

Overt Act No. 632:  In late 2024, to further exert control and dominance over Victim 22, defendant YOUNG raped Victim 22, during which he forced his fingers and penis into Victim 22's vagina against her will, and held down her arms.

Overt Act No. 633:  On January 27, 2025, defendant YOUNG assaulted Victim 22, pulling off her wig and slamming her body into a wall.

Overt Act No. 634:  In or around January 2025, Victim 22 told defendant YOUNG that she no longer wanted to engage in commercial sex work, to which defendant YOUNG responded by beating her for seven days straight, multiple times a day.  Defendant YOUNG justified his beatings to Victim 22 as discipline for her unwillingness to work, desire to leave, failure to give him her phone passcode, and for her revealing to people that he pimped minors.  When Victim 22 reiterated she wanted to stop commercial sex work, defendant YOUNG told her to "shut the fuck up, you're mine" and "you're my property and you will do what I say."

Overt Act No. 635:  On February 12, 2025, defendant YOUNG posted sex advertisements of Victim 22 and Victim 23, using a Megapersonal account which utilized Victim 22's phone number.

Overt Act No. 636:  On February 19, 2025, defendant YOUNG overheard a conversation that Victim 22 was having with a friend about leaving defendant YOUNG, to which defendant YOUNG responded by slapping Victim 22 in the face and taking her cell phone.

Overt Act No. 637:  On February 19, 2025, defendant YOUNG tried to force Victim 22 into a room at the Mission Motel in Lynwood, California, after she packed up her items to leave him, and defendant YOUNG took away her phone.  Victim 22 escaped by jumping in a stranger's car and asking the stranger to drive her to a police station.

Overt Act No. 638:  On February 19, 2025, defendant YOUNG threatened to kill Victim 22 and Victim 22's mother after Victim 22 ran away from him after he assaulted her at the Mission Motel in Lynwood, California.

Overt Act No. 639:  On February 19, 2025, defendant YOUNG spoke to Victim 22's family member, and threatened to kill Victim 22 and the family member.  Defendant YOUNG used his access to Victim 22's phone to turn off Victim 22's location services so that Victim 22's family member could not find her.

Overt Act No. 640:  On March 3, 2025, while Victim 22 was taking a shower, defendant YOUNG hit her in the back of the head and then hit her face so hard she fell to the ground.  Defendant YOUNG video recorded his assault of Victim 22.  After he beat her, defendant YOUNG forced her to engage in commercial sex work on the Figueroa Corridor.

Overt Act No. 641:  In or around April 2025, at the Stadium Inn, defendant YOUNG instructed Victim 22 to beat Victim 20, however, she refused to do so because Victim 20 was a minor.

Overt Act No. 642:  In or around April 2025, at the Stadium Inn, defendant YOUNG beat Victim 20, including but not limited to pushing Victim 20 onto the ground and dragging her by the hair to force Victim 20 to lay outside of a hotel room.  An uncharged enforcer

working with defendant YOUNG kicked Victim 20 in the body and head, causing Victim 20's ear to bleed.

Overt Act No. 643:  On May 9, 2025, at a Hoovers "Hood Day" for the 59 set of Hoovers, defendant YOUNG saw Victim 22 in the crowd and announced he was "going to kill that bitch."

Overt Act No. 644:  From June 2025, until at least July 2025, defendant YOUNG attempted to recruit Victim 22 to come back to work for him, promising not to lay his hands on her anymore.

(e)   Defendant CROCKHAM Directed Sex Trafficking While in Custody

Overt Act No. 645:  On March 14, 2025, while defendant CROCKHAM was in custody in Los Angeles, he engaged in at least nine recorded phone calls in which he actively engaged in sex trafficking.  Using coded language, defendant CROCKHAM directed a sex worker to get him out of custody, spoke to an uncharged co-conspirator about the whereabouts of sex workers, directed a second sex worker to get her work done so they could buy another car, and gave directions about which sex workers should stay at the current motel and which ones should go to Gardena to engage in sex work.  Defendant CROCKHAM also directed a sex worker to stay at the current hotel and focus, because she and the other sex workers should make $6,000 to $7,000 by the following Tuesday.

Overt Act No. 646:  On March 16, 2025, while in custody in Los Angeles, using coded language, defendant CROCKHAM asked a sex worker how much money was being made.

Overt Act No. 647:  On March 17, 2025, while in custody in Los Angeles, using coded language, defendant CROCKHAM and a sex worker spoke on the phone, and she reported that the police were no longer

148

coming by the room and the other sex workers were still in their rooms.

>               (f)   Defendant GRAY Threw Motor Oil on Victim 24, a then-
>                     17-Year-Old Girl, When She Rejected His Recruitment,
>                     Then Defendant GRAY Assisted in Robbing Her

Overt Act No. 648:  On May 19, 2025, while in a car, defendant GRAY shouted at Victim 24, who was waiting at a bus stop to return home from school.  Defendant GRAY told Victim 24 that she needed a new boyfriend who didn't make her wait at bus stops.  Victim 24 responded that she did not have a boyfriend and was a minor. Defendant GRAY threatened Victim 24, telling her to watch her mouth because they were in defendant GRAY's "hood." Defendant GRAY then exited his car, walked toward Victim 24, and threw a bottle of motor oil at Victim 24, hitting her.

Overt Act No. 649:  On May 19, 2025, while defendant GRAY distracted Victim 24 by throwing a bottle of motor oil at her, an uncharged co-conspirator ran up to Victim 24, held a firearm to the temple of her head, and forcibly ripped a gold chain from Victim 24's neck.  The uncharged co-conspirator then ran, and defendant GRAY picked him up in their car.

>               (g)   Defendant MOUTON Sex Trafficked Victim 45, Victim 20,
>                     and Victim 46, All of Whom Were Under the Age of 18

Overt Act No. 650:  Between at least June 2025 and August 2025, defendant MOUTON sex trafficked Victim 45, a then-14-year-old girl, out of the Stadium Inn and motels in Hollywood, California.

Overt Act No. 651:  Between approximately June 2025 and no later than July 2025, defendant MOUTON obtained a fake identification card for Victim 45 so that Victim 45 could rent hotel rooms in her name, despite Victim 45 being a minor.

Overt Act No. 652:  On June 23, 2025, defendant MOUTON posted on Instagram a Missing and Exploited Children flier with a photograph of Victim 45 identifying her as a 14-year-old child.

Overt Act No. 653:  On or around June 27, 2025, defendant MOUTON had Victim 45 perform oral copulation on him, knowing she was a minor.

Overt Act No. 654:  On June 28, 2025, defendant MOUTON encouraged Victim 45 to use Instagram to recruit Victim 20, a then-16-year-old girl, to be his new sex worker.

Overt Act No. 655:  In or around July 2025, Victim 45 recruited Victim 46, a then-17-year-old girl, to be a sex worker for defendant MOUTON.

Overt Act No. 656:  Between at least July 2025 and August 2025, defendant MOUTON sex trafficked Victim 20 and Victim 46 out of the Stadium Inn and other motels in Hollywood, California.

Overt Act No. 657:  Between June 2025 and August 2025, defendant MOUTON required Victim 45 to share her location with him via her cellphone and to remit her earnings from commercial sex work to him. Defendant MOUTON required the same from Victims 20 and 46 from July 2025 to August 2025.

Overt Act No. 658:  Between at least July 2025 and August 2025, defendant MOUTON took all of Victim 45's and Victim 20's money, forcing them to rely on him for food, shelter, and clothing.

Overt Act No. 659:  On July 4, 2025, using coded language in text messages and at defendant MOUTON's direction, Victim 20 advised defendant MOUTON that she had secured commercial sex dates and had earned $360.

150

Overt Act No. 660:  On July 9, 2025, using coded language in text messages, defendant MOUTON ordered Victim 20 to pay for a hotel room.  When Victim 20 raised concerns that she would not be able to provide identification for the room, defendant MOUTON directed her to tell hotel management that she was just renewing the room number.

Overt Act No. 661:  On July 9, 2025, using coded language in text messages, Victim 20 told defendant MOUTON that Victim 45 was 14 years old, that Victim 46 was 17 years old, and that those girls suspected Victim 20 was also a minor.

Overt Act No. 662:  On an unknown date in early July 2025, defendant MOUTON provided Victim 45 money to buy Victim 45 and Victim 20 clothing for commercial sex work.

Overt Act No. 663:  On July 10, 2025, using coded language in text messages, defendant MOUTON directed Victim 20 to make an appointment for an abortion, warning her that after the procedure she would be bleeding.

Overt Act No. 664:  On July 25, 2025, after defendant MOUTON directed her to have an abortion, Victim 20 confirmed via text message that she had the abortion, that it was a two-day procedure, and that she was still bleeding heavily.  Defendant MOUTON ordered her to engage in commercial sex work the same day and threatened to fire her if she did not.

Overt Act No. 665:  Between July 25, 2025 and August 31, 2025, defendant MOUTON received at least $424 in commercial sex proceeds from Victim 45, or directly from Victim 45's sex customers in Cash App payments.

Overt Act No. 666:  On July 30, 2025, using coded language on Instagram, defendant MOUTON and another Instagram user discussed

151

MOUTON trafficking a 14-year-old girl.  The Instagram user told MOUTON not to traffic minors because it made "the set look bad."  MOUTON responded by identifying himself as a Hoover and asking the Instagram user what "set" he was from.  Defendant MOUTON told the Instagram user, "let the bitch work."  Defendant MOUTON also claimed his victim had shown him an ID saying she was 18, despite defendant MOUTON hearing she was 14.  Defendant MOUTON claimed that once he learned his victim was in fact 14, he had the "hgs grxxve her," referring to having his associates assault his victim.  Defendant MOUTON continued trafficking Victim 45, then-14-years-old, and Victim 20, then-16-years-old, for at least another month after this message exchange.

Overt Act No. 667:  By July 2025, defendant MOUTON had seen missing children fliers for both Victim 45 and Victim 20.  Defendant MOUTON continued trafficking Victim 45 and Victim 20 for at least one month after seeing these fliers.

Overt Act No. 668:  In or around August 2025, defendant MOUTON physically assaulted Victim 45 at the Diamond Inn Motel in Inglewood, California, alleging she stole money from him.  Defendant MOUTON beat Victim 45 with his hands and a shoe.  Defendant MOUTON then pulled Victim 45 around the room and punched her multiple times in the body.

Overt Act No. 669:  On August 7, 2025, defendant MOUTON received at least $250 in Cash App payments directly from one of Victim 20's commercial sex customers.

Overt Act No. 670:  Between approximately September 1, 2025 and September 7, 2025, defendant MOUTON attempted to recruit Victim 20 to come back to work for him.  Defendant MOUTON messaged Victim 20, "Trash ass bitch" and "Bitch you ready to come back or what[?]."

Defendant MOUTON then encouraged Victim 20 to Cash App him money and to engage in commercial sex work in Pomona or San Bernadino for fifteen days to earn him more money.

> (h) **Defendant MILLER Sex Trafficked Victim 47 Through Force, Fraud, and Coercion Between 2025 and 2026**

Overt Act No. 671:  From at least January 26, 2025 to January 31, 2026, defendant MILLER sex trafficked Victim 47 through force, threats of force, and coercion.

Overt Act No. 672:  On July 4, 2025, using coded language on Instagram, defendant MILLER instructed Victim 47 that she would return to commercial sex work for him after she gave birth to their child.

Overt Act No. 673:  On July 31, 2025, using coded language on Instagram, defendant MILLER threatened Victim 47 that if she did not return to commercial sex work after she gave birth, she had "another thing coming."

Overt Act No. 674:  On August 1, 2025, using coded language on Instagram, defendant MILLER acknowledged in messages to Victim 47 that he had three commercial sex workers who already worked for him, when he began pimping Victim 47.

Overt Act No. 675:  On August 14, 2025, one day after defendants ARMSTEAD, YOUNG, HARRIS, AMOAKO, EVANS, BROOKS, ROBINSON, PHILLIPS, ISREL, GRAY, and CROCKHAM were arrested on the original indictment in United States v. Armstead, et al., 2:25-cr-0651-JFW, using coded language on Instagram, defendant MILLER told Victim 47 that he needed to get out of California and did not want to hide at her place because it would be the first place someone would look for him.

Overt Act No. 676:  On August 18, 2025, using coded language on Instagram, defendant MILLER told Victim 47 that he would beat her and his other sex worker.

Overt Act No. 677:  On August 26, 2025, using coded language in text messages, defendant MILLER directed Victim 47 to send him photographs of her for sex buyers.  Victim 47 sent defendant MILLER multiple photographs of her in lingerie, but defendant MILLER responded, "That's not enough" and "I need naked."  Victim 47 complied with defendant MILLER's request and sent photographs of herself naked.

Overt Act No. 678:  On September 2, 2025, using coded language in text messages, defendant MILLER directed Victim 47 to provide her MegaPersonal.com account login information.

Overt Act No. 679:  On September 8, 2025, using coded language in text messages, defendant MILLER told Victim 47 he recruited a new sex worker and boasted, "I'm never not go have ah bitch."

Overt Act No. 680:  On September 20, 2025, using coded language on Instagram, defendant MILLER told Victim 47 he would bring her marijuana.

Overt Act No. 681:  On October 8, 2025, using coded language in text messages, defendant MILLER told Victim 47 to send money to the Cash App of Victim 48.

Overt Act No. 682:  On October 14, 2025, using coded language in text messages, defendant MILLER told Victim 47 that defendant MILLER and an unknown co-conspirator would put Victim 47 and another sex worker in a pimp circle to quash the victims' fighting.

Overt Act No. 683:  In or around December 2025, defendant MILLER beat Victim 47 – for at least a second time – causing a large bruise, pain when she walked, and a limp.

Overt Act No. 684:  On January 31, 2026, defendant MILLER monitored Victim 47 while she engaged in commercial sex work on the Figueroa Corridor, watching her walk the blade and approach commercial sex buyers' cars, while defendant MILLER sat in his own car.

Overt Act No. 685:  On January 31, 2026, defendant MILLER sex trafficked Victim 47 and Victim 49 out of the El Rancho Motel.

(i)  Defendant MILLER Sex Trafficked Victim 50 Through Force, Fraud, and Coercion

Overt Act No. 686:  On an unknown date, Victim 50 was branded with a tattoo of defendant MILLER's moniker, "FY3."

Overt Act No. 687:  On July 7, 2025, using coded language on Instagram, defendant MILLER sent a video of Victim 50 to another Instagram user and said Victim 50 was his "lil Russian bitch," meaning she was his sex worker.

Overt Act No. 688:  On September 10, 2025, using coded language, defendant MILLER sent Victim 50 an audio message on Instagram, attempting to recruit her back to work for him.  In the message, defendant MILLER admitted to hitting Victim 50 and attempted to justify it, claiming Victim 50's lie caused him to "spazz."

Overt Act No. 689:  On September 25, 2025, using coded messages on Instagram, defendant MILLER again tried to re-recruit Victim 50 and again attempted to justify his violence, claiming, "I only put my hands on u cuz u left me locked out my car and u was talking to niggas."  Victim 50 responded that it was not the first time

defendant MILLER had beaten her.  Defendant MILLER tried to convince Victim 50 to return to him, telling her he wanted to promise that he would not hit her again, but stopping short of doing so.  Then defendant MILLER wrote, "Ok ma I won't do no dum[b] ass shit like that again just don't [] disrespect me[.]  Can[] I have my bitch back."

Overt Act No. 690:  On September 26, 2025, defendant MILLER, using coded messages on Instagram, continued to attempt to re-recruit Victim 50, telling her he would give her marijuana.

Overt Act No. 691:  On September 30, 2025, using coded language on Instagram, defendant MILLER attempted to recruit Victim 50 to come back and work for him, and stated he understood that she originally left because she did not want defendant MILLER to hit her again.

Overt Act No. 692:  On October 3, 2025, using coded language on Instagram, defendant MILLER told Victim 50 not to cover the tattoo brand of his moniker.

> (j)  Defendant MILLER Sex Trafficked Victim 48 Through Force, Fraud, and Coercion

Overt Act No. 693:  On June 12, 2025, using coded language on Instagram, defendant MILLER extorted Victim 48, demanding that Victim 48 give defendant MILLER $2,500 to get her car back after Victim 48 said she would no longer work for him as a commercial sex worker. Defendant MILLER increased his demand to $10,000 to release the car when Victim 48 refused to pay and said she would stop working for him.

Overt Act No. 694:  On September 14, 2025, using coded language in text messages, defendant MILLER directed Victim 48 to take a commercial sex buyer's "stash" but to be safe about it.

Overt Act No. 695:  On September 14, 2025, using coded language in text messages, defendant MILLER permitted Victim 48 to leave the blade in Pomona and work on the Figueroa Corridor.

Overt Act No. 696:  On September 15, 2025, using coded language in text messages, defendant MILLER told Victim 48 he would give her condoms and told her the blade was "dry" near House of Hotties.

Overt Act No. 697:  On September 15, 2025, using coded language in text messages, while Victim 48 was with a commercial sex buyer, she reported to defendant MILLER that she would rob the buyer and that the buyer had firearms at his home.  Defendant MILLER informed Victim 48 that he needed two firearms, and that they could sell one firearm and keep the other firearm.

Overt Act No. 698:  On September 19, 2025, using coded language in text messages, defendant MILLER offered Victim 48 marijuana, which she declined, but then she asked for a prescription narcotic by sending a pill emoji and a question mark.  Defendant MILLER responded, "Yeah I got it."

Overt Act No. 699:  On September 19, 2025, using coded language in text messages, defendant MILLER directed Victim 48 to steal from a commercial sex buyer, and told her to run out to the parking lot where defendant MILLER was waiting for her.

Overt Act No. 700:  Between September 19 and 29, 2025, using coded language in text messages, Victim 48 reported to defendant MILLER when she secured a commercial sex date and when the date was complete.  Defendant MILLER responded with a trophy emoji.

Overt Act No. 701:  On September 23, 2025, using coded language in text messages, defendant MILLER directed Victim 48 to post online

advertisements for commercial sex instead of working on the streets, due to law enforcement presence.

Overt Act No. 702:  On September 26, 2025, using coded language in text messages, defendant MILLER warned Victim 48 of law enforcement presence and stated he would collect her money and then they could be done for the night.

Overt Act No. 703:  On September 30, 2025, using coded language in text messages, defendant MILLER directed Victim 48 to travel to Cincinnati, Ohio to engage in commercial sex work, and defendant MILLER instructed her to stay focused and safe.

Overt Act No. 704:  On October 1, 2025, using coded language in text messages, after arriving in Cincinnati, Ohio, Victim 48 informed defendant MILLER she was texting commercial sex buyers.  Shortly after, Victim 48 reported to defendant MILLER that a buyer was arriving.  Hours after these messages, defendant MILLER directed Victim 48 to post online sex ads.

Overt Act No. 705:  On October 4, 2025, using coded language in text messages, while Victim 48 was in Cincinnati, Ohio, defendant MILLER told Victim 48, "You better have some real fuckin money, bro that's what the fuck is up with me," and demanded that Victim 48 report her dates and earnings.  Victim 48 explained she had not communicated with defendant MILLER because she had been with a commercial sex buyer for hours.  Defendant MILLER responded with multiple coded messages demanding to know how much money she made and told her, "I didn't need you to call and give me no rundown when he was done, but you should've gave me the rundown in the mist or bitch give a rundown before," and then again demanded that Victim 48 tell him how much money she had made.

Overt Act No. 706:  Between October 4 and 15, 2025, using coded language in text messages, while Victim 48 was in Cincinnati, Ohio, defendant MILLER received various emojis including dolphins and checkmarks from Victim 48, which signified that Victim 48 had secured or completed a commercial sex date.  Defendant MILLER responded to these messages with a trophy emoji and directed her to send money to a Cash App account in Victim 47's name.

Overt Act No. 707:  On October 16, 2025, using coded language in text messages, defendant MILLER directed Victim 48 to send $200 to defendant MILLER through an unindicted co-conspirator's account.

(k)  Defendant MILLER Sex Trafficked and Recruited Additional Victims

Overt Act No. 708:  On August 29, 2025, using coded language in text messages, defendant MILLER told Victim 51 he was on his way to pick her up to engage in commercial sex work.  At defendant MILLER's direction, Victim 51 sent him emojis throughout the day to indicate when she secured commercial sex dates.  Defendant MILLER collected Victim 51's proceeds from this commercial sex work.

Overt Act No. 709:  On August 31, 2025, using coded language in text messages, defendant MILLER directed Victim 51 to go to the Figueroa Corridor, after Victim 51 reported that the Western blade in Hollywood was not lucrative.  Per defendant MILLER's instructions, Victim 51 reported to defendant MILLER when she secured a commercial sex date for $150.

Overt Act No. 710:  On September 3, 2025, using coded language in text messages, defendant MILLER asked Victim 51 where she was, and Victim 51 reported that she was in the Figueroa Corridor around 90th street.  Victim 51 reported she had finished a date by writing, "Done

with one," and defendant MILLER asked why she did not send the star emoji (a symbol of the Hoovers).  Approximately one hour later, Victim 51 sent defendant MILLER the star emoji and he responded by sending a trophy emoji.

Overt Act No. 711:  On September 4, 2025, using coded language in text messages, defendant MILLER told Victim 52 to put regular clothes over her "hoe clothes," directed her where to stand on the Figueroa Corridor, and directed her to send money via Apple Pay to a specific phone number.

Overt Act No. 712:  On September 7, 2025, using coded language in text messages, defendant MILLER told Victim 52 she had to make $1,000, and stated, "You're not coming in without that band." Defendant MILLER later ordered Victim 52 to apologize to Victim 51 and approved the apology text before she sent it.

Overt Act No. 713:  On September 9, 2025, using coded language in text messages, defendant MILLER fired Victim 51, demanded that she hand over her commercial sex proceeds from the day, and forbid her from returning to their hotel room to collect her belongings.  Then, during a verbal argument, defendant MILLER forcefully shoved Victim 51 with both of his hands.

Overt Act No. 714:  On September 19, 2025, using coded language in text messages, defendant MILLER recruited Victim 53 to work for him as a commercial sex worker.  The next day, defendant MILLER stated he would send Victim 53 money for condoms and reassured her it was normal to start working on the Pomona blade around 11 p.m.

                    (1)   <u>Enterprise Members Continued to Sex Traffic, Coerced and Intimidated Victims, Committed Assaults to Further the Hoovers' Reputation for Violence, and Distributed Drugs</u>

<u>Overt Act No. 715</u>:  On January 7, 2025, using coded messages on Instagram, defendant ROBINSON told defendant PHILLIPS that he was getting promethazine with codeine and that he would meet up with defendant PHILLIPS.

<u>Overt Act No. 716</u>:  On January 9, 2025, using coded language on Instagram, Victim 19 asked defendant HARRIS to take her to the blade, and later told him that she had a commercial sex date and was in the motel room.

<u>Overt Act No. 717</u>:  On January 9, 2025, defendant LENOX and an unindicted Hoovers gang member attempted to recruit two women posing as sex workers, but who were, in fact, undercover police officers working in Hoovers Enterprise territory.  Defendant LENOX told the undercover officers that they should leave with him and the unindicted Hoovers gang member, promising to teach them how to engage in commercial sex work.  Defendant LENOX told the officers that they would need to choose to work for the unindicted Hoovers gang member or him and that his "choosing fee" was $1,500 with a daily quota of $1,500.  He told the undercover officers he would pay for their clothing, nails, and hair, and would drive them across the country to engage in commercial sex work.

<u>Overt Act No. 718</u>:  On January 10, 2025, defendant BROOKS posted a photograph on Instagram depicting an unidentified woman in thong underwear branded with a "Buddha" tattoo, defendant BROOKS's moniker, on her buttocks, including a caption that referenced defendant BROOKS's membership in the Hoovers.

Overt Act No. 719:  On January 12 and 13, 2025, using coded messages on Instagram, defendants LOCKETT and EVANS discussed recruiting sex workers together and the police presence on Figueroa Street that was making pimping more difficult and less lucrative. They also discussed going to San Bernardino where commercial sex buyers had more disposable income.

Overt Act No. 720:  On January 15, 2025, using coded messages on Instagram, defendant LOCKETT attempted to recruit a female for commercial sex work.

Overt Act No. 721:  On January 21, 2025, using coded messages on Instagram, defendant YOUNG asked defendant EVANS if defendant YOUNG could purchase an entire bottle of promethazine with codeine from defendant EVANS for further distribution, which defendant EVANS agreed to sell to defendant YOUNG for $140.  Defendant YOUNG said he was at the Stadium Inn, and defendant EVANS said he would meet defendant YOUNG there, later confirming that he had arrived.

Overt Act No. 722:  On January 21, 2025, using coded messages on Instagram, defendant ISREL told defendant AMOAKO to come to Miami because defendant ISREL was going there to sex traffic one of his sex workers, to which defendant AMOAKO acknowledged by using the "like" feature.

Overt Act No. 723:  On January 22, 2024, defendant YOUNG and unindicted Hoovers gang members recorded a video of an unknown male victim being beaten.  In the video, defendant YOUNG punched and kicked the victim, yelling "fuck skirts," which is a derogatory term for a rival gang, the Main Street Crips.

Overt Act No. 724:  On January 23, 2025, using coded messages on Instagram, defendant EVANS complained to an unidentified person that

162

commercial sex buyers were sick of seeing the same sex workers on the Figueroa Corridor and it was a problem.  Defendant EVANS declared that the Figueroa Corridor was a "starter track" and he planned to move his sex workers around the "map."  Defendant EVANS proudly bragged about Hoovers pimps being different and the most "pimpish," and explained this is because the gang members in their set grew up around trafficking so it is "in" them.

Overt Act No. 725:  On January 24, 2025, using coded language on Instagram, defendant YOUNG messaged defendant MILLER and informed defendant MILLER that the sex worker on the corner of the street belonged to defendant YOUNG.  Defendant MILLER responded that he was not attempting to recruit defendant YOUNG's sex worker and was interested in a different worker with "light skin."

Overt Act No. 726:  On January 25, 2025, using coded messages on Instagram, defendant EVANS coached defendant HARRIS on how to traffic sex workers.

Overt Act No. 727:  On January 25, 2025, using coded language on Instagram, defendant HARRIS asked defendant EVANS to post an advertisement on Instagram for promethazine with codeine on defendant HARRIS's behalf.  Defendant HARRIS stated that the drugs cost $170 per line for defendant EVANS but directed defendant EVANS to post a price of $200 per line when further distributing the drugs to others. Defendant HARRIS also offered to provide marijuana and oxycodone to defendant EVANS.

Overt Act No. 728:  On January 25, 2025, using coded messages on Instagram, defendant HARRIS told defendant EVANS that they were going to physically discipline defendant HARRIS's sex worker for

163

complaining that she was in pain and covered in bruises, and that defendant HARRIS only cared about his money.

Overt Act No. 729:  On January 25, 2025, using coded language on Instagram, defendant HARRIS told Victim 19 that he would consider allowing Victim 19 to come back and work for him if she paid a new choosing fee of $1,200.

Overt Act No. 730:  On January 27, 2025, using coded messages on Instagram, defendant PHILLIPS told a pimp who his sex worker left him for that he needed video proof that the sex worker was beaten, and that if the new pimp could not provide this evidence, defendant PHILLIPS would have to beat her himself to discipline her for leaving and to set an example for other sex workers that defendant PHILLIPS did not tolerate disobedience.

Overt Act No. 731:  On January 29, 2025, using coded messages on Instagram, defendant LOCKETT asked defendant EVANS the price of a "line," referring to a unit of promethazine with codeine, advertised on defendant EVANS' Instagram page.  Defendant EVANS told him it belonged to defendant HARRIS and that he could give it to defendant LOCKETT for $175, discounted from the listed price of $200.

Overt Act No. 732:  On January 30, 2025, using coded messages on Instagram, defendants EVANS and ISREL coordinated a drug deal in which defendant EVANS would provide defendant ISREL with promethazine with codeine, and they agreed to meet at the Stadium Inn.

Overt Act No. 733:  On January 30, 2025, using coded language on Instagram, defendant HARRIS told Victim 19 that he fired another sex worker, to which Victim 19 stated that she would travel to Los Angeles to work for defendant HARRIS.  Defendant HARRIS ordered that

164

once Victim 19 started working for him, she would work without breaks until she made $5,000.

Overt Act No. 734: On February 13, 2025, using coded language on Instagram, defendant YOUNG messaged defendant MILLER and informed him that defendant YOUNG planned to recruit a sex worker who had previously worked for defendant MILLER.  Defendant MILLER responded, "do you yo thang but the Mexican[] Bitch can't be on fig."

Overt Act No. 735: On March 23, 2025, an unidentified sex trafficking victim left defendant PHILLIPS to work for another pimp without paying an "exit fee."  On March 28, 2025, using coded messages on Instagram, defendant PHILLIPS demanded his exit fee and asked the victim why she was hiding in a bathroom.  The victim's new pimp wrote to defendant PHILLIPS that he saw defendant PHILLIPS drive by in a Mustang demanding exit fees and threatening to beat the victim.  Defendant PHILLIPS responded in a coded message stating that the victim could work, and if she couldn't, he would have already beaten her, but she got a pass.

Overt Act No. 736: On March 24, 2025, using coded language on Instagram, defendant YOUNG told defendant HARRIS that he was selling promethazine with codeine, and defendant YOUNG offered to sell defendant HARRIS four lines for $500.

Overt Act No. 737: On April 18, 2025, using coded language on Instagram, defendant MOUTON attempted to recruit another Instagram user to be his sex worker by telling her she was "supposed to" make him "comfortable dealing with" her by paying him a "choosing fee." When the user responded by saying defendant MOUTON was not making her feel "wanted," defendant MOUTON responded, "I'm not going to show you

no attention if you not bringing me in no bag," referring to her earning money for him through commercial sex work.

Overt Act No. 738:  On May 24, 2025, using coded language on Instagram, defendants EVANS and HARRIS discussed transporting sex workers to Las Vegas, Nevada, for the purpose of sex trafficking.

Overt Act No. 739:  On or about May 24, 2025, using coded language on Instagram, defendant AMOAKO informed defendant BROOKS that he was picking up a sex worker from an outcall.

Overt Act No. 740:  On or about May 29, 2025, using coded language on Instagram, defendant EVANS told defendant BROOKS that he was trying to have "30k toes or better".

Overt Act No. 741:  On June 3, 2025, using coded language on Instagram, defendant MILLER offered to sell promethazine with codeine to an Instagram user for $20 per "line," and then agreed to sell it for $15 per "line" if the user purchased two "lines."  Defendant MILLER agreed to meet with the user to provide the narcotics.

Overt Act No. 742:  On July 3, 2025, defendant MOUTON accompanied Victim 5 to what he believed was a commercial sex date at the Buena Vista Inn in Anaheim, California but what was, in fact, an undercover law enforcement operation.

Overt Act No. 743:  On or about July 4, 2025, defendant BROOKS punched Victim 10 in the face with a closed fist, at least five times.  Following the assault, defendant BROOKS stole Victim 10's car.

Overt Act No. 744:  On or about July 8, 2025, defendant BROOKS carjacked Victim 10 and kidnapped a second adult, through violence. While Victim 10 and the second adult were waiting in Victim 10's car with their minor children, defendant BROOKS entered the car from the

passenger-side door while Victim 10 was in the driver's seat. Defendant BROOKS strangled Victim 10 for approximately one minute while saying, "Bitch get out the car." Defendant BROOKS attempted to push Victim 10 out of the car while reversing the car. Victim 10 escaped the car and fled on foot, while defendant BROOKS drove away with the two minor children and the second adult in the backseat. After driving away from Victim 10, defendant BROOKS stopped, punched the second adult multiple times, and threw the second adult's phone out of the car. Following this second assault, defendant BROOKS allowed the second adult to remove the two children, and he fled in the car.

Overt Act No. 745: On July 25, 2025, in coded text messages, defendant LOCKETT instructed his unidentified sex trafficking victim to charge her phone, check in with him every hour, and delete all of their messages. He warned that he would be in the area that night so she needed to be on her "best behavior." Defendant LOCKETT instructed that her commercial sex "shift" ended at 6 a.m. Per defendant LOCKETT's instructions, the unidentified victim reported her date and when she secured a deposit.

Overt Act No. 746: On or about July 31, 2025, defendant BROOKS, defendant YOUNG, and at least two other unindicted co-conspirators assaulted a rival gang member, in furtherance of the Hoovers Enterprise. Defendant BROOKS kicked the victim at least one time and defendant YOUNG punched the victim at least one time.

Overt Act No. 747: On October 20, 2025, defendant MOUTON posted on Instagram a photograph of himself wearing a jacket emblazoned in orange with the numbers "52," referring to the "5 deuce" set of the Hoovers. In the photograph, defendant MOUTON is standing in front of

a banner with the letters "FDHGC" and a large orange star, referring to "Five Deuce Hoover Gangster Crips."

**6.    Enterprise Members Committed Promotional Money Laundering by Using the Commercial Sex Proceeds of Victims to Cover Business Expenses to Pimp or Sex Traffic Other Victims**

(a)    Defendant AMOAKO

Overt Act No. 748:  From approximately February 2020 to March 2021, defendant AMOAKO received approximately $2,634 in commercial sex proceeds from Victim 25 in 70 Cash App payments.

Overt Act No. 749:  From approximately November 2022 to June 2024, defendant AMOAKO received approximately $709.65 in commercial sex proceeds from Victim 2 in ten Cash App payments.

Overt Act No. 750:  From approximately April 2023 to January 2025, defendant AMOAKO received approximately $43,086 in commercial sex proceeds from Victim 5 in 176 Cash App payments.

Overt Act No. 751:  From approximately February 2024 to December 2024, defendant AMOAKO received approximately $27,164.42 in commercial sex proceeds from Victim 26 in 163 Cash App payments.

Overt Act No. 752:  While pimping and sex trafficking his victims, defendant AMOAKO commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his pimping of another victim.  For example, on February 8, 2024, defendant received a $100 Cash App payment constituting commercial sex proceeds from Victim 5.  The next day, on February 9, 2024, using the proceeds derived from Victim 5's sex work, defendant AMOAKO made a $10 Cash App payment to Victim 26 with a subject line specifying "condoms."

(b)  Defendant EVANS

Overt Act No. 753:  From approximately October 2021 to August 2022, defendant EVANS received approximately $7,464.32 constituting commercial sex proceeds from Victim 27 in 51 Cash App payments.

Overt Act No. 754:  Between March 2022 and December 2022, defendant EVANS received approximately $15,307.36 in commercial sex proceeds from Victim 4 in 164 Cash App payments.

Overt Act No. 755:  While pimping and sex trafficking his victims, defendant EVANS commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his pimping of another victim.  For example, between February 7, 2022, and March 13, 2022, defendant EVANS received $1,754 in Cash App payments constituting commercial sex proceeds from Victim 27.  On March 17, 2022, using the proceeds from Victim 27's sex work, defendant EVANS made a $300 Cash App payment to Victim 4 to cover her expenses as his sex worker.

(c)  Defendant BROOKS

Overt Act No. 756:  Between approximately October 7, 2024, and November 10, 2024, defendant BROOKS received approximately $1,099 in commercial sex proceeds from Victim 10 in five Cash App payments.

Overt Act No. 757:  Between approximately December 6, 2024, and December 21, 2024, defendant BROOKS received approximately $1,140 in commercial sex proceeds from Victim 28 in five Cash App payments.

Overt Act No. 758:  While pimping and sex trafficking his victims, defendant BROOKS commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his pimping of another victim.  For example, between October 7, 2024 and

November 10, 2024, defendant BROOKS received $1,099 in five Cash App payments constituting commercial sex proceeds from Victim 10.  On December 6, 2024, using the proceeds from Victim 10's sex work, defendant BROOKS made ten Cash App payments totaling $1,198 to Victim 28 to cover her expenses as his sex worker.

(d)  Defendant CROCKHAM

Overt Act No. 759:  Between approximately November 2024, and April 2025, defendant CROCKHAM received approximately $8,502.37 in commercial sex proceeds from Victim 29 in 97 Cash App payments.

Overt Act No. 760:  Between approximately November 2024 and April 2025, defendant CROCKHAM received approximately $3,933.74 in commercial sex proceeds from Victim 30 in 67 Cash App payments.

Overt Act No. 761:  While pimping and sex trafficking his victims, defendant CROCKHAM commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his pimping of another victim.  For example, between December 29, 2024, and December 30, 2024, defendant CROCKHAM received $116 in two Cash App payments constituting commercial sex proceeds from Victim 29.  On December 30, 2024, using the proceeds from Victim 29's sex work, defendant CROCKHAM made a Cash App payment of $12 to Victim 30 with a memo line "Uber to room" to cover her expenses as his sex worker.

(e)  Defendant ISREL

Overt Act No. 762:  Between approximately June 23, 2020, and May 11, 2023, defendant ISREL collected approximately $33,438.83 in commercial sex proceeds from Victim 1 in 170 Cash App payments.

Overt Act No. 763: Between approximately December 1, 2022, and February 17, 2025, defendant ISREL collected approximately $79,132.62 in commercial sex proceeds from Victim 3 in 302 Cash App payments.

Overt Act No. 764: While sex trafficking and pimping his victims, defendant ISREL commingled their commercial sex proceeds in his Cash App account and used proceeds from one victim to promote his trafficking and pimping of another victim. For example, between May 9, 2023, and May 11, 2023, defendant ISREL received $810 in four Cash App payments from Victim 3, which constituted commercial sex trafficking proceeds. On May 12, 2023, using the proceeds from Victim 3's sex work, defendant ISREL made a Cash App payment of $40 to Victim 1, with a subject line specifying "uber," to cover her expenses as his sex worker.

**7.    Defendant LOCKETT Commits Concealment Money Laundering to Conceal and Disguise the Nature of Sex Trafficking Proceeds**

Overt Act No. 765: On December 8, 2024, defendant LOCKETT opened a Cash App account with the display name "Cameron Lockett," his true name.

Overt Act No. 766: On January 2, 2025, defendant LOCKETT changed the display name on his Cash App account to "Hesogreedy."

Overt Act No. 767: On January 9, 2025, through coded text messages, defendant LOCKETT instructed Victim 41 to hold off on putting $5,000 into one of his accounts because she had recently put $5,000 into his bank account and another deposit would make the bank "suspicious" and would cause the "feds" to watch their activity. Defendant LOCKETT then instructed Victim 41 to try to get the $5,000 payment from her commercial sex buyer in cash, to avoid alerting the bank to their illegal activity.

171

Overt Act No. 768:  On January 18, 2025, at defendant LOCKETT's direction, Victim 41 sent $300 in sex trafficking proceeds to defendant LOCKETT's Cash App account.

Overt Act No. 769:  On January 18, 2025, defendant LOCKETT transferred $600 from his Cash App account to a debit card ending in -3199, held at Altura Credit Union.

172

**NOTICE OF SPECIAL SENTENCING FACTORS REGARDING COUNT ONE**

37.  As part of their agreement to conduct and participate in the conduct of the affairs of the Hoovers Enterprise through a pattern of racketeering activity, the defendants committed the following acts, all in violation of 18 U.S.C. § 1962(d):

38.  <u>Sex Trafficking of Children – 18 U.S.C. § 1591</u>

On or about the dates listed below, within the Central District of California, and elsewhere, the defendants listed below, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means the minor listed below, having had a reasonable opportunity to observe the minor and in knowing and in reckless disregard of the fact that the minor had not attained the age of 18 years, and knowing and in reckless disregard that the minor would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(2), (c).

| Dates | Defendant(s) | Minor |
|---|---|---|
| February 2023 – September 2023 | LOCKETT | Victim 31 |
| July 2023 | ROBINSON | Victim 7 |
| January 2024 | MELENDEZ | Victim 33 |
| April 2024 | ARMSTEAD | Victim 11 |
| June 2024 – July 2024 | YOUNG | Victim 12 |
| June 2024 – July 2024 | LENOX | Victim 39 |
| July 2024 | HARRIS | Victim 15 |
| July 2024 | YOUNG | Victim 14 |
| December 2024 – April 2025 | BROOKS | Victim 21 |
| December 2024 – February 2025 | HARRIS, LENOX | Victim 17 |

173

| February 2025 - March 2025 | YOUNG | Victim 20 |
| June 2025 - August 2025 | MOUTON | Victim 20 |
| June 2025 - August 2025 | MOUTON | Victim 45 |
| June 2025 - August 2025 | MOUTON | Victim 46 |

39.  Sex Trafficking by Force, Fraud, or Coercion – 18 U.S.C. § 1591

On or about the dates listed below, within the Central District of California, and elsewhere, the defendants listed below, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means the victim listed below, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, coercion, and any combination of such means would be used to cause the victim to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(1).

| Dates | Defendant(s) | Victim |
| --- | --- | --- |
| April 2022 – June 2023 | AMOAKO | Victim 2 |
| December 2022 – January 2025 | EVANS | Victim 4 |
| December 2022 – February 2025 | ISREL | Victim 3 |
| April 2023 - March 2024 | AMOAKO | Victim 5 |
| June 2023 – August 2023 | ROBINSON | Victim 6 |
| September 2023 – February 2024 | PHILLIPS | Victim 8 |
| September 2023 - February 2024 | PHILLIPS | Victim 9 |
| January 2024 | MELENDEZ | Victim 33 |
| January 2024 – April 2025 | ULLOA-FRANCO JR. | Victim 35 |
| February 2024 – July 2024 | MELENDEZ | Victim 36 |

174

| April 2024 - October 2025 | ULLOA-FRANCO JR. | Victim 38 |
|---|---|---|
| June 2024 – July 2024 | YOUNG | Victim 13 |
| August 2024 – February 2025 | YOUNG | Victim 22 |
| September 2024 – October 2024 | MILLER | Victim 40 |
| November 2024 - November 2025 | LOCKETT | Victim 41 |
| December 2024 – April 2025 | BROOKS | Victim 21 |
| December 2024 – February 2025 | HARRIS, LENOX | Victim 17 |
| January 2025 - March 2025 | HARRIS | Victim 18 |
| January 2025 – January 2026 | MILLER | Victim 47 |
| February 2025 | ROBINSON | Victim 17 |
| February 2025 - March 2025 | YOUNG | Victim 20 |
| June 2025 - August 2025 | MOUTON | Victim 20 |
| June 2025 - August 2025 | MOUTON | Victim 45 |
| July 2025 – September 2025 | MILLER | Victim 50 |

40.   Transportation of Minors – 18 U.S.C. § 2423

On or about the date listed below, within the Central District of California and elsewhere, the defendant listed below, knowingly transported the minor listed below, who had not attained the age of 18 years, in interstate and foreign commerce, with the intent that the minor engage in prostitution and any sexual activity for which any person could be charged with a criminal offense, in violation of Title 18, United States Code, Section 2423(a).

| Dates | Defendant(s) | Minor |
|---|---|---|
| February 2025 | HARRIS | Victim 17 |

COUNT TWO

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT AMOAKO]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around April 2022 and continuing through on or about June 17, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant AMOAKO, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 2, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 2 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

176

COUNT THREE

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT EVANS]

1.     The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.     Beginning in or around December 2022 and continuing through on or about January 5, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant EVANS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 4, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 4 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT FOUR

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT ISREL]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around December 1, 2022, and continuing through on or about February 17, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant ISREL, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 3, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 3 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT FIVE

[18 U.S.C. § 1591(a)(1), (b)(2), (c); 1594(a)]

[DEFENDANT LOCKETT]

1.   The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.   Beginning in or around February 25, 2023 and continuing to at least on or about September 11, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant LOCKETT, in and affecting interstate and foreign commerce, knowingly attempted to recruit, entice, harbor, transport, provide, obtain, and maintain by any means an individual who had not yet attained the age of 18 years, namely, Victim 31, a then-17-year-old girl, having had reasonable opportunity to observe Victim 31 and knowing and in reckless disregard that Victim 31 was under the age of 18 years old, and knowing and in reckless disregard that Victim 31 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT SIX

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT AMOAKO]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around April 2023 and continuing through on or about March 1, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant AMOAKO, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 5, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 5 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT SEVEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT LENOX]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning on or about June 12, 2024 and continuing through on or about July 10, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant LENOX, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 39, a then-17-year-old girl, having had reasonable opportunity to observe Victim 39 and knowing and in reckless disregard that Victim 39 was under the age of 18 years old, and knowing and in reckless disregard that Victim 39 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

181

COUNT EIGHT

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT ROBINSON]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around June 2023 and continuing through in or around August 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROBINSON, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 6, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 6 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

182

COUNT NINE

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT ROBINSON]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    In or around July 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROBINSON, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 7, a then-16-year-old girl, having had reasonable opportunity to observe Victim 7 and knowing and in reckless disregard that Victim 7 was under the age of 18 years old and knowing and in reckless disregard that Victim 7 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT TEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT PHILLIPS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around September 2023 and continuing through on or about February 28, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant PHILLIPS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 8, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 8 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT ELEVEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT PHILLIPS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around September 2023 and continuing through on or about February 28, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant PHILLIPS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 9, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 9 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT TWELVE

[18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), (c)]

[DEFENDANT MELENDEZ]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about January 5, 2024, and continuing until at least January 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant MELENDEZ, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 33, a then-14-year-old girl, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 33 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and having had a reasonable opportunity to observe Victim 33, knowing and in reckless disregard of the fact that Victim 33 had not attained the age of 18 years and knowing and in reckless disregard of the fact that Victim 33 would be caused to engage in a commercial sex act.

186

COUNT THIRTEEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT ULLOA-FRANCO JR.]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around January 2024, and continuing through on or about April 13, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant ULLOA-FRANCO JR., in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 35, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 35 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

187

COUNT FOURTEEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT MELENDEZ]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning on or about February 17, 2024, and continuing until at least July 5, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant MELENDEZ, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 36, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 36 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT FIFTEEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT ULLOA-FRANCO JR.]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around April 14, 2024, and continuing through on or about October 13, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant ULLOA-FRANCO JR., in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 38, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 38 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT SIXTEEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT ARMSTEAD]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    In or around April 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARMSTEAD, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 11, a then-14-year-old girl, having had reasonable opportunity to observe Victim 11 and knowing and in reckless disregard that Victim 11 was under the age of 18 years old and knowing and in reckless disregard that Victim 11 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT SEVENTEEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT YOUNG]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around June 2024 and continuing through July 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 13, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 13 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT EIGHTEEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT YOUNG]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around June 2024 and continuing through July 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 12, a then-17-year-old girl, having had reasonable opportunity to observe Victim 12 and knowing and in reckless disregard that Victim 12 was under the age of 18 years old and knowing and in reckless disregard that Victim 12 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

192

COUNT NINETEEN

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT HARRIS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    In or around July 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant HARRIS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 15, a then-17-year-old girl, having had reasonable opportunity to observe Victim 15 and knowing and in reckless disregard that Victim 15 was under the age of 18 years old and knowing and in reckless disregard that Victim 15 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT TWENTY

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT YOUNG]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    In or around July 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 14, a then-15-year-old girl, having had reasonable opportunity to observe Victim 14 and knowing and in reckless disregard that Victim 14 was under the age of 18 years old and knowing and in reckless disregard that Victim 14 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

194

COUNT TWENTY-ONE

[18 U.S.C. § 2251(a), (e)]

[DEFENDANT YOUNG]

1. The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2. On or about July 9, 2024, in Los Angeles County, within the Central District of California, defendant YOUNG, knowingly employed, used, persuaded, induced, enticed, and coerced Victim 14, a then-15-year-old girl, to engage in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(A), for the purpose of producing a visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, and which visual depiction was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer and smartphone, and which visual depiction was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

COUNT TWENTY-TWO

[18 U.S.C. § 2251(a), (e)]

[DEFENDANT YOUNG]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about July 18, 2024, in Los Angeles County, within the Central District of California, defendant YOUNG, knowingly employed, used, persuaded, induced, enticed, and coerced Victim 14, a then-15-year-old girl, to engage in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(A), for the purpose of producing a visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, and which visual depiction was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer and smartphone, and which visual depiction was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

196

COUNT TWENTY-THREE

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT YOUNG]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around August 2024 and continuing through in or around February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 22, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 22 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT TWENTY-FOUR

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT MILLER]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around September 7, 2024, and continuing through on or about October 27, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant MILLER, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 40, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 40 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT TWENTY-FIVE

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT LOCKETT]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around November 2024, and continuing through on or about November 19, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant LOCKETT, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 41, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 41 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT TWENTY-SIX

[18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), (c)]

[DEFENDANT BROOKS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around December 2024 and continuing through in or around April 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant BROOKS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 21, a then-17-year-old girl, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 21 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and having had a reasonable opportunity to observe Victim 21, knowing and in reckless disregard of the fact that Victim 21 had not attained the age of 18 years and knowing and in reckless disregard of the fact that Victim 21 would be caused to engage in a commercial sex act.

COUNT TWENTY-SEVEN

[18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), (c); 18 U.S.C. § 2(a)]

[DEFENDANTS HARRIS AND LENOX]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around December 2024 and continuing through in or around February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendants HARRIS and LENOX, each aiding and abetting the other, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 17, a then-16 and later 17-year-old girl, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 17 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and having had a reasonable opportunity to observe Victim 17, knowing and in reckless disregard of the fact that Victim 17 had not attained the age of 18 years and knowing and in reckless disregard of the fact that Victim 17 would be caused to engage in a commercial sex act.

COUNT TWENTY-EIGHT

[18 U.S.C. § 2251(a), (e)]

[DEFENDANT HARRIS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about January 29, 2025, in Los Angeles County, within the Central District of California, defendant HARRIS knowingly employed, used, persuaded, induced, enticed, and coerced Victim 17, a then-16-year-old girl, to engage in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(A), for the purpose of producing a visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, and which visual depiction was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer and smartphone, and which visual depiction was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

202

COUNT TWENTY-NINE

[18 U.S.C. § 2423(a)]

[DEFENDANT HARRIS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    In and around February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant HARRIS knowingly transported Victim 17, who had not attained the age of 18 years, in interstate and foreign commerce, with the intent that Victim 17 engage in prostitution and sexual activity for which any person can be charged with a criminal offense, namely, Child Sex Trafficking, in violation of Arizona Revised Statutes Section 13-3212, and Human Trafficking for Sexual Servitude, in violation of Colorado Revised Statutes Section 18-3-504.

COUNT THIRTY

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT ROBINSON]

1.   The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.   In or around February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROBINSON, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 17, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 17 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT THIRTY-ONE

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT HARRIS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around January 2025 and continuing through in or around March 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant HARRIS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 18, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 18 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT THIRTY-TWO

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT MILLER]

1.   The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.   Beginning on or about January 26, 2025, and continuing through on or about January 31, 2026, in Los Angeles County, within the Central District of California, and elsewhere, defendant MILLER, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 47, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 47 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT THIRTY-THREE

[18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), (c)]

[DEFENDANT YOUNG]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around February 2025 and continuing until at least March 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant YOUNG, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 20, a then-16-year-old girl, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 20 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and having had a reasonable opportunity to observe Victim 20, knowing and in reckless disregard of the fact that Victim 20 had not attained the age of 18 years and knowing and in reckless disregard of the fact that Victim 20 would be caused to engage in a commercial sex act.

COUNT THIRTY-FOUR

[18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), (c)]

[DEFENDANT MOUTON]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around June 2025 and continuing through in or around August 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant MOUTON, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 45, a then-14-year-old girl, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 45 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and having had a reasonable opportunity to observe Victim 45, knowing and in reckless disregard of the fact that Victim 45 had not attained the age of 18 years and knowing and in reckless disregard of the fact that Victim 45 would be caused to engage in a commercial sex act.

COUNT THIRTY-FIVE

[18 U.S.C. § 1591(a)(1), (b)(2), (c)]

[DEFENDANT MOUTON]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning in or around June 2025 and continuing through in or around August 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant MOUTON, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 46, a then-17-year-old girl, having had reasonable opportunity to observe Victim 46 and knowing and in reckless disregard that Victim 46 was under the age of 18 years old, and knowing and in reckless disregard that Victim 46 would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT THIRTY-SIX

[18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), (c)]

[DEFENDANT MOUTON]

1. The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2. Beginning in or around June 2025 and continuing through in or around August 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant MOUTON, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means an individual who had not yet attained the age of 18 years, namely, Victim 20, a then-16-year-old girl, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 20 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3), and having had a reasonable opportunity to observe Victim 20, knowing and in reckless disregard of the fact that Victim 20 had not attained the age of 18 years and knowing and in reckless disregard of the fact that Victim 20 would be caused to engage in a commercial sex act.

210

COUNT THIRTY-SEVEN

[18 U.S.C. § 1591(a)(1), (b)(1)]

[DEFENDANT MILLER]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    Beginning on or about July 7, 2025, and continuing to in or around September 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant MILLER, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 50, knowing and recklessly disregarding that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 50 to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

COUNT THIRTY-EIGHT

[18 U.S.C. § 1591(a)(2), (b); 18 U.S.C. § 2(a)]

[DEFENDANT AHIR]

1.    The Grand Jury realleges paragraphs 6, 23, and 34(h) and Overt Acts 281, 284, 289, 292, 295, 303, 304, 305, 306, 311, 312, 313, 314, 315, 316, 346, 378, 379, 380, 413, 505, 538, 554, 572, 574, 575, 576, 583, 612, 625, 641, 642, 650, 656, 721, and 732 of Count One of this Indictment here.

2.    Beginning no later than in or around December 2023, and continuing to on or about August 13, 2025, in Los Angeles County, within the Central District of California, defendant MUKESHKUMAR RAMBHAI AHIR, also known as "Ockie" and "Ocky," and others known and unknown to the Grand Jury, each aiding and abetting the others, in and affecting interstate and foreign commerce, knowingly benefited financially and received anything of value from participation in a venture that recruited, enticed, harbored, transported, provided, obtained, and maintained by any means a person, knowing and in reckless disregard of the fact that the person had not attained the age of 18 years, and knowing and in reckless disregard of the fact that the person would be caused to engage in a commercial sex act, as defined in Title 18, United States Code, Section 1591(e)(3).

212

COUNT THIRTY-NINE

[18 U.S.C. § 1952(a)(3)(A); 18 U.S.C. § 2(b)]

[DEFENDANT AHIR]

Beginning no later than in or around December 2023, and continuing to on or about August 13, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant MUKESHKUMAR RAMBHAI AHIR, also known as "Ockie" and "Ocky," knowingly used, and willfully caused to be used, a facility in interstate and foreign commerce, namely, the Stadium Inn and Spas located at 10411 S. Vermont Avenue, Los Angeles, California 90044, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, a business enterprise involving prostitution offenses in violation of California Penal Code Sections 647(b) and 653.23, and thereafter performed, and willfully caused the performance of, an act to distribute the proceeds of such unlawful activity and an act to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of such unlawful activity.

COUNT FORTY

[21 U.S.C. § 846]

[DEFENDANTS ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, MILLER, MELENDEZ, AND ROBINSON]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

2.    Beginning on an unknown date and continuing through in or around April 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, MILLER, MELENDEZ, and ROBINSON, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally (i) possess with intent to distribute, and (ii) distribute, the following controlled substances:

a.    Oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C);

b.    Promethazine with Codeine, a Schedule V controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(3); and

c.    Marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(D).

B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

3.    The objects of the conspiracy were to be accomplished, in substance, as follows:

214

a.    Defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, MILLER, MELENDEZ, and ROBINSON, and others known and unknown to the Grand Jury, would supply each other with narcotics to be distributed to Enterprise members' sex trafficking victims to recruit them, gain or maintain their victims' compliance, and breed addiction that engendered dependency on their trafficker, thereby aiding the continuous sex trafficking of victims.

b.    Defendants ARMSTEAD, EVANS, and AMOAKO, and others known and unknown to the Grand Jury, would store their supplies of drugs at hotels, including the Stadium Inn, in rooms where they sex trafficked their victims.

c.    Defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, and MILLER, and others known and unknown to the Grand Jury, would supply and offer to supply each other with narcotics to be distributed to third party customers.

d.    Defendant HARRIS would solicit co-conspirators, including defendant EVANS, to post advertisements for narcotics on Instagram, on behalf of defendant HARRIS, and in exchange, defendant HARRIS would sell narcotics to defendant EVANS and other co-conspirators at a discounted price.

e.    Defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, and MILLER, and others known and unknown to the Grand Jury, would inform each other when they sold or acquired narcotics.

f.    Defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, and BROOKS, and others known and unknown to the Grand Jury, would use violence and intimidation to control narcotics trafficking in the Enterprise's territory.

g.    Defendants ARMSTEAD and EVANS, and others known and unknown to the Grand Jury, would obtain, possess, store, share, and use firearms and ammunition to maintain and strengthen the Hoovers Enterprise's control over the narcotics trafficking occurring within its territory, including in strategically beneficial locations, such as Hoovers strongholds like the Stadium Inn where members would need firearms protect themselves and their product while engaged in drug trafficking.

C.    OVERT ACTS

4.    On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants ARMSTEAD, EVANS, AMOAKO, HARRIS, YOUNG, BROOKS, MILLER, MELENDEZ, and ROBINSON, and others known and unknown to the Grand Jury, committed the following overt acts, among others, within the Central District of California and elsewhere:

5.    The Grand Jury realleges Overt Acts 4, 9, 78, 103, 181, 186, 191, 200, 201, 209, 210, 216, 225, 228, 237, 238, 247, 248, 249, 250, 252, 253, 255, 256, 261, 262, 264, 265, 269, 271, 272, 277, 278, 279, 289, 300, 305, 394, 396, 437, 439, 447, 448, 466, 474, 477, 485, 508, 517, 528, 544, 553, 602, 613, 627, 680, 698, 715, 721, 727, 731, 732, 736, and 741 of Count One of this Indictment here.

COUNT FORTY-ONE

[18 U.S.C. § 932(b)(1), (b)(2)]

[DEFENDANT ISREL]

1. The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

A. INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

2. Defendant ISREL was a resident of both Los Angeles, California, within the Central District of California, and Las Vegas, Nevada.

3. Co-Conspirator 1 was a resident of Los Angeles, California, within the Central District of California, and Las Vegas, Nevada.

4. Defendant ISREL previously had been convicted of at least one crime punishable by imprisonment for a term exceeding one year, namely:

a. Carrying a Concealed Firearm, in violation of California Penal Code Section 25400(a)(2), in the Superior Court of the State of California, County of Los Angeles, Case Number TA133991, on or about November 4, 2014; and

b. Felon in Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), in the Superior Court of the State of California, County of Los Angeles, Case Number BA487254, on or about October 13, 2021.

B. OBJECT OF THE CONSPIRACY

5. Beginning on or about November 24, 2023 and continuing until on or about February 27, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant ISREL conspired with Co-Conspirator 1 for Co-Conspirator 1 to knowingly

217

purchase two firearms, namely, a Micro Draco pistol, serial number 23PMD-47926 (the "Draco Pistol") and a Five-Seven pistol, serial number 386445475 (the "FN Pistol"), each in and affecting interstate and foreign commerce, for, on behalf of, and at the request and demand of defendant ISREL, knowing and having reasonable cause to believe that defendant ISREL previously had been convicted of at least one crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 932(b)(1).

C.    MANNER AND MEANS OF THE CONSPIRACY

6.    The object of the conspiracy was to be accomplished, in substance, as follows:

a.    Defendant ISREL would identify to Co-Conspirator 1 the firearms that he wanted Co-Conspirator 1 to purchase on his behalf.

b.    Co-Conspirator 1 would purchase firearms for, on behalf of, and at the request and demand of defendant ISREL from a Federal Firearm Licensee ("FFL") located in Las Vegas, Nevada.

c.    Co-Conspirator 1 would represent to the FFL that she was the actual buyer of the firearms when in reality Co-Conspirator 1 was purchasing the firearms for, on behalf of, and at the request and demand of defendant ISREL, knowing and having reason to believe that defendant ISREL previously had been convicted of at least one crime punishable by imprisonment for a term exceeding one year.

d.    Defendant ISREL or Co-Conspirator 1 would transport the firearms to Los Angeles, where they both lived part time.

e.    Defendant ISREL would possess these firearms in Los Angeles and would use one of them in a music video he filmed in Los Angeles.

D.    OVERT ACTS

7.    On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant ISREL, Co-Conspirator 1, and others known and unknown to the Grand Jury, committed the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:    On November 24, 2023, in or around Los Angeles, California, using direct messages on Instagram, defendant ISREL sent Co-Conspirator 1 a photograph depicting a Century Arms Mini Draco Pistol along with coded messages indicating that he wanted this gun and that it cost $1,100.

Overt Act No. 2:    On November 24, 2023, using direct messages on Instagram, Co-Conspirator 1 replied that she did not really "know guns" but that defendant ISREL should get the gun if it was a good price and he wanted it.

Overt Act No. 3:    On February 13, 2024, Co-Conspirator 1 purchased the Draco Pistol and the FN Pistol from an FFL in Henderson, Nevada.

Overt Act No. 4:    After Co-Conspirator 1 purchased the Draco Pistol and FN Pistol on February 13, 2024, defendant ISREL paid Co-Conspirator 1 $1,100 in three Cash App payments between February 17, 2024 and February 27, 2024, which was the purchase price defendant ISREL quoted for the Draco Pistol in his Instagram messages to Co-Conspirator 1.

Overt Act No. 5:    Between February 14, 2024, and May 14, 2024, defendant ISREL filmed a music video in Los Angeles in which defendant ISREL possessed and brandished the Draco Pistol.

219

Overt Act No. 6:    Between February 14, 2024 and May 14, 2024, Co-Conspirator 1 filmed a video of herself holding the FN Pistol in her lap.

Overt Act No. 7:    On May 19, 2024, in Las Vegas, Nevada, defendant ISREL, a convicted felon, possessed the FN Pistol in a car.

COUNT FORTY-TWO

[18 U.S.C. § 1951(a); 18 U.S.C. § 2(a)]

[DEFENDANT GRAY]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about March 22, 2024, in Los Angeles County, within the Central District of California, defendant GRAY, and others known and unknown to the Grand Jury, each aiding and abetting the others, obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce by knowingly committing robbery, in that defendant GRAY, and others known and unknown to the Grand Jury, unlawfully took and obtained property, which had traveled in interstate and foreign commerce and belonged to LensCrafters, a commercial business located at 8471 Beverly Boulevard, Suite 105, Los Angeles, California 90048, from the LensCrafters store and in the presence of employees of LensCrafters, against the employees' will, by means of actual and threatened force, violence, and fear of injury, immediate and future, to the employees.

221

COUNT FORTY-THREE

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT EVANS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about March 17, 2022, defendant EVANS knowingly conducted a financial transaction, that is, a $300 Cash App payment to Victim 4, knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, pimping Victim 27, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h, with the intent to promote the carrying on of additional specified unlawful activity, namely, defendant EVANS's sex trafficking of Victim 4 by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a)(1), (b)(1), and pimping of Victim 4, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h.

COUNT FORTY-FOUR

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT ISREL]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about May 12, 2023, defendant ISREL knowingly conducted a financial transaction, that is, a Cash App payment of $40 to Victim 1 with a subject line specifying "uber," knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, the sex trafficking of Victim 3 through force, threats of force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a)(1), (b)(1), and the pimping of Victim 3, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h, with the intent to promote the carrying on of additional specified unlawful activity, namely, the sex trafficking of Victim 1 through force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a)(1), (b)(1), and the pimping of Victim 1, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h.

COUNT FORTY-FIVE

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT AMOAKO]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about February 9, 2024, defendant AMOAKO knowingly conducted a financial transaction, that is, a $10 Cash App payment to Victim 26 with a subject line specifying "condoms," knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, the sex trafficking of Victim 5 by force, threats of force, fraud, or coercion, in violation of Title 18, United States Code, Section 1591(a)(1), and the pimping of Victim 5 in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h, with the intent to promote the carrying on of additional specified unlawful activity, namely, defendant AMOAKO's pimping of Victim 26, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h.

224

COUNT FORTY-SIX

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT BROOKS]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about December 6, 2024, defendant BROOKS knowingly conducted a financial transaction, that is, a $330 Cash App payment to Victim 28 with a subject line specifying "room," knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, the pimping of Victim 10, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h, with the intent to promote the carrying on of additional specified unlawful activity, namely, the pimping of Victim 28, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h.

COUNT FORTY-SEVEN

[18 U.S.C. § 1956(a)(1)(A)(i)]

[DEFENDANT CROCKHAM]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about December 30, 2024, defendant CROCKHAM knowingly conducted a financial transaction, that is, a Cash App payment of $12 to Victim 30 with a memo line "Uber to room," knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, the pimping of Victim 29, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h, with the intent to promote the carrying on of additional specified unlawful activity, namely, the pimping of Victim 30, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h.

COUNT FORTY-EIGHT

[18 U.S.C. § 1956(a)(1)(B)(i)]

[DEFENDANT LOCKETT]

1.    The Grand Jury realleges paragraphs 1 through 34 of Count One of this Indictment here.

2.    On or about January 18, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant LOCKETT knowingly conducted a financial transaction, that is, a transfer of $600 from defendant LOCKETT's Cash App account, under the Display Name "Hesogreedy," to a debit card in defendant LOCKETT's name, ending in digits –3199, held at Altura Credit Union, knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, the sex trafficking of Victim 41 by force, threats of force, fraud, or coercion, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(1), and the pimping of Victim 41, in violation of 18 U.S.C. § 1952(a)(3), (b)(1) (Travel Act) and California Penal Code § 266h, and knowing that the financial transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of such proceeds.

COUNTS FORTY-NINE THROUGH SIXTY

[18 U.S.C. § 1956(a)(1)(B)(ii)]

[DEFENDANT AHIR]

On or about the dates set forth below, in Los Angeles County, within the Central District of California, defendant MUKESHKUMAR RAMBHAI AHIR, also known as "Ockie" and "Ocky," knowingly conducted financial transactions, that is, the deposit of funds into a JPMorgan Chase account ending in digits -5056, in the amounts set forth below, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, that is, the Sex Trafficking of Children by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), Prostitution, in violation of California Penal Code § 647(b), and Supervising or Aiding Prostitution, in violation of California Penal Code § 653.23, and knowing that the transactions were designed in whole and in part to avoid a transaction reporting requirement under Federal law:

| COUNT | DATE | AMOUNT |
| --- | --- | --- |
| FORTY-NINE | 9/3/2024 | $4,000.00 |
| FIFTY | 9/3/2024 | $4,000.00 |
| FIFTY-ONE | 9/5/2024 | $3,200.00 |
| FIFTY-TWO | 7/7/2025 | $9,520.00 |
| FIFTY-THREE | 7/10/2025 | $9,860.00 |
| FIFTY-FOUR | 10/7/2025 | $8,678.00 |
| FIFTY-FIVE | 10/8/2025 | $3,000.00 |
| FIFTY-SIX | 12/2/2025 | $6,000.00 |
| FIFTY-SEVEN | 12/3/2025 | $4,000.00 |

228

| COUNT | DATE | AMOUNT |
|---|---|---|
| FIFTY-EIGHT | 12/29/2025 | $5,323.00 |
| FIFTY-NINE | 1/2/2026 | $5,000.00 |
| SIXTY | 1/2/2026 | $2,000.00 |

COUNTS SIXTY-ONE THROUGH SIXTY-FIVE

[31 U.S.C. § 5324(a)(3); 18 U.S.C. § 2(b)]

[DEFENDANT AHIR]

On or about the dates set forth below, in Los Angeles County, within the Central District of California, defendant MUKESHKUMAR RAMBHAI AHIR, also known as "Ockie" and "Ocky," knowingly and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder, structured, assisted in structuring, and willfully caused the structuring of transactions with a domestic financial institution, that is, the following deposits of funds into a JPMorgan Chase account ending in digits -5056:

| COUNT | DATE | AMOUNT |
|-------|------|--------|
| SIXTY-ONE | 9/3/2024, 9/5/2024 | Cash deposits of $4,000.00, $4,000.00, and $3,200.00 |
| SIXTY-TWO | 7/7/2024, 7/10/2024 | Cash deposits of $9,520.00 and $9,860.00 |
| SIXTY-THREE | 10/7/2024, 10/8/2024 | Cash deposits of $8,678.00 and $3,000.00 |
| SIXTY-FOUR | 12/2/2025, 12/3/2025 | Cash deposits of $6,000.00 and $4,000.00 |
| SIXTY-FIVE | 12/29/2025, 1/2/2026 | Cash deposits of $5,323.00, $5,000.00, and $2,000.00 |

230

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1963, in the event of any defendant's conviction of the offense set forth in Count One of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)  Any interest the convicted defendant has acquired or maintained as a result of such offense;

(b)  Any interest in, security of, claim against, or property or contractual right of any kind affording a source or influence over, any enterprise which the convicted defendant has established, operated, controlled, conducted, or participated in the conduct of, as a result of such offense;

(c)  Any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity as a result of any such offense; and

(d)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.    Pursuant to Title 18, United States Code, Section 1963(m), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof

231

(a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 1594(d)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1594(d), in the event of any defendant's conviction of any of the offenses set forth in any of Counts Two through Twenty, Twenty-Three through Twenty-Seven, and Thirty through Thirty Eight of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)  Any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of such violation, and any property traceable to such property;

(b)  Any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property; and

(c)  In the event such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 2253]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 2253, in the event of any defendant's conviction of any of the offenses set forth in any of Counts Twenty-One, Twenty-Two, or Twenty-Eight of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following property:

(a)  All right, title, and interest in any visual depiction involved in any such offense, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received and involved in any such offense;

(b)  All right, title, and interest in any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense;

(c)  All right, title, and interest in any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property; and

(d)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 2253(b), any

234

defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 2428]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 2428, in the event of any defendant's conviction of the offense set forth in Count Twenty-Nine of this First Superseding Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following property:

(a)    All right, title, and interest in any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such offense;

(b)    All right, title, and interest in any property, real or personal, constituting or derived from any proceeds obtained directly or indirectly from such offense; and

(c)    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 2428(b)(2), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

236

court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FIVE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in either of Counts Thirty-Nine or Forty-Two of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any of the offenses; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

238

FORFEITURE ALLEGATION SIX

[21 U.S.C. § 853]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853, in the event of any defendant's conviction of the offense set forth in Count Forty of this First Superseding Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from such offense;

(b) All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offense; and

(c) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3. Pursuant to Title 21, United States Code, Section 853(p), any defendant so convicted shall forfeit substitute property if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION SEVEN

[18 U.S.C. §§ 934 and 924]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 934(a)(1) and 924(d), in the event of any defendant's conviction of the offense set forth in Count Forty-One of this First Superseding Indictment.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title, and interest in any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation;

(b) All right, title, and interest in any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation;

(c) All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

(d) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been

240

transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION EIGHT

[18 U.S.C. § 982]

1.  Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction of any of the offenses set forth in any of Counts Forty-Three through Sixty of this First Superseding Indictment.

2.  Any defendant so convicted shall forfeit to the United States of America the following:

(a)  Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.  Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an

242

intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

FORFEITURE ALLEGATION NINE

[31 U.S.C. § 5317]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 31, United States Code, Section 5317, in the event of any defendant's conviction of any of the offenses set forth in any of Counts Sixty-One through Sixty-Five of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All property, real or personal, involved in the offense and any property traceable thereto; and

(b)  To the extent that such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section 5317(c)(1)(B), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

//

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
Foreperson

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

*Jennifer Waier*

JENNIFER L. WAIER
Chief Assistant United States
Attorney & Chief, Criminal
Division

KEVIN J. BUTLER
Assistant United States Attorney
Chief, Major Crimes Section

CHELSEA NORELL
Assistant United States Attorney
Deputy Chief, Major Crimes
Section

MIRELLE RAZA
Assistant United States Attorney
Major Crimes Section

RAHUL HARI
Assistant United States Attorney
Major Crimes Section

245